# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS; SOCIETY OF THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF LAKE CHARLES; SOCIETY OF THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF LAFAYETTE; CATHOLIC UNIVERSITY OF AMERICA,

*Plaintiffs-Appellants,*

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Louisiana (Lake Charles)
No. 2:24-cv-691, Hon. David C. Joseph

## BRIEF FOR APPELLANTS

JAMES R. CONDE
WALKER FORTENBERRY*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
   Suite 900
Washington, DC 20006
(202) 955-0620


*Application for admission to
the U.S. Court of Appeals for
the Fifth Circuit pending

DANIEL H. BLOMBERG
LAURA WOLK SLAVIS
ANDREA R. BUTLER
JORDAN T. VARBERG
BENJAMIN A. FLESHMAN
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
   Suite 400
Washington, DC 20006
(202) 955-0095

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff-Appellant | Counsel for Plaintiff-Appellants |
|---|---|
| • United States Conference of Catholic Bishops<br>• The Society of the Roman Catholic Church of the Diocese of Lake Charles<br>• The Society of the Roman Catholic Church of the Diocese of Lafayette<br>• The Catholic University of America | *The Becket Fund for Religious Liberty:*<br><br>• Daniel H. Blomberg<br>• Laura Wolk Slavis<br>• Andrea R. Butler<br>• Jordan T. Varberg<br>• Benjamin A. Fleshman<br>• Michael J. O'Brien<br><br>*Boyden Gray PLLC:*<br><br>• James R. Conde<br>• Walker Fortenberry |

| Defendants-Appellees | Counsel for Defendants-Appellees |
|---|---|
| • Equal Employment Opportunity Commission<br>• Andrea R. Lucas, Chair of the Equal Employment Opportunity Commission, in her official capacity | *United States Department of Justice:*<br><br>• Urja Mittal<br>• Jacob S. Siler<br>• Jack Starcher<br>• Diane Kelleher<br>• Yaakov M. Roth |

/s/ *Daniel H. Blomberg*
Daniel H. Blomberg
*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe that oral argument is appropriate in this case, which addresses whether mandating abortion accommodations under the Pregnant Workers Fairness Act and its implementing regulations violates the Act itself as well as the Administrative Procedure Act, the First Amendment to the U.S. Constitution, and the Religious Freedom Restoration Act. This case's resolution will significantly impact the Appellants' fundamental rights as religious organizations under federal constitutional and statutory law.

**TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF AUTHORITIES.................................................................v

INTRODUCTION.............................................................................1

JURISDICTIONAL STATEMENT.......................................................3

STATEMENT OF ISSUES PRESENTED...............................................4

BACKGROUND ..............................................................................4

    A. The PWFA expands protections for pregnant workers. .................4

    B. The PWFA does not cover abortion..........................................5

    C. EEOC issues rule mandating abortion accommodations. ..............6

    D. The Bishops' religious beliefs.................................................8

    E. EEOC's actions burden the Bishops' religious beliefs. .................10

    F. Proceedings below. ...............................................................12

SUMMARY OF THE ARGUMENT ......................................................16

STANDARD OF REVIEW..................................................................17

ARGUMENT ..................................................................................18

I. The PWFA statute does not require employers to accommodate
any abortions, nor authorize EEOC to do so....................................18

    A. Traditional tools of statutory construction foreclose reading
abortion into the PWFA's text. ...................................................19

    B. The abortion-accommodation mandate violates the major
questions doctrine. ....................................................................23

        1. The mandate is politically significant.....................................24

        2. The mandate implicates constitutional structure. ..................26

    C. The district court erred.............................................................27

II. The Bishops are entitled to permanent relief under the PWFA, the First Amendment, and RFRA. ................................. 31

    A. The Court has jurisdiction to grant the Bishops permanent relief ............................................................ 31

    B. The Bishops are entitled to an injunction and vacatur under the PWFA's religious exemption. ........................................ 36

        1. The PWFA and Title VII have broad religious exemptions. .............................................................. 36

        2. The Final Rule violates the text of the PWFA and Title VII. ............................................................... 39

        3. The Final Rule violates the constitutional avoidance canon. ............................................................ 40

    C. The Bishops are entitled to an injunction under the church autonomy doctrine. ............................................................ 41

        1. The church autonomy doctrine protects internal church governance. ....................................................... 42

        2. The mandate violates the church autonomy doctrine. ............. 42

    D. The Bishops are entitled to an injunction under RFRA. .............. 50

    E. The Bishops are entitled to an injunction under the Free Exercise Clause. ........................................................... 55

    F. The Bishops are entitled to an injunction under the right to freedom of expressive association. ......................................... 56

CONCLUSION ................................................................... 58

CERTIFICATE OF SERVICE ................................................ 59

CERTIFICATE OF COMPLIANCE ......................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airlines for Am. v. DOT,*
110 F.4th 672 (5th Cir. 2024) ...................................................... 18, 29

*Ali v. Stephens,*
822 F.3d 776 (5th Cir. 2016) ............................................................ 54

*All. for Fair Bd. Recruitment v. SEC,*
125 F.4th 159 (5th Cir. 2024) .................................................. *passim*

*Bear Creek Bible Church v. EEOC,*
571 F. Supp. 3d 571 (N.D. Tex. 2021) .................................. 38, 53, 56

*Biden v. Nebraska,*
600 U.S. 477 (2023) .................................................................... 26-27

*Billard v. Charlotte Catholic High Sch.,*
101 F.4th 316 (4th Cir. 2024) ......................................................... 39

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ......................................................................... 53

*Boy Scouts of Am. v. Dale,*
530 U.S. 640 (2000) .................................................................. 56, 57

*BP v. Mayor & City Council,*
593 U.S. 230 (2021) ......................................................................... 27

*Bradford v. Sovereign Pest Control,*
167 F.4th 809 (5th Cir. 2026) ........................................................ 19

*Braidwood Mgmt. v. EEOC,*
70 F.4th 914 (5th Cir. 2023) ............................................. 44, 51, 53, 55

*Bryce v. Episcopal Church,*
289 F.3d 648 (10th Cir. 2002) ...................................... 43, 44, 45, 46

*BST Holdings v. OSHA,*
17 F.4th 604 (5th Cir. 2021) ........................................ 25

*Burwell v. Hobby Lobby,*
573 U.S. 682 (2014) ............................................. 50, 54

*Career Colls. & Schs. v. DOE,*
98 F.4th 220 (5th Cir. 2024) ...................................... 17

*Carroll Coll. v. NLRB,*
558 F.3d 568 (D.C. Cir. 2009) ..................................... 46

*Catholic Benefits Ass'n v. Burrows,*
732 F.Supp.3d 1014 (D.N.D. 2024) ................................. 54

*Catholic Benefits Ass'n v. Lucas,*
No. 24-cv-142, 2025 WL 1144768
(D.N.D. Apr. 15, 2025) ............................................ 35

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) ...................................... 44

*Clarke v. CFTC,*
74 F.4th 627 (5th Cir. 2023) ...................................... 34

*Cochran v. SEC,*
20 F.4th 194 (5th Cir. 2021) ...................................... 19

*Cooper/T. Smith Stevedoring v. Liuzza,*
293 F.3d 741 (5th Cir. 2002) ...................................... 40

*Corp. of Presiding Bishop v. Amos,*
483 U.S. 327 (1987) ............................................ 44, 50

*Curay-Cramer v. Ursuline Acad.,*
450 F.3d 130 (3d Cir. 2006) ..................................... 38, 41

*Demkovich v. St. Andrew the Apostle Parish,*
3 F.4th 968 (7th Cir. 2021) ...................................... 46-47

*Digit. Realty Tr. v. Somers,*
583 U.S. 149 (2018) .............................................. 36

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022)......................................21, 25

*Doe v. Bolton*,
  410 U.S. 179 (1973)............................................25

*Dr. James Dobson Fam. Inst. v. Kennedy*,
  No. 4:24-cv-986, 2025 WL 4693641
  (N.D. Tex. Aug. 8, 2025)....................................54

*Duquesne Univ. of the Holy Spirit v. NLRB*,
  947 F.3d 824 (D.C. Cir. 2020) ...............46, 47, 50

*EEOC v. Catholic Univ. of Am.*,
  83 F.3d 455 (D.C. Cir. 1996) ................................48

*EEOC v. Houston Funding II*,
  717 F.3d 425 (5th Cir. 2013)...........................20, 21

*EEOC v. Kerrville Bus Co.*,
  925 F.2d 129 (5th Cir. 1991)................................33

*EEOC v. Miss. Coll.*,
  626 F.2d 477 (5th Cir. 1980)...........................37, 38

*Emp. Div. v. Smith*,
  494 U.S. 872 (1990)...........................................56

*FCA v. SJUSD*,
  82 F.4th 664 (9th Cir. 2023) ...............................55

*First Choice Women's Resource Ctrs. v. Davenport*,
  No. 24-781, 2026 WL 1153029 (U.S. Apr. 29, 2026)......................3, 56

*Fischer v. United States*,
  603 U.S. 480 (2024)...........................................22

*Fitzgerald v. Roncalli High Sch.*,
  73 F.4th 529 (7th Cir. 2023) ...............................38

*In re Fort Worth Chamber of Com.*,
  100 F.4th 528 (5th Cir. 2024) ..........................33, 34

*Franciscan All. v. Becerra,*
47 F.4th 368 (5th Cir. 2022) ...................................................... 51

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ....................................................... 53, 55, 56

*Garcia-Carias v. Holder,*
697 F.3d 257 (5th Cir. 2012) ...................................................... 19

*Hall v. Baptist Mem'l Health Care,*
215 F.3d 618 (6th Cir. 2000) ...................................................... 41

*Hosanna-Tabor v. EEOC,*
565 U.S. 171 (2012) ............................................................. 49, 57

*Inhance Techs. v. EPA,*
96 F.4th 888 (5th Cir. 2024) ...................................................... 40

*Learning Res. v. Trump,*
146 S. Ct. 628 (2026) ............................................................. 24

*Little Sisters of the Poor v. Pennsylvania,*
591 U.S. 657 (2020) .............................................................. 52

*Little v. Wuerl,*
929 F.2d 944 (3d Cir. 1991) ................................................. 37, 41

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .............................................................. 19

*Louisiana v. Biden,*
55 F.4th 1017 (5th Cir. 2022) .................................................... 24

*McAllen Grace Brethren Church v. Salazar,*
764 F.3d 465 (5th Cir. 2014) ................................................. 52, 54

*McClure v. Salvation Army,*
460 F.2d 553 (5th Cir. 1972) ..................................................... 48

*McDonald v. Longley,*
4 F.4th 229 (5th Cir. 2021) ...................................................... 57

*McRaney v. N. Am. Mission Bd.,*
   157 F.4th 627 (5th Cir. 2025) ..................................................... *passim*

*Mirabelli v. Bonta,*
   146 S. Ct. 797 (2026)............................................................34

*Moore v. Tangipahoa Par. Sch. Bd.,*
   864 F.3d 401 (5th Cir. 2017)..................................... 17, 31, 33

*Munoz v. Intercontinental Terminals,*
   85 F.4th 343 (5th Cir. 2023) .............................................22

*NFIB v. Sebelius,*
   567 U.S. 519 (2012)..........................................................19-20

*NLRB v. Catholic Bishop,*
   440 U.S. 490 (1979)...................................................... 40, 48

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   591 U.S. 732 (2020)......................................... 42, 44, 46, 47

*Planned Parenthood v. Casey,*
   505 U.S. 833 (1992)..........................................................21

*Serbian E. Orthodox Diocese v. Milivojevich,*
   426 U.S. 696 (1976)...................................................... 42, 47

*Skrzypczak v. Roman Catholic Diocese of Tulsa,*
   611 F.3d 1238 (10th Cir. 2010).........................................47

*Slattery v. Hochul,*
   61 F.4th 278 (2d Cir. 2023)..............................................57

*Stanley Herzog Found. v. EEOC,*
   781 F. Supp. 3d 897 (W.D. Mo. 2025).......................... 35, 54

*Starkey v. Roman Catholic Archdiocese,*
   41 F.4th 931 (7th Cir. 2022) ...........................................38

*Tandon v. Newsom,*
   593 U.S. 61 (2021)............................................................55

*Tennessee v. EEOC,*
737 F. Supp. 3d 685 (E.D. Ark. 2024)................................................21

*Texas v. United States,*
126 F.4th 392 (5th Cir. 2025) .........................................................17

*Union Gospel Mission of Yakima v. Brown,*
162 F.4th 1190 (9th Cir. 2026) ............................................. 43, 44, 45

*United States v. Hamilton,*
46 F.4th 389 (5th Cir. 2022) .........................................................41

*United States v. Moore,*
71 F.4th 392 (5th Cir. 2023) .........................................................19

*United States v. Radley,*
632 F.3d 177 (5th Cir. 2011).........................................................19

*Van Loon v. Dep't of Treasury,*
122 F.4th 549 (5th Cir. 2024) ..................................................... 19, 20

*Ware v. La. Dep't of Corr.,*
866 F.3d 263 (5th Cir. 2017)........................................................53

*Watson v. Jones,*
80 U.S. (13 Wall.) 679 (1872)........................................................26

*West Virginia v. EPA,*
597 U.S. 697 (2022)............................................................. 23, 24, 26

*Whole Woman's Health v. Smith,*
896 F.3d 362 (5th Cir. 2018)..................................................... 41, 45, 50

*Williams v. Taylor,*
529 U.S. 362 (2000)..............................................................39-40

**Statutes**

5 U.S.C. § 706 .................................................................. 17, 40

28 U.S.C. § 1291 ...................................................................3

28 U.S.C. § 1292 ...................................................................... 3, 31

31 U.S.C. § 3729 ......................................................................... 11

42 U.S.C. § 2000bb ...................................................................... 50

42 U.S.C. § 2000e ................................................................. *passim*

42 U.S.C. § 2000gg ................................................................ *passim*

**Other Authorities**

29 C.F.R. § 1636.3 ........................................................... 14, 22, 29

45 C.F.R. § 92.302 ...................................................................... 54

88 Fed. Reg. 54,714 (Aug. 11, 2023) ............................................. 6

89 Fed. Reg. 29,096 (Apr. 19, 2024) ........................................ *passim*

89 Fed. Reg. 37,522 (May 6, 2024) ......................................... 54-55

Fed. R. App. P. 4 ......................................................................... 3

Fed. R. Civ. P. 54 .................................................................... 3, 14

Catechism of the Catholic Church ........................................... 9, 10

Code of Canon Law (1983) ......................................................... 10

Congregation for the Doctrine of the Faith, *Donum Vitae*
   (1987) .................................................................................... 9

Bias Task Force, *Eradicating Anti-Christian Bias
Within the Federal Government* 100-01 (Apr. 30, 2026) .................... 30

Brief of the United States, *Doe v. CRS*, No. 25-1569,
   2025 WL 3527721 (4th Cir. Dec. 2, 2025) ............................... 44, 55

*Jeremiah* ................................................................................... 9

*Luke* ........................................................................................ 9

Pope Pius XI, *Casti Connubii* (1930) .......................................... 9

Pope Saint John Paul II, *Evangelium Vitae* (1995)..................................9

Pope Saint Paul VI, *Gaudium et Spes* (1965)...........................................9

*Psalms* ............................................................................................9

Richard Carlson, *The Small Firm Exemption*,
80 St. John's L. Rev. 1197 (2006) .....................................................53

*Dorland's Illustrated Medical Dictionary*
(33rd ed. 2020)....................................................................................21

*Financial Assistance General Certifications and*
*Representations*, U.S. HRSA...............................................................11

Michael W. McConnell, *The Ninth Amendment in Light of*
*Text and History*, 2010 Cato Sup. Ct. Rev. 13...................................26

*Mosby's Medical Dictionary* (8th ed. 2009) ............................................20

*New Oxford Am. Dictionary* (online ed. 2015) ........................................20

*Prime Award Results,* USASpending.gov ................................................11

*Taber's Cyclopedic Medical Dictionary*
(online 25th ed. 2025) ............................................................. 20, 21

## INTRODUCTION

The Pregnant Workers Fairness Act promotes healthy mothers and babies by requiring employers to reasonably accommodate an employee's pregnancy, childbirth, and related medical conditions. The PWFA doesn't mention "abortion" even once. Its lead sponsors on both sides of the aisle emphasized it had nothing to do with abortion, and its bipartisan congressional supporters universally emphasized that the law was noncontroversial. Yet the Equal Employment Opportunity Commission imposed a first-of-its-kind rule under the PWFA requiring employers nationwide to accommodate abortion and to change their policies, practices, employee speech, and even "atmosphere" accordingly. That forces Catholic organizations—like Appellants here, the United States Conference of Catholic Bishops, the Dioceses of Lake Charles and Lafayette, and The Catholic University of America (collectively, the Bishops)—to radically transform their ministries or face liability and entanglement.

At first blush, the district court seemed to reject EEOC's blatant power grab. It recognized that "from a strictly textual standpoint, there is a complete lack of support" to determine that Congress intended abortion to be covered under the PWFA. And the court also recognized EEOC's mandate violated the major questions doctrine: Given that "abortion has been one of the most important social, religious, and political issues of our time," Congress would have been explicit "had it wanted to include an abortion accommodation provision in the PWFA."

1

But those holdings proved to be little more than lip service. With no analysis whatsoever, the district court concluded that the PWFA statute *itself* "required" accommodating all abortions except for those that are "purely elective." Despite ruling elsewhere that abortion was a "procedure" and not a covered "medical condition," the court determined that "abortions stemming from the underlying treatment of a medical condition related to pregnancy" were in fact covered.

But under EEOC's Final Rule, qualifying medical conditions include many that are *universal* to pregnancy, such as minor hormonal changes. So the district court's recast version of the mandate has the same severe ramifications for religious objectors, the same lack of support in statutory text, and the same regulatory overreach. And now the abortion-accommodation mandate is rooted in the statute, not just a regulation.

The district court's errors did not stop there. Unlike the conspicuously absent abortion mandate, the PWFA has an explicit and categorical religious exemption that bars using the PWFA (or its implementing regulations) to force religious objectors to violate their faith. And while the district court initially enjoined EEOC's attempt to read that exemption into a nullity, the court retreated in the judgment below and left the Bishops exposed to civil liability and intrusive litigation. The district court also refused to grant a permanent injunction under the First Amendment and the Religious Freedom Restoration Act (RFRA), despite the myriad church-state conflicts its ruling guaranteed.

The Bishops are facing an unprecedented mandate requiring them to either malform their ministries or violate federal law. That requirement is the opposite of what the PWFA actually says and tramples foundational First Amendment rights. And until the Bishops get permanent relief, they are left exposed to entangling lawsuits, investigations, enforcement actions, and liability. That has an inescapable chilling effect, precisely as it was meant to. "[T]he value of a sword of Damocles is that it hangs—not that it drops." *First Choice Women's Resource Ctrs. v. Davenport*, No. 24-781, 2026 WL 1153029, at *9 (U.S. Apr. 29, 2026).

The Bishops respectfully request this Court vacate the abortion-accommodation mandate and EEOC's unlawful narrowing of the statutory religious exemption, and that it grant a permanent injunction.

## JURISDICTIONAL STATEMENT

On May 21, 2025, the district court entered a partial final judgment on the Bishops' claims under Federal Rule of Civil Procedure 54(b), effectively denied the Bishops an injunction, and modified a previous injunction. ROA.9126-68. The Bishops timely appealed on July 15, 2025. ROA.9187; *see* Fed.R.App.P. 4(a)(1)(B). This Court has jurisdiction to review the final judgment under 28 U.S.C. §1291, and the denial of and modification of an injunction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF ISSUES PRESENTED

1. Whether the district court erred by concluding that the PWFA's plain text requires employers to accommodate abortions.

2. Whether the district court erred in concluding that the EEOC did not exceed its statutory authority in issuing PWFA regulations mandating employers to accommodate abortions.

3. Whether the Bishops are entitled to permanent relief prohibiting enforcement of that requirement against them under the PWFA's religious exemption, the First Amendment, or RFRA.

## BACKGROUND

**A. The PWFA expands protections for pregnant workers.**

Congress passed the PWFA to expand protections for pregnant women in the workplace. The PWFA requires a "covered" employer to provide a reasonable accommodation to an employee with a "known limitation," meaning a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. §2000gg(2), (4), *id.* §2000gg-1(1). The statute bars employers from denying employment opportunities or taking adverse employment action based on such covered pregnancy accommodations. *Id.* §2000gg-1(2)-(5). It also prohibits taking adverse action against an employee who advocates for an accommodation or interfering with an employee's exercise of her statutory right to an accommodation. *Id.* §2000gg-2(f)(1)-(2).

4

Though a standalone statute, the PWFA incorporates some of Title VII's provisions—including its remedies and enforcement provisions. *Id.* §2000gg-2(a). EEOC and private parties may sue private employers for alleged violations, and EEOC has all investigative and enforcement powers available to it under Title VII.

The PWFA also incorporates Title VII's religious exemption. *Id.* §2000gg-5(b). This exempts religious employers from any application of the PWFA concerning "the employment of individuals of a particular religion." 42 U.S.C. §2000e-1(a). "Religion" is defined to include "all aspects of religious observance and practice, as well as belief." *Id.* §2000e(j).

**B. The PWFA does not cover abortion.**

The PWFA does not include the word "abortion" once. The administrative record contains not a single legislative supporter claiming that the PWFA includes abortion. *See* ROA.8346-9003. To the contrary, lawmakers from both parties expressly said that the PWFA does not require accommodations for abortion. Lead Senate co-sponsor Bill Cassidy "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." ROA.8908. And, given that the PWFA required EEOC to "provide examples of reasonable accommodations," 42 U.S.C. §2000gg-3(a), the other lead Senate co-sponsor, Bob Casey, emphasized "for the record" that EEOC "could not—could not—issue any regulation that requires abortion leave," ROA.8908.

The PWFA's supporters stressed that the law was bipartisan and uncontroversial. Originating Committee Chair Senator Patty Murray emphasized PWFA supporters were not "asking for much,": "Give pregnant workers a break, give them a seat, and give them a hand. … I can't think of a more commonsense, less controversial bill[.]" ROA.8907. She described the PWFA as "fundamentally bipartisan," meant "to provide basic" accommodations for women "welcoming a new family member." ROA.8907. Senator Casey agreed, emphasizing that the PWFA is "very straightforward" and "very simple," a "commonsense bill" that has "bipartisan support" from "over 200 advocacy groups from all parts of the ideological spectrum." ROA.8996-97.

**C. EEOC issues rule mandating abortion accommodations.**

In August 2023, EEOC issued a notice of proposed rulemaking that included a mandate to accommodate all abortions. *See* 88 Fed.Reg. 54,714 (Aug. 11, 2023). According to EEOC, "having … an abortion" constituted an "example[]" of a "medical condition" related to pregnancy or childbirth. *Id.* at 54,774. The Proposed Rule also narrowly construed the PWFA's religious exemption to bar only religious discrimination claims—a type of claim that the PWFA does not authorize. *Id.* at 54,746-47.

Over 54,000 individuals and groups submitted comments opposing the Proposed Rule. *See* 89 Fed.Reg. 29,096, 29,104 (Apr. 19, 2024). USCCB and CUA, which had supported the PWFA, submitted a comment warning that the rule would harm Catholic ministries. ROA.102, ROA.112.

By a 3 to 2 vote, EEOC codified the abortion-accommodation mandate. 89 Fed.Reg. 29,096; ROA.9047. The Final Rule concedes the "lack of an explicit mention of abortion in the PWFA," but insisted that abortion is covered as a "medical condition" related to pregnancy or childbirth. 89 Fed.Reg. at 29,111, 29,183, 29,186 (citing 42 U.S.C. §2000gg-1(1)).

The Final Rule also requires that the PWFA's retaliation and coercion provisions "be interpreted broadly" to cover anything that "might have dissuaded a reasonable worker" from seeking an abortion accommodation. *Id.* at 29,215; *see also id.* at 29,214-18. Employers face liability if their "workplace policies or practices" seemingly "purport[] to limit" such accommodations. *Id.* at 29,199, 29,216. EEOC noted that speech opposing accommodations in "statements regarding religious beliefs," "mission statements," or "code[s] of conduct" can be illegal. *Id.* at 29,141-42 & n.201. Employers cannot "indicat[e]" that accommodations may yield adverse action or otherwise do or say things that might be understood to "harass" an employee for seeking accommodation—even if the actions did not "actually deter[]" them. *Id.* at 29,216. Nor can employers say or do things that are deemed "to coerce, intimidate, threaten, harass, or interfere" with "any individual" supporting abortion accommodation. *Id.* at 29,188. And to ensure that no "discriminatory work … atmosphere" exists, employers must monitor and restrict "unwelcome, critical" employee speech against abortion accommodations. *Id.* at 29,214, 29,218.

Finally, the Final Rule limits employers' religious defenses. It adopted EEOC's proposed narrow interpretation of PWFA's religious exemption, protecting only against nonexistent PWFA claims for *religious* discrimination. 89 Fed.Reg. at 29,146-47 & n.239. And the Final Rule predicted RFRA and First Amendment defenses would fail because its provisions never "infringe[] on any covered entity's freedom of speech," "expressive association," or free exercise of religion, and—even if strict scrutiny were required—would pass review because they "serve a compelling governmental interest." *Id.* at 29,147-49, 29,151-53. And the Final Rule subjected all defenses to "case-by-case" adjudication, requiring religious employers to expose themselves to entanglement and liability for failing to follow the abortion-accommodation mandate. *Id.* at 29,147-53.[1]

**D. The Bishops' religious beliefs.**

Appellants are the USCCB, an assembly of the Catholic bishops in the United States, ROA.7431-32; the Dioceses of Lake Charles and of Lafayette, dioceses serving Catholic communities in Louisiana that have existed since the 1750s, ROA.7854; and CUA, "the national university of the Catholic Church in the United States" that was papally chartered in 1887 and is committed to being "faithful to the teachings of the Church," ROA.7693.

---

[1] The Final Rule further requires accommodation for contraception and for "fertility treatment" such as in vitro fertilization and surrogacy. 89 Fed.Reg. at 29,183. The Bishops have challenged these requirements, but those claims remain before the district court and are not part of this appeal.

The Bishops follow the doctrine of the Catholic Church, which teaches that preborn people, like all people, are created in the image and likeness of God and are thus imbued with inherent human dignity. ROA.7370 (citing Congregation for the Doctrine of the Faith, *Donum Vitae*; *Psalms* 139:16; *Jeremiah* 1:4-5; *Luke* 1:39-45); *see also* ROA.7695, ROA.7097, ROA.7854-55. The Catechism of the Catholic Church thus emphasizes that "[h]uman life must be respected and protected absolutely from the moment of conception," and that from this "first moment of … existence," a preborn child has "the inviolable right … to life." ROA.7370 (quoting Catechism of the Catholic Church §2270).

The Church thus teaches that "direct abortion, that is, abortion willed as an end or as a means, always constitutes a grave moral disorder, since it is the deliberate killing of an innocent human being." ROA.7371. Nor can it be justified by serious illness of the mother during pregnancy. ROA.7372-73 (citing Pope Pius XI, *Casti Connubii*, ¶ 30). A mother may receive life-sustaining treatment even if it has the unintended effect of ending the life of her child, such as in certain treatments for ectopic pregnancy or uterine cancer; such actions are not understood as "abortion" within Catholic theology. *See id.* But the "deliberate and direct killing" of a child via abortion is an "unspeakable crime[]." *Id.* (quoting Pope Saint John Paul II, *Evangelium Vitae*, ¶ 58, and Pope Saint Paul VI, *Gaudium et Spes*, ¶ 51).

The Church forbids the faithful from in any way supporting or encouraging direct abortion or being complicit in the actions of those who do. ROA.7371-73; Catechism of the Catholic Church §§2270-71. Under canon law, the penalty for procuring or helping to procure an abortion is automatic excommunication—meaning the very act results in excommunication without need for action by Church authority. ROA.7373 (citing *Code of Canon Law* cc. 1398, 1323 (1983)). The person remains excommunicated until he or she seeks and obtains the sacrament of confession, which ordinarily must be provided by a bishop. *Id.*

Further, Catholics are not only required to refrain from abortion but also to advocate on behalf of preborn persons and to encourage mothers and fathers to protect their unborn children. *See* ROA.7376-80. The Bishops accordingly have numerous programs and policies that oppose abortion and encourage pro-life decisions and policies. ROA.7097-100, ROA.7376-82, ROA.7432-36, ROA.7694-99, ROA.7855-57.

**E. EEOC's actions burden the Bishops' religious beliefs.**

In following Catholic beliefs, the Bishops do not allow their employees (and in particular, in the case of CUA, their faculty) to speak and act in ways that conflict with the application of those beliefs within their ministries, such as by advocating in favor of abortion in the workplace. ROA.7380-82, ROA.7435-36, ROA.7697-98, ROA.7097-99, ROA.7855-56.

10

But the Final Rule pressures the Bishops to knowingly accommodate employees or faculty even where such accommodations are contrary to the Bishops' sincerely held religious beliefs. ROA.7435-37, ROA.7697-98, ROA.7097-99, ROA.7855-56. It also prohibits the Bishops from taking adverse actions against employees or faculty that advocate for these types of accommodations, even where such actions are required by the Bishops' beliefs. ROA.7435-37, ROA.7697-98, ROA.7097-99, ROA.7855-56. Further, the Final Rule pressures the Bishops to replace their current religious policies and practices opposing objectionable accommodations or advocacy to (1) affirm a willingness to accommodate such conduct and speech, (2) prohibit any potentially "unwelcome" or "critical" workplace discussions opposing them, and (3) avoid "interfer[ing] with" "any individual['s]" exercise of the Final Rule's accommodation-related rights. 89 Fed.Reg. at 29,215-16, 29,218, 29,141-42 & n.201, 29,188.

Finally, because several of the Bishops' ministries regularly contract with the federal government, the Final Rule exposes the Bishops to potential False Claims Act liability. *See* 31 U.S.C. §3729(a); *Financial Assistance General Certifications and Representations*, U.S. HRSA, https://perma.cc/F4Y8-K7JH ("standard certification" requiring grant recipient to annually "attest[]" that it is in compliance "with all applicable requirements of all other federal laws"); *Prime Award Results,* USASpending.gov, https://perma.cc/R7G6-W4LT (listing federal contracts and grants awarded to CUA, including from HRSA).

**F. Proceedings below.**

*Preliminary Injunction.* On May 22, 2024, the Bishops sought a preliminary injunction. After consolidating the case with one brought by Louisiana and Mississippi, the district court granted the injunction on June 17, 2024, the day before the Final Rule was scheduled to go into effect. ROA.886.

The district court ruled that the Bishops had standing based on the costs of compliance with the Final Rule and based on burdens to their religious exercise, as established by RFRA and the First Amendment caselaw. ROA.897-901. The district court found a likelihood of success on two grounds: a violation of the APA by imposing an abortion-accommodation mandate contrary to the PWFA's text, and a violation of the PWFA's broad statutory religious exemption granted to the Bishops.

On the first ground, the district court rejected EEOC's attempt to read an abortion mandate into the PWFA as "semantic gymnastics" and "a textbook case of a federal administrative agency exceeding its statutory authority." ROA.905, 909. On the second ground, the court explained that EEOC had "failed to include a broad religious exception in the Final Rule," which "d[id] not square with the PWFA" and left the Bishops exposed to "protracted investigations and litigation." ROA.913. The court "conclude[d]" that the Bishops had "demonstrated a substantial likelihood of success on their claims of statutory and constitutional overreach." ROA.913-14.

Thus, the court postponed the effective date of the abortion-accommodation mandate's application to the Bishops, as well as the States and certain employers within the States. It also preliminarily enjoined EEOC from taking steps to enforce the mandate against the Bishops, including by preventing EEOC from issuing Notices of Right to Sue to private complainants allowing them to file suit against the Bishops. ROA.916-17. While the order noted that accommodations for non-elective abortions were still required "to the extent set forth in the PWFA," ROA.916 n.16, the ruling under the PWFA's religious exemption protected the Bishops as the parties entered streamlined summary judgment proceedings.

***Summary Judgment Order.*** In May 2025, the district court granted the Bishops' summary judgment motion in part and denied it in part. ROA.9163-65.

First, the court vacated the Final Rule's abortion-accommodation mandate as to "purely elective" abortions, but ruled that employers were still "required" to "provide accommodation[s]" for all other abortions. ROA.9167-68, 9168 n.1. The court held that this obligation was rooted in the PWFA statute itself, which required that "abortions stemming from the underlying treatment of a medical condition related to pregnancy" must be accommodated because "[s]uch procedures are clearly 'related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions.'" *Id.* (citing 42 U.S.C. §2000gg(4)).

This ruling meant that the Bishops must accommodate abortions obtained to treat "medical conditions" such as "minor" cases of "anxiety," "dehydration," "nausea or vomiting," "loss of balance," and "changes in hormone levels." 29 C.F.R. §1636.3(a)(2), (b). And while the court granted vacatur of the Final Rule on those terms, it denied the Bishops' requested injunction against the abortion-accommodation mandate. ROA.9163-65. The court issued a partial final and appealable judgment as to its disposition of the mandate pursuant to Rule 54(b). ROA.9166-68.

Second, the court refused to grant permanent injunctive relief under the PWFA's religious exemption, the First Amendment, or RFRA. ROA.9160 & n.23. The court said that it would address those issues after ordering renewed motions for summary judgment.

Finally, the court modified its previous preliminary injunction order to remove the Bishops' protection under the PWFA's religious exemption. The court construed its previous decision as having relied on the PWFA's religious exemption only to show standing, not as a ruling on the merits of the exemption. ROA.9159. This left the Bishops unprotected against the partial final judgment's abortion-accommodation mandate.

***Subsequent proceedings.*** On July 15, after unsuccessful negotiations with EEOC to obtain protection during the pendency of the case, the Bishops filed a timely notice of appeal of the district court's summary judgment order and also filed a motion with the district court seeking an injunction pending appeal against the abortion-accommodation mandate.

*See* ROA.9187, ROA.9191. The motion relied on the same arguments from previous briefing and thus asked for prompt resolution. ROA.9192. After the district court *sua sponte* doubled EEOC's response time, the Bishops sought an injunction pending appeal from this Court. Dkt. 11-1.

This Court granted an administrative stay protecting the Bishops. Dkt. 48-1. But after the district court ruled that the notice of appeal divested it of jurisdiction to rule on the motion for injunction pending appeal still outstanding before it, ROA.9307-11, this Court issued an order noting that ruling was incorrect, "recogniz[ing] the grave First Amendment interests at stake," "urg[ing] the district court to resolve the motion as expeditiously as possible," and denying the Bishops' request without prejudice to being re-raised if the district court failed to provide relief. Dkt. 56-1 at 2-4. Shortly thereafter, the district court entered an injunction pending appeal protecting the Bishops from the abortion-accommodation mandate. ROA.9393-94. This injunction, though, allowed EEOC to issue Notices of Right to Sue against the Bishops. *Id.*

In January 2026, this Court stayed issuance of a briefing schedule in this appeal until April 1 to allow the district court to rule on the remaining non-abortion-related claims below, over which dispositive motion practice had initiated in August 2025. Dkt. 72. On April 7, after no ruling below was issued, this Court set an expedited briefing schedule. Dkt. 80. On April 20, the district court stayed proceedings below pending this Court's resolution of *Texas v. Blanche*, No. 24-10386 (5th Cir.).

## SUMMARY OF THE ARGUMENT

The district court erred by reading an abortion-accommodation mandate into the PWFA, failing to vacate that mandate in the Final Rule, and refusing to grant the Bishops permanent injunctive relief.

**I.** The PWFA's text does not mandate that employers accommodate abortions. The PWFA requires accommodation for medical conditions, not procedures. Abortion is a procedure, not a medical condition.

If Congress had intended to impose a new nationwide mandate on the extraordinarily important and contentious issue of abortion, it would have said so. But the word "abortion" is entirely absent from the statute, and the PWFA's Congressional supporters never once suggested it should be included. Rather, they emphasized the opposite. Thus, as a matter of the text and the major questions doctrine, the district court's interpretation of the PWFA and the Final Rule is wrong.

**II.** The district court erred by failing to grant the Bishops injunctive relief and by reducing injunctive relief it previously granted.

First, the plain text of the PWFA's religious exemption categorically bars imposing the mandate on the Bishops; the Final Rule's contrary construction of the PWFA is short of statutory right and must be vacated. Second, the First Amendment's church autonomy doctrine does so as well, barring EEOC from forcing the Bishops to transform their ministries to knowingly accommodate abortion. Third, RFRA protects against the mandate's substantial burden on the Bishops' religious beliefs, in

16

part because EEOC completely exempts most other employers for purely secular reasons. Fourth, the First Amendment's Free Exercise Clause protects those same beliefs, because the mandate creates such secular exemptions and it allows EEOC to grant more on a case-by-case basis. And fifth, the mandate violates the First Amendment's right of expressive association by requiring the Bishops to associate with individuals who harm their religious, pro-life expression.

## STANDARD OF REVIEW

This Court "review[s] a summary judgement *de novo*." *Texas v. United States*, 126 F.4th 392, 405 (5th Cir. 2025). It reviews modifications and denials of injunctions for abuse of discretion. *See Moore v. Tangipahoa Par. Sch. Bd.*, 864 F.3d 401, 405 (5th Cir. 2017) (modifications); *Career Colls. & Schs. v. DOE*, 98 F.4th 220, 233 (5th Cir. 2024) (denials). "[U]nderlying legal determinations are reviewed *de novo* and factual findings for clear error," and "[a] district court by definition abuses its discretion when it makes an error of law." *Career Colls.*, 98 F.4th at 233.

Under the APA, this Court may "hold unlawful and set aside [final] agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. §706(2)(A)). "An agency decision runs afoul of this provision if it applies an incorrect legal standard." *Id.* (cleaned up).

# ARGUMENT

## I. The PWFA statute does not require employers to accommodate any abortions, nor authorize EEOC to do so.

EEOC's abortion-accommodation mandate required the nation's employers to accommodate all abortions, including employers with longstanding religious objections like the Bishops. It also required employers to change their policies, procedures, environments, and speech about abortion.

On a surface level, the district court rejected that gambit. But in reality, it created a massive loophole that puts those same employers back where they started: So long as an employee invokes one of EEOC's myriad (and nonexhaustive) list of "related medical conditions" of pregnancy—such as minor cases of nausea or hormonal changes—the Bishops are "required to provide accommodation" for that abortion. ROA.9164 n.24. The Bishops must also radically malform their ministries' internal speech and conduct to prevent giving the impression that they would not do so.

The district court's construction of the PWFA not only "obliterate[s] the directly applicable textual limits spelled out in [the statute]," *Airlines for Am. v. DOT*, 110 F.4th 672, 676 (5th Cir. 2024), it also squarely implicates the major questions doctrine. Reversal is required.

## A. Traditional tools of statutory construction foreclose reading abortion into the PWFA's text.

"The appropriate starting point when interpreting any statute is its plain meaning." *Bradford v. Sovereign Pest Control*, 167 F.4th 809, 812 (5th Cir. 2026). Where that meaning is clear, that is the end of the inquiry. *See Garcia-Carias v. Holder*, 697 F.3d 257, 264 (5th Cir. 2012). Undefined statutory terms are given their "ordinary, contemporary, common meaning," *Van Loon v. Dep't of Treasury*, 122 F.4th 549, 563 (5th Cir. 2024), informed by dictionary definitions, *United States v. Radley*, 632 F.3d 177, 182 (5th Cir. 2011). Where doubt remains, this Court employs other traditional "canons of construction." *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023). And when doing so, courts give "no deferen[ce]" to the agency's view. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

Here, every "traditional tool[] of statutory construction," *id.* at 403—including PWFA's plain text, canons of construction, and the legislative record—make clear that PWFA does not cover abortions of any kind. *A fortiori*, the district court erred in concluding that the PWFA covers virtually all abortions. So too for the Final Rule's mandate, which was promulgated in excess of EEOC's PWFA rulemaking authority.

***Plain text.*** The analysis "start[s], of course, with the statutory text," *Cochran v. SEC*, 20 F.4th 194, 200 (5th Cir. 2021) (en banc), which is the "best evidence of Congress's intent," *NFIB v. Sebelius*, 567 U.S. 519, 544

(2012). As the district court recognized and EEOC conceded, the PWFA "does not contain the word 'abortion' even once." ROA.903. Instead, the statute requires employers to accommodate "known limitations related to … pregnancy, childbirth, or related medical conditions." 42 U.S.C. §2000gg-1(1). And these "known limitation[s]" must themselves be "physical or mental condition[s]." *Id.* §2000gg(4). Thus, the PWFA requires accommodation *only* for "physical or mental conditions" arising from "pregnancy, childbirth, or related medical conditions." Under the PWFA's plain terms, abortion doesn't qualify.

The core underlying term is "condition." A covered condition must be "physical or mental," "medical" in nature, and "related" to "pregnancy" or "childbirth." The term "condition" is undefined and therefore must be given its plain meaning. *Van Loon*, 122 F.4th at 563. The ordinary meaning of "condition" in the medical context is "a state of being, specifically in reference to physical and mental health or well-being." *EEOC v. Houston Funding II*, 717 F.3d 425, 428 n.4 (5th Cir. 2013) (quoting *Mosby's Medical Dictionary* (8th ed. 2009), collecting similar definitions); "Condition," *New Oxford Am. Dictionary* (online ed. 2015) (a "state of health or physical fitness" or "illness or other medical problem"); "Condition," *Taber's Cyclopedic Medical Dictionary* (online 25th ed. 2025) (similar).

Thus, for instance, this Court recognized in *Houston Funding II* that a pregnancy-related "medical condition" under Title VII is a "physiologi-

cal" state that is "initiated by pregnancy and concludes sometime thereafter." 717 F.3d at 429. That's sensible here too—a covered "condition" is a physiological state of being that relates to pregnancy or childbirth.

Abortion is not a physiological state of being. It is a "procedure." *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *accord* ROA.9164 n.24. Unlike a condition, a procedure is defined as "[a] particular way of accomplishing a desired result." "Procedure," *Taber's Cyclopedic Medical Dictionary*; "Procedure," *Dorland's Illustrated Medical Dictionary* 1493 (33rd ed. 2020) (similar). Abortion fits that description precisely: It describes "[a] particular way of accomplishing [the] desired result" of ending a pregnancy and preventing childbirth. Because abortion is a procedure, not a condition, it falls outside the PWFA's scope.

That remains true regardless of the abortion's justification. Even if amorphous concepts of "health" or "safety" are invoked, abortion nevertheless remains a "procedure," ROA.9164 n.24, about which the PWFA has nothing to say. In other words, "from a strictly textual standpoint, there is a complete lack of support for the EEOC's contention that Congress intended for abortion to be defined as a 'medical condition' under the PWFA." ROA.9136; *see also Tennessee v. EEOC*, 737 F. Supp. 3d 685, 701 (E.D. Ark. 2024) (plaintiffs "have the better argument on the text" because "[a]bortion doesn't fit into the ordinary meaning of condition"), *rev'd on other grounds*, 129 F.4th 452 (8th Cir. 2025).

***Canons of construction.*** The *ejusdem generis* canon leads to the same result. That canon holds that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific [items] that precede it." *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 178 (5th Cir. 2024) (en banc) ("*Alliance*"). Applying the canon allows "a general phrase [to] be given a more focused meaning by the terms linked to it," ensuring that the phrase is not interpreted so broadly that it covers conduct "so unlike the examples that the [statute] provided" that linking them "would be implausible." *Fischer v. United States*, 603 U.S. 480, 488 (2024).

Here, the general term "related medical condition[]" refers to states like "pregnancy" and "childbirth," which are fundamentally dissimilar from a procedure that exists solely to end a pregnancy and eliminate the possibility of childbirth. *See* ROA.9149-50. Indeed, the Final Rule itself helps illustrate the stark contrast. It provides a list of 50 "conditions" related to pregnancy and childbirth, of which 49 are diseases, injuries, infections, syndromes, or similar naturally occurring conditions. 29 C.F.R. §1636.3(b). Only one is actually an external procedure: abortion.

***Legislative record.*** If any ambiguity remained (it does not), the PWFA's legislative record "provides extra icing on a cake already frosted." ROA.9155; *see Munoz v. Intercontinental Terminals*, 85 F.4th 343, 350 (5th Cir. 2023) (legislative history "confirms th[e] understanding" of the statute's plain text).

Here, the legislative record is as important for what it does *not* say as for what it does. Imagine that Congress was imposing a nationwide abortion-accommodation mandate for state and private employers in tandem with the Supreme Court's consideration of *Dobbs*. Now imagine the kind of impassioned arguments in favor of the mandate that would necessarily be reflected in the legislative record.

That record doesn't exist. Despite multiple rounds of briefing and an extensive administrative record, EEOC failed to unearth a single example of any congressional supporter saying—even once—that the PWFA imposes an abortion-accommodation mandate of any kind. To the contrary, supporters from both parties expressly took the divisive issue of abortion off the table and instead emphasized that PWFA was, "fundamentally, a bipartisan" bill that couldn't be "less controversial." ROA.8907.

In sum, the text of the PWFA does not mandate abortion accommodation. And it was never meant to.

### B. The abortion-accommodation mandate violates the major questions doctrine.

"The major questions doctrine confirms [PWFA's] ordinary meaning." *Alliance*, 125 F.4th at 180. That doctrine prevents EEOC's attempt to assert "highly consequential power" in an area of vast "political significance" since it lacks "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 721, 723-24 (2022).

To apply the doctrine, courts examine in "context" the "history and the breadth of the authority that the agency has asserted and the economic and political significance of that assertion" to ensure that Congress indeed "meant to confer th[at] power." *Id.* at 721 (cleaned up). Relevant context also includes "constitutional structure" and "common sense" principles of how Congress would choose to "delegate[] highly consequential power." *Learning Res. v. Trump*, 146 S.Ct. 628, 639 (2026) (cleaned up). If an interpretation would result in an "enormous and transformative expansion in" regulatory authority, *Louisiana v. Biden*, 55 F.4th 1017, 1031 (5th Cir. 2022), that "counsels skepticism," *West Virginia*, 597 U.S. at 732. Here, the Final Rule's "staggering" overreach hits on both the political lightning rod of abortion and the structural constitutional rights protecting religious bodies, and it lacks the Congressional clarity to do either. *Alliance*, 125 F.4th at 181.

### 1. The mandate is politically significant.

Attempting to force employers to accommodate abortions, and to transform their workplaces accordingly, clearly implicates matters of deep political significance. As the district court concluded, "abortion has been one of the most important social, religious, and political issues of our time" since *Roe v. Wade* in 1973, "and is a major issue in every federal election." ROA.906, ROA.9153-55, ROA.9136-37.

But *Roe* was not solely responsible for the "national controversy" of abortion, which "has embittered our political culture for a half century" and "inflamed our national politics." *Dobbs*, 597 U.S. at 229, 269. Its companion case, *Doe v. Bolton*, lent further fuel to the fire by defining *Roe*'s "health" exception so broadly as to make abortion nearly always obtainable. 410 U.S. 179, 192 (1973) (assessing "all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient").

Here, the district court's ruling has much the same effect as *Doe*: mandating abortion accommodation simply by tying the abortion to any condition arising in pregnancy. Thus, the ruling operates precisely as EEOC's original mandate. And in both cases, it ignores reality to think that Congress delegated to EEOC the authority to "definitively resolve one of today's most hotly debated political issues" for workplaces employing over 100 million Americans. *BST Holdings v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (collecting cases, vacating COVID vaccine mandate); *Alliance*, 125 F.4th at 181 (vacating rule involving one of the most "politically divisive issues in the Nation").

That is especially true because abortion regulation belongs "primarily [to] the *States*." *Alliance*, 125 F.4th at 182 (emphasis in original); *Dobbs*, 597 U.S. at 241-50. "[I]ntrud[ing] into an area that is the particular domain of state law" confirms the mandate "presents a major question." *Alliance*, 125 F.4th at 182.

## 2. The mandate implicates constitutional structure.

Requiring religious employers to accommodate abortion implicates another major question—the structural constitutional limitations set by the Religion Clauses.

The major questions doctrine protects structural constitutional rights such as "separation of powers principles" by ensuring that agencies exercise "only those powers given to them by Congress." *West Virginia*, 597 U.S. at 723. Such principles are at stake here. The Religion Clauses' church autonomy doctrine embodies "a structural constitutional protection implicating the separation of powers," restricting the exercise of civil power over "religious issues." *McRaney v. N. Am. Mission Bd.*, 157 F.4th 627, 644, 650 (5th Cir. 2025) (collecting cases). This robust protection for proper "relations of church and state under our system of laws" "lies at the foundation of our political principles." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727-28 (1872). Accordingly, since the Founding, courts have imposed a "clear statement" rule to avoid infringing natural rights, of which the Religion Clauses are a preeminent example. Michael W. McConnell, *The Ninth Amendment in Light of Text and History*, 2010 Cato Sup. Ct. Rev. 13, 18.

As addressed in detail below, *infra* Section II(C), the abortion-accommodation mandate "profound[ly] burdens" structural constitutional rights by creating unprecedented entanglement with extraordinarily sensitive religious convictions on abortion. *Biden v. Nebraska*, 600 U.S. 477,

505 (2023). Thus, the mandate needs "clear authorization" from Congress, which "is sorely lacking." *Alliance*, 125 F.4th at 183.[2]

## C. The district court erred.

The district court began its statutory analysis on sound footing. It correctly recognized that the PWFA fails to mention abortion "even once," and that "Congress's decision <u>not</u> to include any reference to abortion in the PWFA was intentional." ROA.903-05. And it recognized that "from a strictly textual standpoint, there is a complete lack of support for the EEOC's contention that Congress intended for abortion to be defined as a 'medical condition' under the PWFA." ROA.9136.

But then, in an abrupt and unexplained about-face, the district court cabined this textual reading only to "purely elective" abortions and determined that the PWFA *requires* accommodation for "abortions stemming from the underlying treatment of a medical condition related to pregnancy." ROA.9164 & n.24. The court had previously agreed that abortion is "better described as a medical 'procedure'" than a "medical condition," and that EEOC's "arguments to the contrary amount to little

---

[2] EEOC suggested below that clarity was provided by the use of "pregnancy, childbirth, or related medical conditions" in the Pregnancy Discrimination Act (PDA), a 1970s amendment to Title VII. EEOC claimed that it was "settled" that this language covered abortion in the PDA and thus likewise did so in the PWFA, an assertion that relied on old nonbinding EEOC guidance and a handful of court decisions. ROA.9151-52. The district court correctly rejected that argument, as EEOC's "smattering" of pre-*Dobbs* lower court opinions was far from "a judicial consensus 'so broad and unquestioned'" that it could overcome the PWFA's plain text and context, and the PDA was conspicuously not among the provisions of Title VII incorporated into the PWFA. ROA.9152-53 (quoting *BP v. Mayor & City Council*, 593 U.S. 230, 244 (2021)).

more than semantic gymnastics." ROA.905. Yet somehow, in a footnote devoid of any analysis, the court ultimately concluded that the "procedure[]" of abortion is "*clearly* 'related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions'" where it is not "purely elective." ROA.9164 & n.24 (emphasis added).

The district court made the same error respecting the major questions doctrine. The court began by correctly finding that "insert[ing] the issue of abortion into a law designed to ensure healthy pregnancies for America's working mothers squarely implicate[d]" the doctrine. ROA.905. Thus, it required "'clear congressional authorization' to extend the PWFA to impose an abortion accommodation mandate." ROA.907. "[G]iven the enormous social, religious, and political importance of the abortion issue," ROA.9136, one would expect the district court to conclude that this applied to accommodating *any* abortions. Yet, without explanation, the district court again cabined its holding on the Final Rule to only "purely elective" abortions, leaving the Bishops subject to the mandate for any "abortions stemming from the underlying treatment of a medical condition related to pregnancy." ROA.9136.

That misinterpretation is devastating. Under the Final Rule and the district court's order, the Bishops must accommodate abortions obtained to alleviate "modest" or "minor" symptoms of "anxiety" and "depression," "dehydration," "nausea or vomiting," "loss of balance," and even "changes

in hormone levels." 29 C.F.R. §§1636.3(a)(2), 1636.3(b). Given the universality of some of these experiences in pregnancy, the district court's order effectively "require[s]" the Bishops to accommodate virtually any abortion and bans the Bishops from taking adverse action over such conduct. ROA.9164 n.24. And the Bishops are required to replace their pro-life policies, practices, ministry environments, and statements of faith with ones that avoid giving the impression that they would not accommodate abortions.

That makes no textual sense. The PWFA requires accommodating "conditions," not "procedures." Abortion is a "procedure," not a "condition." The district court provided no basis as to why that conclusion does not also apply to its subset of abortions; indeed, it could not even reach its single-sentence contrary conclusion without describing such abortions as "procedures." ROA.9164 n.24. The district court's interpretation thus "obliterate[s] the directly applicable textual limits spelled out in [the PWFA]." *Airlines for Am.*, 110 F.4th at 676. Any employee could demand accommodation for an effectively "elective" abortion simply by justifying that request by reference to hormonal changes. And the Bishops must still prospectively re-order their ministries to signal willingness to provide such accommodation. Thus, the rule fashioned by the district court functions in practice as the same outright mandate it found wholly inconsistent with the statute's text.

The same illogic permeates the district court's major questions analysis. *Doe*'s controversially capacious understanding of "health" employed a similarly freight-train-sized exception as that recognized by the district court. If Congress needed to speak clearly to authorize EEOC to impose "purely elective" abortions on the nation's employers, so too for the vast swath of abortions now shoehorned into the statute and left operative in the Final Rule. The same "staggering" political ramifications are implicated, *Alliance*, 125 F.4th at 181, the same threat to "structural" church autonomy protection is unavoidable, *McRaney*, 157 F.4th at 644, and the same "clear authorization is sorely lacking," *Alliance*, 125 F.4th at 183. Either way, "there can be little doubt … that any version of the PWFA that included an abortion accommodation requirement would have failed to pass Congress." ROA.9154.

The Trump administration recently acknowledged that "interpret[ing] the [PWFA] to require employers to accommodate an employee's abortion" by "read[ing] abortion into 'medical condition'" goes "far beyond the underlying text of the law" and "twist[s] this commonsense statute to reach radical ends." Bias Task Force, *Eradicating Anti-Christian Bias Within the Federal Government* 100-01 (Apr. 30, 2026), https://perma.cc/Q9B3-5RCH. Just so. The district court's ruling and EEOC's requirements violate the PWFA and the major questions doctrine. Reversal is required.

## II. The Bishops are entitled to permanent relief under the PWFA, the First Amendment, and RFRA.

Even if the PWFA could be read to mandate the district court's reinterpretation of the statute and its implementing regulations, the PWFA's religious exemption, the First Amendment, and RFRA still bar applying that mandate to the Bishops. This Court can and should grant permanent relief on any of these grounds now.

### A. The Court has jurisdiction to grant the Bishops permanent relief.

To start, this Court has jurisdiction over these statutory and constitutional claims pursuant to 28 U.S.C. §1292(a)(1). First, by eliminating protections for the Bishops' religious objections included in its earlier order, the district court modified the preliminary injunction in a manner that exposes the Bishops to accruing liability. Second, the district court's continued refusal to grant full relief on these claims—preliminary or permanent—has effectively denied the injunction. The district court's inexplicable delay means the Bishops remain subject to uncertainty over whether their ministries are protected from entanglement and liability caused by the abortion-accommodation mandate.

***Modification.*** This Court has appellate jurisdiction over an order "modif[ying] an existing injunction." *Moore*, 864 F.3d at 405. To decide whether there was a modification, courts "look beyond the terms used by the parties and the district court to the substance of the action." *Id*.

Here, the "substance" of the district court's action was to modify the preliminary injunction. The district court's initial ruling found that the Bishops were "[c]learly" correct on their claim that the Final Rule "d[id] not square with the PWFA" because it failed to include PWFA's "broad religious exemption," which protected the Bishops from complying with any abortion-accommodation requirement or being drawn into "protracted investigations and litigation" from that requirement. ROA.913. And so the court "conclude[d that] the Bishops … have demonstrated a substantial likelihood of success on their claims of statutory and constitutional overreach." ROA.913-14.

But the partial summary judgment order fundamentally changed the Bishops' obligations by removing the preliminary injunction's reliance on the PWFA's religious exemption. The district court claimed that its preliminary injunction ruling had relied on the PWFA's religious exemption only to show standing and had not ruled on the merits. ROA.9159. Not so. The order's standing analysis was a distinct section with its own heading and recounted only RFRA and First Amendment caselaw. ROA.892; ROA.897-901. The likelihood of success analysis had its own distinct section and heading, relied primarily on the PWFA statutory exemption, and concluded that the Bishops *had* demonstrated likelihood of success. ROA.911-14. This flip-flop on the application of the religious exemption confirms that the injunction below was modified.

Further, the district court also issued a final judgment that the statute itself "require[s]" the Bishops to accommodate "abortions stemming from the underlying treatment of a medical condition related to pregnancy." ROA.9165-68. Thus, under the "substance" of the current state of play, *Moore*, 864 F.3d at 405, the Bishops now face accruing liability and the kind of "protracted investigations and litigation" that the original injunction protected them from, unless they accommodate abortions and transform their ministries accordingly, ROA.913. Because the judgment "chang[ed] the command of the injunction," appellate jurisdiction exists and the Bishops need relief. *Moore*, 864 F.3d at 405.

***Effective denial.*** This Court also has jurisdiction over orders denying an injunction. "[W]here an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *In re Fort Worth Chamber of Com.*, 100 F.4th 528, 533 (5th Cir. 2024). Even when the district court does not "specifically deny an injunction," jurisdiction exists where "the order may have serious, perhaps irreparable consequences," and "can only be effectively challenged by an immediate appeal." *EEOC v. Kerrville Bus Co.*, 925 F.2d 129, 132 (5th Cir. 1991).

The summary judgment order meets those criteria. First, the court expressly "decline[d]" to grant the Bishops' requests for permanent injunctive relief, ROA.9160—requests that the parties agreed presented purely legal issues and had been ripe for resolution for over six months when

they were effectively denied one year ago, *see* ROA.9139. *See also In re Fort Worth*, 100 F.4th at 534 (*one*-month delay effectively denied preliminary injunction). And this Court's order "urg[ing]" the district court to act on the Bishops' motion for an injunction pending appeal because their "constitutional rights [were] imperiled," Dkt. 56-1 at 3-4, only confirms the point—there would have been no need for a temporary injunction during the pendency of this appeal had the district court not effectively denied the Bishops' permanent relief.[3] *Cf. Clarke v. CFTC*, 74 F.4th 627, 635 (5th Cir. 2023) (discussing grant of injunction pending appeal to review effectively denied injunction).

Second, the refusal to grant an injunction has serious consequences. Without permanent relief settling their rights and obligations, the Bishops face an unprecedented threat to their First Amendment rights from accruing potential liability and intrusive proceedings for failing to comply with the abortion-accommodation mandate. *See Mirabelli v. Bonta*, 146 S.Ct. 797, 803 (2026) (recognizing the "irreparable harm" from denial of relief during "the potentially protracted appellate process"). This liability includes potential threats under the False Claims Act, as some of the Bishops' ministries receive federal contracts and grants that require them to certify and maintain compliance with federal law.

---

[3] Notably, the injunction pending appeal partially denied even *temporary* requested injunctive relief by allowing EEOC to issue Notices of Right to Sue to private parties who have filed abortion-related charges against the Bishops, which permits such private parties to file civil lawsuits on those charges. ROA.9394.

Third, this harm can only be fully resolved by immediate appeal, as the district court continues to steadfastly avoid granting the Bishops' request for permanent injunctive relief. For example, the district court's initial basis for declining to rule on the Bishops' religious objections was that "the recent change in the administration and resulting statement of Andrea Lucas" suggested EEOC's position might change. ROA.9159-60. That rationale conflicts with every other court to have considered the issue—all of which have rejected the idea that courts should not relieve the existing legal obligation that EEOC has imposed because the agency *might* rescind aspects of the rule at some point in the future. *See, e.g.*, *Catholic Benefits Ass'n v. Lucas*, No. 24-cv-142, 2025 WL 1144768, at *3-4 (D.N.D. Apr. 15, 2025); *Stanley Herzog Found. v. EEOC*, 781 F.Supp.3d 897, 913-14 (W.D. Mo. 2025). And even a year later, EEOC has taken no steps to withdraw the rule.[4]

Given the district court's effective denial of permanent relief, this Court can and should exercise jurisdiction to permanently protect the Bishops' statutory and constitutional rights now.

---

[4] Nor is there any prospect of prompt relief below. Nine months after the Bishops submitted the required renewed summary judgment motion on other objections to the Final Rule, the district court *sua sponte* stayed the case indefinitely pending this Court's resolution of the unrelated appeal in *Texas v. Blanche*, No. 24-10386 (5th Cir.). Dkt. 157. The reason for the court's stay is unclear given that *Blanche* involves unrelated challenges to the PWFA and seeks relief only for the plaintiff.

**B. The Bishops are entitled to an injunction and vacatur under the PWFA's religious exemption.**

At the same time that it mandated abortion accommodation, EEOC also narrowed the religious exemptions found in the PWFA and Title VII. EEOC's view is that Title VII's religious exemption protects only against claims for *religious* discrimination—a view it has now imported into the PWFA. 89 Fed.Reg. at 29,146-47 & n.239. But as this Court and judges around the country have explained in the Title VII context, EEOC's interpretation is wrong. And the PWFA's passage makes EEOC's error even more obvious: The PWFA does not authorize religious-discrimination claims in the first place, so EEOC's position renders the exemption a nullity, protecting only against claims that don't exist. EEOC's cramped view must be vacated and a permanent injunction granted to the Bishops.

**1. The PWFA and Title VII have broad religious exemptions.**

All of the PWFA is "subject to" Title VII's religious exemption. 42 U.S.C. §2000gg-5(b). Title VII's exemption provides that "[t]his subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." 42 U.S.C. §2000e-1(a). The "subchapter" here is all of Title VII. The statute then defines "religion" to mean "all aspects of religious observance and practice, as well as belief." *Id.* §2000e(j). "When a statute includes an explicit definition, [courts] must follow" it. *Digit. Realty Tr. v. Somers*, 583 U.S. 149, 160 (2018).

Doing so here yields the following: "This subchapter [i.e., Title VII] shall not apply to" a religious employer "with respect to the employment of individuals of a particular [religious 'belief,' 'observance,' or 'practice']." 42 U.S.C. §§2000e-1(a), 2000e(j). In other words, religious employers have statutory "permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991).

Again, the PWFA incorporates these principles into its own exemption. *See* 42 U.S.C. §2000gg-5(b). Thus, putting all the pieces together, a religious employer does not have to comply with the PWFA where doing so would require accommodating beliefs, observances, or practices that conflict with the employer's religion.

The exemption covers all employment discrimination claims, which is how this Court has applied it. *EEOC v. Mississippi College* involved a professor at a religious school who filed charges of sex and race discrimination after she was passed over for a vacancy. 626 F.2d 477, 479-80 (5th Cir. 1980). The college said it had a preference for hiring Baptists, and—invoking the religious exemption—refused to comply with an EEOC subpoena. *Id.* at 480-81. On a religious-discrimination-only reading, the exemption would have been irrelevant, since the professor's claims were for sex and race discrimination. But this Court rejected this understanding, holding instead that if "the College applied its policy of preferring Bap-

tists over non-Baptists in granting the faculty position to [another applicant] rather than [plaintiff], then §702 exempts that decision from the application of Title VII and would preclude any investigation by the EEOC." *Id.* at 484-86. *Mississippi College* thus shows that the exemption bars all Title VII claims when a religious employer "ma[kes a] challenged employment decision on the basis of an individual's religion." *Id.*

Other courts agree. For instance, in *Curay-Cramer v. Ursuline Academy*, a Catholic school dismissed a teacher for engaging in pro-abortion advocacy. 450 F.3d 130, 132 (3d Cir. 2006). The teacher believed she had suffered sex discrimination, but the Third Circuit rejected her Title VII claim, explaining that "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at 141. Because the school had "offer[ed] a religious justification" for its decision—violation of Catholic teaching—her claim was barred, even though she claimed sex discrimination. *Id.* at 141-42; *accord Bear Creek Bible Church v. EEOC*, 571 F.Supp.3d 571, 591 (N.D. Tex. 2021).

Several federal appellate judges have recently reached the same conclusion. Judge Easterbrook stated that "when [an employment] decision is founded on religious beliefs, then all of Title VII drops out." *Starkey v. Roman Catholic Archdiocese*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). Judge Brennan later agreed. *Fitzgerald v. Roncalli High Sch.*, 73 F.4th 529, 535 (7th Cir. 2023) (Brennan, J., concurring).

And Judge King deemed it the most "straightforward reading" of Title VII. *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 335 (4th Cir. 2024) (King, J., concurring in the judgment).

**2. The Final Rule violates the text of the PWFA and Title VII.**

By contrast, EEOC contends that the PWFA and Title VII religious exemptions protect religious entities from claims of "discrimination *on the basis of religion*" while leaving them "still subject" to all other claims. 89 Fed.Reg. at 29,146-47 (emphasis added).

But if Congress wanted to limit the religious exemption to religious-discrimination claims, it easily could have done so. It could have changed the law that "shall not apply"—from "[t]his subchapter" to "[t]his sub-chapter's prohibition on religious discrimination." Alternatively, it could have framed the exemption in terms of the plaintiff's claim instead of the employer's conduct—stating that the subchapter "shall not apply" to a religious employer "with respect to claims of religious discrimination." It did neither. Instead, it barred application of all Title VII and PWFA claims when a religious employer makes a decision based on an individual's religious beliefs, observances, or practices.

That conclusion is plain enough under Title VII. But it stands out in stark relief when applied in the PWFA context, which has nothing to do with religious-discrimination claims. On EEOC's reading, the PWFA's exemption would exempt claims that do not exist. EEOC's interpretation thereby violates the "cardinal principle of statutory construction that

[courts] must give effect, if possible, to every clause and word of a statute," *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (cleaned up), as well as the admonition that courts cannot "render as meaningless the language of the statute," *Cooper/T. Smith Stevedoring v. Liuzza*, 293 F.3d 741, 746 (5th Cir. 2002). Because the Final Rule conflicts with the text of the PWFA and Title VII, it falls "short of statutory right" and constitutes "unlawful … agency action." 5 U.S.C. §706(2).

### 3. The Final Rule violates the constitutional avoidance canon.

The constitutional avoidance canon also requires rejecting EEOC's emaciated rendition of the religious exemptions. Under the canon, "a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Inhance Techs. v. EPA,* 96 F.4th 888, 893 (5th Cir. 2024). Thus, for instance, *NLRB v. Catholic Bishop* held that the NLRB couldn't order Catholic schools to collectively bargain with "lay teachers" given the "serious constitutional questions" that would follow. 440 U.S. 490, 494-95, 501 (1979). Otherwise, in schools where employment practices are governed by "religious creeds," civil adjudication would "necessarily involve inquiry" into "the school's religious mission," and the "very process of inquiry" could itself "impinge on rights guaranteed by the Religion Clauses." *Id.* at 502.

So too here. EEOC's interpretation of the statutory religious exemptions would inescapably create serious First Amendment problems, including violating "the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions," *Hall v. Baptist Mem'l Health Care*, 215 F.3d 618, 623-24 (6th Cir. 2000); *infra* Section II(C). Inevitably, "serious constitutional questions" arise when a court probes "a religious employer's religious mission or the plausibility of its religious justification for an employment decision." *Curay-Cramer*, 450 F.3d at 137-41 (relying on *Catholic Bishop*). Thus, given "the constitutional concerns that would be raised by a contrary interpretation," courts have repeatedly "read the exemption broadly" to allow religious employers "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951. Accordingly, EEOC's entangling construction must be rejected because it invites "a hoard of constitutional problems." *United States v. Hamilton*, 46 F.4th 389, 398 n.3 (5th Cir. 2022).

### C. The Bishops are entitled to an injunction under the church autonomy doctrine.

Chief among that "hoard" is EEOC's violation of the church autonomy doctrine. The doctrine prohibits the state from invading the "private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018). The mandate does just that.

## 1. The church autonomy doctrine protects internal church governance.

The First Amendment's "'general principle of church autonomy' guarantees to religious institutions 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" *McRaney*, 157 F.4th at 635. Civil government cannot "dictate or even … influence such matters." *Id.* at 636.

While one "component of this autonomy" guards the relationship between a religious organization and its ministers, the "general principle of church autonomy" sweeps further. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746-47 (2020). It protects religious institutions' ability to "govern their own affairs free from government intrusion." *McRaney*, 157 F.4th at 634, 640. This broader protection "limit[s] the role" of the government "in the resolution of religious controversies," even those "that incidentally affect civil rights." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976).

## 2. The mandate violates the church autonomy doctrine.

The abortion-accommodation mandate violates the church autonomy doctrine four times over. First, it forces the Bishops to retain employees who violate their faith. Second, it forces the Bishops to change their religious speech and to police their employees' speech about matters of faith and doctrine. Third, it subjects the Bishops to governmental surveillance of internal religious management. Fourth, it forces the Bishops to endure

unconstitutionally entangling investigations and litigation into religious matters. These intrusions undermine the Bishops' independence in governing their ministries in accordance with their beliefs.

***Employment Decisions.*** EEOC and its Final Rule compel the Bishops to retain employees who flout their religious teachings in the workplace. For instance, employers may not discriminate against an employee "based on" the "decision[] to have … an abortion." 89 Fed.Reg. at 29,106, 29,112, 29,187; ROA.9164 & n.24. Thus, when an employee decides to have an abortion, the Bishops cannot discourage that decision or take adverse action without risking investigation and liability.

That is unconstitutional. Church autonomy protects "a religious institution['s] … conclu[sion] that it would undermine the institution's identity and mission … if its own employees contradict or disavow the tenets it teaches." *Union Gospel Mission of Yakima v. Brown*, 162 F.4th 1190, 1197 (9th Cir. 2026). So "[w]hen a church makes a personnel decision based on religious doctrine," the "broader church autonomy doctrine" protects that decision from second-guessing. *Bryce v. Episcopal Church*, 289 F.3d 648, 658 n.2, 660 (10th Cir. 2002).

Thus, the Ninth Circuit, recognizing that "personnel is policy," held in *Union Gospel* that the First Amendment protects policies that require a religious organization's employees to "live according to [the organization's] religious principles." 162 F.4th at 1204 (collecting cases). Similarly, the Tenth Circuit held in *Bryce* that a church employee's suit under

Title VII for opposing her same-sex union was barred by church autonomy because the church's "personnel decision" was "rooted in religious belief." 289 F.3d at 657-58; *see also McRaney*, 157 F.4th at 641 (endorsing *Bryce*). And the United States has recently agreed, urging the Fourth Circuit to adopt this view of the church autonomy doctrine. U.S. Br., *Doe v. CRS*, No. 25-1569, 2025 WL 3527721, at *22-27 (4th Cir. Dec. 2, 2025).

That result makes sense. There are few issues more "closely linked" to "internal government" and a church's "central mission," *Our Lady*, 591 U.S. at 746-47, than ensuring that its representatives do not openly "flout and disregard its religious beliefs," *Union Gospel*, 162 F.4th at 1204. Making sure that "only those committed to [the church's] mission should conduct" its activities is the "means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). If a religious group must "accept as members those who engage in … conduct" that violates the group's core beliefs, that "would cause the group as it currently identifies itself to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006); *see Union Gospel*, 162 F.4th at 1203-04. Thus, as this Court concluded in *Braidwood Management v. EEOC*, "[b]eing forced to employ someone to represent [a religious organization] who behaves in a manner directly violative of [its] convictions" obviously "inhibits the practice of [its] beliefs." 70 F.4th 914, 938 (5th Cir. 2023).

***Internal Religious Expression.*** EEOC also bans employers from maintaining any policy that "purports to limit an employee's rights to invoke PWFA protections" regarding abortion. 89 Fed.Reg. at 29,216, *see id.* at 29,199. Even "statements regarding religious beliefs," "mission statements," and "code[s] of conduct" must be sanitized of speech that might "dissuade" an employee from requesting an accommodation. *Id.* at 29,141-42 & n.201, 29,215-16. And to ensure no "discriminatory work … atmosphere" exists, the Bishops must monitor and punish "unwelcome, critical" employee speech against abortion. *Id.* at 29,214, 29,218.

None of this can be squared with church autonomy, which broadly safeguards "a church's internal communications relating to church governance or matters of faith or doctrine." *McRaney*, 157 F.4th at 640. That's why this Court held in *Whole Woman's Health* that the First Amendment protects a religious group's "ability to conduct frank internal dialogue and deliberations" about abortion. 896 F.3d at 373. It's also why other courts have protected a religious group's right to insist that its employees "share its Christian beliefs and practices" and "set[] an example of how to live a Christian life" so as to "ensure that it communicates a united and consistent religious message to the public." *Union Gospel*, 162 F.4th at 1203, 1209; *see also Bryce*, 289 F.3d at 658 (protecting "rights of the church to discuss church doctrine and policy freely").

The First Amendment "outlaws" "any attempt by government to dictate or even to influence such matters." *Our Lady*, 591 U.S. at 746. The abortion-accommodation mandate nonetheless dictates that the Bishops accommodate conduct and messages they would exclude, change their religious speech in their religious employment policies, and censor the expressive "atmosphere" among their employees. By regulating "internal church dialogue" about sensitive "religious topics," EEOC violates church autonomy. *Bryce*, 289 F.3d at 659.

***Pervasive Surveillance.*** The Final Rule gives EEOC sweeping oversight powers. EEOC "broadly" interprets this authority to regulate everything from the "atmosphere" of the Bishops' ministries to their "workplace policies [and] practices" to anything else that "might" "dissuade[] a reasonable worker" from seeking or advocating in favor of abortion. 89 Fed.Reg. at 29,199, 29,215-16. EEOC thus asserts power to control the Church's day-to-day operations.

That places the Bishops' ministries under ongoing, pervasive scrutiny. But the Religion Clauses bar laws that "allow[] the [government] to consider all aspects of a religious [group's] organization and function that it deem[s] relevant," *Carroll Coll. v. NLRB*, 558 F.3d 568, 572 (D.C. Cir. 2009) (cleaned up), or that permit the government to sift through "nearly everything that goes on" in a religious entity, *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 829 (D.C. Cir. 2020) (collecting cases). *Accord Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 980-81

(7th Cir. 2021) (en banc) (barring certain hostile-work-environment claims because of intrusion into religious workplace). Such surveillance necessarily requires "engaging in a searching and therefore impermissible inquiry" into religious affairs. *Milivojevich*, 426 U.S. at 723.

Indeed, if it is unconstitutionally entangling for the government to broadly regulate the secular "terms and conditions of employment" even for employees who *follow* the Church's beliefs, *Duquesne*, 947 F.3d at 829, then it follows *a fortiori* that EEOC cannot regulate *fundamentally religious* terms and conditions for employees who *reject* the Church's beliefs within a religious workplace. Again, a "religious organization shapes its faith and mission through its work environment," and the kind of extensive oversight EEOC seeks here "interfere[s] with [the Bishops'] internal governance," *Demkovich*, 3 F.4th at 980-81, and causes "gross substantive and procedural entanglement with the Church's core functions, its polity, and its autonomy," *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1245 (10th Cir. 2010).

The Constitution ensures that the Bishops, not EEOC, have control over the "atmosphere" and internal religious operations of their ministries. *See McRaney*, 157 F.4th at 639-41. And it should go without saying that pressuring *the Bishops themselves* to knowingly violate the faith by accommodating abortion *within their own ministries* directly implicates issues of "internal government" that are "essential to the [Bishops'] central mission." *Our Lady*, 591 U.S. at 746-47.

***Entangling Investigations.*** Finally, EEOC purports to subject the religious practices and defenses of the Bishops to "case-by-case" review—deeply entangling review that a single Commissioner can trigger with a charge. 89 Fed.Reg. at 29,145-51; *see* 42 U.S. Code §2000e-5(b). But the "very process" of protracted investigations and litigation authorized by the Final Rule is barred. *Catholic Bishop*, 440 U.S. at 502; *McRaney*, 157 F.4th at 645.

EEOC's case-by-case regime guarantees years of "litigation [and] bureaucratic entanglement" that will "cause[] a significant diversion of … time and resources" and will "inevitably affect" how ministries choose to carry out their religious missions. *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) (finding EEOC's intrusive investigation into CUA, a party here, violated the First Amendment). The "investigation and review" of religious employment "practices and decisions" about abortion causes "the State to intrude upon matters of church administration and government," which "produce[s] by its coercive effect the very opposite" of the "separation of church and State." *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972). Put differently, the "investigati[on]" of the Bishops' internal decisions on abortion "necessarily intrude[s] into church governance in a manner that [is] inherently coercive," which is "enough to bar the involvement of the civil courts." *McRaney*, 157 F.4th at 645.

An example of the problem lies in how the Final Rule requires the government to weigh the Church's religious beliefs and mission to determine if an accommodation would impose an "undue hardship." 89 Fed.Reg. at 29,153-54, 29,205. EEOC could've acknowledged that coercing religious employers into violating their beliefs on abortion is a *per se* undue hardship, which is a straightforward way to avoid entanglement. But EEOC rejected that option in favor of one in which EEOC, civil courts, and juries must assess on a "case-by-case" basis whether an acknowledged religious hardship is "undue" based on "individualized evidence" about whether the accommodation "would fundamentally alter the nature or operation" of the Church. *Id.* at 29,154.

That analysis leads to the entangling inquiries Justices Alito and Kagan warned of in *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 205-06 (2012). The "credibility" of the claim of hardship requires "assess[ing] … the importance" a church "attaches to" the issue. *Id.* at 205. And to evaluate that, a jury needs to hear from "witnesses … about the importance and priority of the religious [decision] in question," and "a civil factfinder" will sit "in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission." *Id.* at 205-06. The "mere adjudication of such questions would pose grave problems for religious autonomy." *Id.* That is why this Court deems church autonomy "a constitutional immunity" that "must be resolved at the threshold of litigation" to prevent irreparable harm. *McRaney*, 157 F.4th at 641.

EEOC's entangling "'case-by-case' inquiry" thus causes entanglement and will "'chill[] religious activity.'" *Duquesne*, 947 F.3d at 835 (quoting *Amos*, 483 U.S. at 343-44 (Brennan, J., concurring)). It "empowers" pro-abortion groups and governmental entities to "harass, impose disastrous costs on, and uniquely burden" the Bishops. *Whole Woman's Health*, 896 F.3d at 373-74 (protecting bishops against subpoenas by abortion clinics). Indeed, all it takes to trigger the litigation machinery is a *single* EEOC commissioner who wishes to investigate the Bishops. *See* 89 Fed.Reg. at 29,147; 42 U.S.C. §2000e-5(b). The church autonomy doctrine prevents such entanglement by protecting churches "from the burdens and preju-dicial effects of incremental litigation." *McRaney*, 157 F.4th at 645.

**D. The Bishops are entitled to an injunction under RFRA.**

Under RFRA, the federal government may not "substantially burden a person's exercise of religion" unless that burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. §2000bb-1(a)-(b). RFRA must be construed "in favor of a broad protection of religious exercise" to the "maximum extent" possible. *Burwell v. Hobby Lobby*, 573 U.S. 682, 696 & n.5 (2014). EEOC's abortion-accommodation mandate fails under this framework.

***Substantial Burden.*** The Bishops sincerely believe that abortion is a grave moral wrong, that they cannot support or accommodate it within their own ministries, and that they must speak out against it. ROA.6274-76, ROA.6373-74, ROA.6532-33, ROA.6802-03. The mandate burdens the

Bishops' exercise of those beliefs by forcing them to "choose between two untenable alternatives": knowingly accommodate actions and advocacy supporting abortion within their ministries, or risk significant liability and entangling litigation. *Braidwood*, 70 F.4th at 937.

This is a substantial burden. "Being forced to employ someone … who behaves in a manner directly violative of the company's convictions is a substantial burden," as is being forced to "broadly change" its "employment policies" and "tacitly endorse" behavior "it sees as sinful." *Id.* at 938.

This burden accrues immediately, despite EEOC's attempts to delay grappling with RFRA by claiming it will consider religious defenses on a "case-by-case" basis. 89 Fed.Reg. at 29,149; *Franciscan All. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022) ("promise to 'comply with [RFRA]'" inadequate). The Final Rule requires the Bishops to *immediately* change their religious policies on abortion. If, for instance, a church gets an abortion-accommodation request tomorrow, it must immediately assess its response against exposure to liability under the Final Rule. By the time EEOC begins a "case-by-case" review, the church will have *already* accrued the risk of liability. And even without receiving an accommodation request, the Bishops are already facing liability because their policies, speech, and "atmosphere" might "dissuade[]" a job applicant or employee from seeking an accommodation. 89 Fed.Reg. at 29,214-15. Thus, the Bishops must *now* "comply wholeheartedly" with a rule they "see[] as sinful" to avoid liability. *Braidwood*, 70 F.4th at 938.

***Compelling Interest.*** Because the Bishops have shown a substantial burden, EEOC must prove that its actions further an interest "of the highest order." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014). "General statements of its interests are not sufficient"; EEOC must demonstrate how the interests are compelling as applied "to the person whose sincere exercise of religion is being seriously impaired." *Id.* (cleaned up).

The Final Rule's sole attempt to establish a compelling interest is asserting that "[n]ondiscrimination laws and policies have been found to serve a compelling governmental interest." 89 Fed.Reg. at 29,148. This fails the basic terms of RFRA scrutiny: the asserted interest is not specific to the Bishops. *McAllen*, 764 F.3d at 472.

Nor is there any compelling interest in an abortion-accommodation mandate. No legislator claimed from the congressional floor that such an interest lay dormant in the PWFA's proposed text. *See, e.g.*, ROA.5819-20 (collecting legislative history). Instead, the PWFA's sponsors repeatedly *denied* they were imposing an abortion mandate. A denied interest is not a compelling one. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 697 (2020) (Alito, J., concurring) ("[I]f Congress thought that there was a compelling need," "why didn't Congress mandate that [provision] in the [law] itself?").

Further, the Supreme Court has said that RFRA "supersede[s] Title VII's [antidiscrimination] commands in appropriate cases." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020). That is equally true of related statutes like the PWFA. And *Bostock*'s "qualification would be a nullity if the government's compelling interest in purportedly eradicating sex discrimination were a trump card against every RFRA claim." *Braidwood*, 70 F.4th at 939.

Finally, EEOC "leaves appreciable damage to [its] supposedly vital interest unprohibited," demonstrating that the "government's claimed interest isn't actually so compelling after all." *Ware v. La. Dep't of Corr.*, 866 F.3d 263, 269 (5th Cir. 2017). For instance, the law exempts employers with less than 15 employees, leaving about 80 percent of private employers and millions of employees uncovered. 89 Fed.Reg. at 29,151; *see* ROA.6023-24; Richard Carlson, *The Small Firm Exemption*, 80 St. John's L. Rev. 1197, 1198-99 & n.14 (2006). And EEOC exempts *any* employer facing an "undue hardship," 89 Fed.Reg. at 29,205, as well as employment actions based on occupational qualifications and private-membership status. *Id.* at 29,126; 42 U.S.C. §§2000gg(B)(i), 2000e(b). The government cannot excuse so many employers while also claiming "that its non-discrimination policies can brook no departures." *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021); *accord Bear Creek*, 571 F.Supp.3d at 613.

***Least Restrictive Means.*** EEOC also cannot pass the least restrictive means test. EEOC must prove "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby*, 573 U.S. at 728. And EEOC must show this with "*actual evidence*, not just conjecture," *McAllen*, 764 F.3d at 476, proving "that it considered the claimant's proposed alternatives" and that they "are ineffective," *Ali v. Stephens*, 822 F.3d 776, 786 (5th Cir. 2016).

A consequence of EEOC's *post hoc* attempt to hide abortion in a pregnancy statute and to eviscerate the PWFA's religious exemption is that Congress never evaluated whether there were less-restrictive ways to accomplish the objectives EEOC imposes. To the contrary: Congress didn't intend to burden religion at all, so it didn't justify that burden.

Nor does EEOC's "case-by-case" approach do the trick. As multiple other courts have recognized in protecting religious objectors from the Final Rule, there are "a number of alternatives the EEOC could have taken, which are less restrictive" of the Bishops' religious exercise. *Stanley Herzog Found.*, 781 F.Supp.3d at 916-17; *accord Catholic Benefits Ass'n v. Burrows*, 732 F.Supp.3d 1014, 1027 (D.N.D. 2024); *Dr. James Dobson Fam. Inst. v. Kennedy*, No. 4:24-cv-986, 2025 WL 4693641, at *9 (N.D. Tex. Aug. 8, 2025).

For example, EEOC could follow HHS's adoption of presumptive safe harbors for religious objectors to similar federal regulatory mandates. 45 C.F.R. §92.302; 89 Fed.Reg. 37,522, 37,657 (May 6, 2024). This Court has identified such frameworks as plausible less restrictive alternatives. *Braidwood*, 70 F.4th at 940 n.59. Thus, the mandate violates RFRA.

**E. The Bishops are entitled to an injunction under the Free Exercise Clause.**

EEOC also violates "bedrock" Free Exercise rights in two distinct ways. *FCA v. SJUSD*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc).

First, the mandate burdens religion while reserving discretion for EEOC "to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537. EEOC admits that it reserves discretion to make "case-by-case" decisions on whether accommodating a particular employee or particular situation is an "undue hardship." 89 Fed.Reg. at 29,205. But such "case-by-case analysis" "is antithetical to a generally applicable policy." *FCA*, 82 F.4th at 688. Thus, allowing "exemptions based on the circumstances underlying each" requested exemption triggers strict scrutiny. *Fulton,* 593 U.S. at 534.

Second, the Final Rule treats "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *FCA*, 82 F.4th at 688. Here, as noted above, EEOC provides several categorical exemptions, including for all employers with less than 15 employees. *See also* U.S. Br., *Doe v. CRS*, 2025 WL 3527721, at *31 (agreeing

such "secular exceptions" require courts to assess whether those exemptions "pose a greater risk to the government interests underlying those statutes than [a] religious exemption"). Because EEOC chose to treat such secular interests more favorably than religious objections to abortion for "no apparent reason other than administrative convenience," EEOC must satisfy strict scrutiny. *Bear Creek*, 571 F.Supp.3d at 613.[5] And EEOC fails that scrutiny for the reasons identified above.

### F. The Bishops are entitled to an injunction under the right to freedom of expressive association.

Finally, EEOC's requirements violate the First Amendment right to expressive association. Each right guaranteed by the First Amendment, "necessarily carries with it a corresponding right to associate with others." *First Choice*, 2026 WL 1153029, at *5 (cleaned up). And this "plainly presupposes a freedom not to associate," preventing a group from being forced "to accept members it does not desire." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). The Bishops' associational rights are burdened here because 1) they "engage in some form of expression"; and 2) the forced association would "significantly affect [their] ability to advocate" for their viewpoints. *Id.* at 648, 650.

---

[5] Strict scrutiny is also required because EEOC "imposes a substantial burden on religious exercise." *See Fulton*, 593 U.S. at 614 (Alito, J., concurring). The Bishops recognize this argument is barred by *Employment Division v. Smith*, 494 U.S. 872 (1990), but preserve it here.

First, "[r]eligious groups" like those led by the Bishops are "the archetype of associations formed for expressive purposes," since their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring). It is "indisputable that an association that seeks to transmit … a system of values engages in expressive activity." *Dale*, 530 U.S. at 650. That applies to the Bishops. *See, e.g.*, ROA.6230-31, ROA.6372-74.

Second, forced association with individuals who promote violating Catholic teachings would significantly impair the Bishops' collective expression of the Catholic Church's beliefs in the sanctity of life. That's why the Bishops do not allow speech or conduct encouraging abortions from their employees or faculty. ROA.6374. EEOC's mandate "force[s] the [Bishops] to send a message" that they accept violations of Catholic faith "as a legitimate form of behavior," and burdens their expressive association rights. *Dale*, 530 U.S. at 653; *see also Slattery v. Hochul*, 61 F.4th 278, 288-91 (2d Cir. 2023) (anti-discrimination law barring pregnancy center from declining to hire employees' "whose actions suggest that they believe the opposite of the message it is trying to convey" violated associational rights).

This associational burden must be narrowly tailored to serve a compelling government interest. *McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021). As shown above, it is not.

## CONCLUSION

This Court should reverse and remand with instructions to vacate the Final Rule's abortion-accommodation mandate and unlawful construction of the statutory religious exemption, and enter permanent injunctive relief for the Bishops.

Dated: May 18, 2026

JAMES R. CONDE
WALKER FORTENBERRY*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
   Suite 900
Washington, DC 20006
(202) 955-0620

*Application for admission to
the U.S. Court of Appeals for the
Fifth Circuit pending

Respectfully submitted,

/s/ *Daniel H. Blomberg*
DANIEL H. BLOMBERG
LAURA WOLK SLAVIS
ANDREA R. BUTLER
JORDAN T. VARBERG
BENJAMIN A. FLESHMAN
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
   Suite 400
Washington, DC 20006
(202) 955-0095

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I certify that on May 18, 2026, I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record who are registered CM/ECF users will be served by the court's electronic filing system.

/s/ *Daniel H. Blomberg*
Daniel H. Blomberg

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,961 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft 365 (the same program used to calculate the word count).

/s/ *Daniel H. Blomberg*
Daniel H. Blomberg

Dated:    May 18, 2026