No. 25-30398

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS; SOCIETY OF THE
ROMAN CATHOLIC CHURCH OF THE DIOCESE OF LAKE CHARLES; SOCIETY OF
THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF LAFAYETTE; CATHOLIC
UNIVERSITY OF AMERICA,

*Plaintiffs-Appellants,*

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Louisiana (Lake Charles)
No. 2:24-cv-691, Hon. David C. Joseph

## APPELLANTS' RECORD EXCERPTS

| | |
|---|---|
| JAMES R. CONDE | DANIEL H. BLOMBERG |
| WALKER FORTENBERRY* | LAURA WOLK SLAVIS |
| BOYDEN GRAY PLLC | ANDREA R. BUTLER |
| 800 Connecticut Ave. NW | JORDAN T. VARBERG |
|    Suite 900 | BENJAMIN A. FLESHMAN |
| Washington, DC 20006 | THE BECKET FUND FOR |
| (202) 955-0620 |    RELIGIOUS LIBERTY |
| | 1919 Pennsylvania Ave. NW |
| *Application for admission to |    Suite 400 |
| the Court of Appeals for the | Washington, DC 20006 |
| Fifth Circuit pending | (202) 955-0095 |

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

**Page**

Docket Sheet
     ROA.1-28..............................................................................Tab 1

Memorandum Order Granting Preliminary Injunction (ECF 53)
     ROA.886-917........................................................................Tab 2

Declaration of Father Ronald Kunkel, attachments omitted
(ECF 83-3)
     ROA.7368-7382....................................................................Tab 3

Declaration of Theresa Ridderhoff, attachments omitted
(ECF 83-5)
     ROA.7430-7438....................................................................Tab 4

Memorandum Order on Summary Judgment (ECF 113)
     ROA.9126-9168....................................................................Tab 5

FRCP 54(b) Partial Final Judgment (ECF 114)
     ROA.9166-9165....................................................................Tab 6

Notice of Appeal (ECF 124)
     ROA.9187-9190....................................................................Tab 7

Certificate of Service

# Tab 1

APPEAL,ATTENTION

Jump to Docket Table

# U.S. District Court
## Western District of Louisiana (Lake Charles)
## CIVIL DOCKET FOR CASE #: 2:24-cv-00691-DCJ-TPL
## Internal Use Only

United States Conference of Catholic Bishops et al v. Equal Employment Opportunity Commission et al
Assigned to: Judge David C Joseph
Referred to: Magistrate Judge Thomas P LeBlanc
Related Case:  2:24-cv-00629-DCJ-TPL
Case in other court:  5CCA, 25-30398
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ED/AK, 2:24-cv-00084
Cause: 05:702 Administrative Procedure Act

Date Filed: 05/22/2024
Jury Demand: Plaintiff
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**United States Conference of Catholic Bishops**

represented by **Michael J O'Brien**
Becket Fund for Religious Liberty
1919 Pennsylvania Ave NW Ste 400
Washington, DC 20006
202-955-0095
Email: mobrien@becketfund.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea R Butler**
Becket Fund for Religious Liberty
1919 Pennsylvania Ave NW Ste 400
Washington, DC 20006
202-955-0095
Email: abutler@becketlaw.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel H Blomberg**
Becket Fund for Religious Liberty
1919 Pennsylvania Ave NW Ste 400
Washington, DC 20006
202-955-0095
Email: dblomberg@becketfund.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James R Conde**
Boyden Gray
800 Connecticut Ave N W Ste 900
Washington, DC 20006

25-30398.1

202-955-0620
Fax: 202-955-0621
Email: jconde@boydengray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Berry**
Boyden Gray
800 Connecticut Ave N W Ste 900
Washington, DC 20006
202-955-0620
Fax: 202-955-0621
Email: jberry@boydengray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jordan T Varberg**
Becket Fund for Religious Liberty
1919 Pennsylvania Ave NW Ste 400
Washington, DC 20006
202-955-0095
Email: jvarberg@becketlaw.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Wolk Slavis**
Becket Fund for Religious Liberty
1919 Pennsylvania Ave NW Ste 400
Washington, DC 20006
202-955-0095
Email: lslavis@becketlaw.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Society of the Roman Catholic Church of the Diocese of Lake Charles** | represented by | **Michael J O'Brien**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Andrea R Butler**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Daniel H Blomberg**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **James R Conde**<br>(See above for address)<br>*PRO HAC VICE* |

25-30398.2

*ATTORNEY TO BE NOTICED*

**Jonathan Berry**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jordan T Varberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Wolk Slavis**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Society of the Roman Catholic Church of the Diocese of Lafayette** | represented by | **Michael J O'Brien**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrea R Butler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel H Blomberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James R Conde**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Berry**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jordan T Varberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Wolk Slavis**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Catholic University of America**                    represented by   **Michael J O'Brien**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Andrea R Butler**
                                                                       (See above for address)
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Daniel H Blomberg**
                                                                       (See above for address)
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **James R Conde**
                                                                       (See above for address)
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Jonathan Berry**
                                                                       (See above for address)
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Jordan T Varberg**
                                                                       (See above for address)
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Laura Wolk Slavis**
                                                                       (See above for address)
                                                                       *PRO HAC VICE*
                                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Equal Employment Opportunity**                     represented by   **Jacob S Siler**
**Commission**                                                        U S Dept of Justice
                                                                      1100 L St N W
                                                                      Washington, DC 20005
                                                                      202-353-4556
                                                                      Email: jacob.s.siler@usdoj.gov
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Karima Ortolano**
                                                                      U S Dept of Justice
                                                                      1100 L St N W

Washington, DC 20005
202-451-7467
Email: karima.ortolano2@usdoj.gov
*TERMINATED: 06/16/2025*
*LEAD ATTORNEY*

**Yuri Fuchs**
U S Dept of Justice
1100 L St N W
Washington, DC 20005
202-598-3869
Email: yuri.s.fuchs@usdoj.gov
*TERMINATED: 07/14/2025*
*LEAD ATTORNEY*

**Alexandra Widas**
U S Dept of Justice
950 Pennsylvania Ave N W
Washington, DC 20001
202-598-3883
Email: awidas@cov.com
*TERMINATED: 03/17/2025*

**Daniel Schwei**
U S Dept of Justice
1100 L St N W Rm 11532
Washington, DC 20005
202-305-8693
Fax: 202-616-8470
Email: daniel.s.schwei@usdoj.gov
*TERMINATED: 06/16/2025*

**Laura B Bakst**
U S Dept of Justice (L St)
1100 L Street NW
Washington, DC 20005
202-514-3183
Email: laura.b.bakst@usdoj.gov
*TERMINATED: 04/04/2025*

**<u>Defendant</u>**

**Charlotte Burrows**                    represented by    **Jacob S Siler**
*in her official capacity*                                (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Karima Ortolano**
                                                          (See above for address)
                                                          *TERMINATED: 06/16/2025*
                                                          *LEAD ATTORNEY*

                                                          **Yuri Fuchs**
                                                          (See above for address)

<span style="color:red">25-30398.5</span>

*TERMINATED: 07/14/2025*
*LEAD ATTORNEY*

**Alexandra Widas**
(See above for address)
*TERMINATED: 03/17/2025*

**Daniel Schwei**
(See above for address)
*TERMINATED: 06/16/2025*

**Laura B Bakst**
(See above for address)
*TERMINATED: 04/04/2025*

V.

**Movant**

Better Balance                                    represented by   **Charles Andrew Perry**
                                                                   A C L U of Louisiana
                                                                   1340 Poydras St Ste 2160
                                                                   New Orleans, LA 70112
                                                                   504-522-0628
                                                                   Email: aperry@laaclu.org
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Movant**

Actors Equity Association                          represented by   **Charles Andrew Perry**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Movant**

American Federation of Teachers                    represented by   **Charles Andrew Perry**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Movant**

American Postal Workers Union A F L -              represented by   **Charles Andrew Perry**
C I O                                                              (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Movant**

Americans United for Separation of                 represented by   **Charles Andrew Perry**
Church & State                                                     (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Movant**

**Bend the Arc A Jewish Partnership for Justice**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Center for WorkLife Law**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Communications Workers of America**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Interfaith Alliance**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Legal Aid at Work**
*formerly known as*
Legal Aid Society - Employment Law Center

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**National Center for Law & Economic Justice**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**National Council of Jewish Women**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**National Employment Law Project**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**National Partnership for Women & Families**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**One Fair Wage**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Public Counsel**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Service Employees International Union**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**United Food & Commerical Workers International Union**

represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Small Business Majority**

represented by **William Brock Most**
Most & Assoc
201 St Charles Ave Ste 2500 #9685
New Orleans, LA 70170
650-465-5023
Email: williammost@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carrie Flaxman**
Democracy Forward Foundation
P O Box 34553
Washington, DC 20043
202-448-9090
Email: cflaxman@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlyn Golden**

Democracy Forward Foundation
P O Box 34553
Washington, DC 20043
202-701-1789
Email: kgolden@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Main Street Alliance** | represented by | **William Brock Most** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Carrie Flaxman** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Kaitlyn Golden** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **American Sustainable Business Council** | represented by | **William Brock Most** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Carrie Flaxman** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Kaitlyn Golden** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **American Civil Liberties Foundation of Louisiana** | represented by | **Charles Andrew Perry** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **American Civil Liberties Union Foundation** | represented by | **Charles Andrew Perry** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Gillian Thomas**
American Civil Liberties Union Foundation
(NY)
125 Broad St 18th Fl
New York, NY 10004
212-284-7356
Email: gthomas@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Kaley**
American Civil Liberties Union Foundation
(NY)
125 Broad St 18th Fl
New York, NY 10004
212-519-7823
Email: lkaley@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Qi Chu**
American Civil Liberties Union Foundation
(NY)
125 Broad St 18th Fl
New York, NY 10004
332-204-2736
Email: mchu@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Womens Law Center**                    represented by **Charles Andrew Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gaylynn Ann Burroughs**
National Women's Law Center
1350 I St N W Ste 700
Washington, DC 20005
202-319-3025
Email: gburroughs@nwlc.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Narefsky**
National Women's Law Center
1350 I St N W Ste 700
Washington, DC 20005
202-319-3056
Email: lnarefsky@nwlc.org

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Email to Active Attorneys' Primary Addresses
Email to All Attorneys' Primary Addresses
Email to Casewide NEF Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 05/22/2024 | 1 (p.29) | COMPLAINT against Charlotte Burrows, Equal Employment Opportunity Commission with Jury Demand (Filing fee $405, receipt number ALAWDC-5952733) filed by United States Conference of Catholic Bishops, Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles. (Attachments: # 1 (p.29) Exhibit A, # 2 (p.397) Exhibit B, # 3 (p.399) Exhibit C, # 4 (p.402) Exhibit D, # 5 (p.404) Exhibit E, # 6 (p.411) Exhibit F)(Attorney Michael J O'Brien added to party Catholic University of America, (pty:pla), Society of the Roman Catholic Church of the Diocese of Lafayette (pty:pla), Society of the Roman Catholic Church of the Diocese of Lake Charles (pty:pla), United States Conference of Catholic Bishops(pty:pla))(aty,O'Brien, Michael) Modified on 5/23/2024 to modify docket text. (Crick, S). (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 2 (p.397) | Civil Cover Sheet by by United States Conference of Catholic Bishops, Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles . (aty,O'Brien, Michael) Modified on 5/23/2024 to modify docket text.(Crick, S). (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 3 (p.399) | CORPORATE DISCLOSURE STATEMENT by United States Conference of Catholic Bishops, Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles. (aty,O'Brien, Michael) Modified on 5/23/2024 to modify docket text. (Crick, S). (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 4 (p.402) | NOTICE by by United States Conference of Catholic Bishops, Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles of Local Rule 3.1 List of Collateral Cases (aty,O'Brien, Michael) Modified on 5/23/2024 to modify docket text. (Crick, S). (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 5 (p.404) | MOTION for Daniel H. Blomberg to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5952767) by All Plaintiffs. Motion Ripe Deadline set for 5/22/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,O'Brien, Michael) (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 6 (p.411) | MOTION for Laura Wolk Slavis to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5952769) by All Plaintiffs. Motion Ripe Deadline set for 5/22/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,O'Brien, Michael) (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 7 (p.417) | MOTION for Andrea R. Butler to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5952770) by All Plaintiffs. Motion Ripe Deadline set for |

| | | |
|---|---|---|
| | | 5/22/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,O'Brien, Michael) (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 8 (p.423) | MOTION for Jordan T. Varberg to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5952771) by All Plaintiffs. Motion Ripe Deadline set for 5/22/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,O'Brien, Michael) (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 9 (p.429) | MOTION for Jonathan Berry to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5952772) by All Plaintiffs. Motion Ripe Deadline set for 5/22/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,O'Brien, Michael) (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 10 (p.435) | MOTION for James R. Conde to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5952773) by All Plaintiffs. Motion Ripe Deadline set for 5/22/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,O'Brien, Michael) (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | 11 (p.441) | MOTION for Preliminary Injunction by United States Conference of Catholic Bishops, Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles . Motion Ripe Deadline set for 5/22/2024. (Attachments: # 1 (p.29) Memorandum / Brief in support of Preliminary Injunction, # 2 (p.397) Exhibit Caraway Declaration, # 3 (p.399) Exhibit Brown Declaration, # 4 (p.402) Exhibit Fontenot Declaration, # 5 (p.404) Exhibit Kunkel Declaration, # 6 (p.411) Exhibit Ridderhoff Declaration, # 7 (p.417) Proposed order)(aty,O'Brien, Michael) Modified on 5/23/2024 to modify docket text. (Crick, S). (Entered: 05/22/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/22/2024 | | CASE Assigned to Judge James D Cain, Jr and Magistrate Judge Thomas P LeBlanc. Motions referred to Magistrate Judge Thomas P LeBlanc. (crt,Crick, S) (Entered: 05/23/2024) |
| 05/23/2024 | 12 (p.624) | SUMMONS ISSUED as to U S Attorney, U S Attorney General, Equal Employment Opportunity Commission, Charlotte Burrows. (crt,Crick, S) (Entered: 05/23/2024) |
| 05/23/2024 | 13 (p.632) | NOTICE of Appearance by Daniel Schwei on behalf of Charlotte Burrows, Equal Employment Opportunity Commission (Attorney Daniel Schwei added to party Charlotte Burrows(pty:dft), Attorney Daniel Schwei added to party Equal Employment Opportunity Commission(pty:dft)) (aty,Schwei, Daniel) (Entered: 05/23/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/23/2024 | 14 (p.634) | NOTICE by Charlotte Burrows, Equal Employment Opportunity Commission re 11 (p.441) MOTION for Preliminary Injunction *of Defendants' Opposition* (aty,Schwei, Daniel) (Entered: 05/23/2024), (QC'ed on 05/23/2024, by Crick , S) |
| 05/24/2024 | 15 (p.636) | ORDER REASSIGNING CASE. Case reassigned to Judge David C Joseph. Judge James D Cain, Jr no longer assigned to case. Signed by Judge James D Cain, Jr on 5/24/2024. (crt,Crick, S) (Entered: 05/28/2024) |
| 05/25/2024 | 16 (p.637) | ORDER granting 10 (p.435) Motion to Appear Pro Hac Vice for appearance of James R Conde for Catholic University of America, Society of the Roman Catholic |

25-30398.12

| | | |
|---|---|---|
| | | Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. Signed by Magistrate Judge Thomas P LeBlanc on 5/25/2024. (crt,Crick, S) (Entered: 05/28/2024) |
| 05/25/2024 | 17 (p.638) | ORDER granting 5 (p.404) Motion to Appear Pro Hac Vice for appearance of Daniel H Blomberg for Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette,Daniel H Blomberg for Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. Signed by Magistrate Judge Thomas P LeBlanc on 5/25/2024. (crt,Crick, S) (Entered: 05/28/2024) |
| 05/25/2024 | 18 (p.639) | ORDER granting 6 (p.411) Motion to Appear Pro Hac Vice for appearance of Laura Wolk Slavis for Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. Signed by Magistrate Judge Thomas P LeBlanc on 5/25/2024. (crt,Crick, S) (Entered: 05/28/2024) |
| 05/25/2024 | 19 (p.640) | ORDER granting 7 (p.417) Motion to Appear Pro Hac Vice for appearance of Andrea R Butler for Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette,Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. Signed by Magistrate Judge Thomas P LeBlanc on 5/25/2024. (crt,Crick, S) (Entered: 05/28/2024) |
| 05/25/2024 | 20 (p.641) | ORDER granting 8 (p.423) Motion to Appear Pro Hac Vice for appearance of Jordan T Varberg for Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. Signed by Magistrate Judge Thomas P LeBlanc on 5/25/2024. (crt,Crick, S) (Entered: 05/28/2024) |
| 05/25/2024 | 21 (p.642) | ORDER granting 9 (p.429) Motion to Appear Pro Hac Vice for appearance of Jonathan Berry for Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. Signed by Magistrate Judge Thomas P LeBlanc on 5/25/2024. (crt,Crick, S) (Entered: 05/28/2024) |
| 05/28/2024 | 22 (p.643) | NOTICE of Appearance by Laura B Bakst on behalf of Charlotte Burrows, Equal Employment Opportunity Commission (Attorney Laura B Bakst added to party Charlotte Burrows(pty:dft), Attorney Laura B Bakst added to party Equal Employment Opportunity Commission(pty:dft)) (aty,Bakst, Laura) (Entered: 05/28/2024), (QC'ed on 05/29/2024, by Crick , S) |
| 05/28/2024 | 23 (p.645) | NOTICE of Appearance by Alexandra Widas on behalf of Charlotte Burrows, Equal Employment Opportunity Commission (Attorney Alexandra Widas added to party Charlotte Burrows(pty:dft), Attorney Alexandra Widas added to party Equal Employment Opportunity Commission(pty:dft)) (aty,Widas, Alexandra) (Entered: 05/28/2024), (QC'ed on 05/29/2024, by Crick , S) |
| 05/29/2024 | 24 | ELECTRONIC MINUTE ENTRY: A joint hearing is set for 6/4/2024 at 10:00 AM in Lafayette, Courtroom 1 before Judge David C Joseph to hear argument and issue rulings regarding the following items: 1 - The Court's sua sponte consolidation of |

| | | docket numbers 24-cv-629 and 24-cv-691 pursuant to Federal Rule of Civil Procedure 42(a)(2); 2- The Defendant's Motion to Transfer [Doc. 5] in 24-cv-629; 3 - To set a briefing schedule and hearing date for Plaintiffs' Motion for Preliminary Injunction in 24-cv-691 prior to implementation of the Final Rule on June 18, 2024. The parties may, but are not required, to file briefing pertinent to these issues on or before May 31, 2024. Signed by Judge David C Joseph on 5/29/2024. (crt,LaCombe, L) (Entered: 05/29/2024) |
|---|---|---|
| 05/29/2024 | 25 | ELECTRONIC MINUTE ENTRY: Joint hearing and argument RESET for 6/5/2024 at 10:00 AM in Lafayette, Courtroom 1 before Judge David C Joseph. See Electronic Minute Entry 24 for additional details. Signed by Judge David C Joseph on 5/29/2024. (crt,LaCombe, L) (Entered: 05/29/2024) |
| 05/30/2024 | 26 (p.647) | NOTICE by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops *Regarding June 5, 2024 Joint Hearing* (aty,O'Brien, Michael) (Entered: 05/30/2024), (QC'ed on 05/30/2024, by Crick , S) |
| 05/31/2024 | 27 (p.653) | NOTICE of Regarding June 5, 2024 Joint Hearing by Charlotte Burrows, Equal Employment Opportunity Commission (aty,Bakst, Laura) (Entered: 05/31/2024), (QC'ed on 06/03/2024, by Crick , S) |
| 06/03/2024 | | (Court only) ***Deadlines/Hearings terminated. Motion Ripe Deadline terminated. (crt,LaCombe, L) (Entered: 06/03/2024) |
| 06/05/2024 | 28 (p.656) | MINUTES for proceedings held before Judge David C Joseph. STATUS CONFERENCE held on 6/5/2024. 11 (p.441) Motion for Preliminary Injunction set for 6/12/2024 at 10:00 AM in Lafayette, Courtroom 1 before Judge David C Joseph. Defendants, Equal Employment Opportunity Commission shall file their Responses by end of day 6/5/2024. Replies due by 6/11/2024. (Court Reporter: Myra Primeaux) (crt,LaCombe, L) (Entered: 06/05/2024) |
| 06/05/2024 | 29 (p.658) | MEMORANDUM in Opposition re 11 (p.441) MOTION for Preliminary Injunction filed by Charlotte Burrows, Equal Employment Opportunity Commission. (aty,Schwei, Daniel) (Entered: 06/05/2024), (QC'ed on 06/06/2024, by Crick , S) |
| 06/06/2024 | 30 (p.9213) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings for Motion Hearing and Status Conference held on 6/5/2024 before Judge David C Joseph. Court Reporter Myra Primeaux, Telephone number (318)442-3080. Total pages: 33. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter. Redaction Request due 7/1/2024. Redacted Transcript Deadline set for 7/11/2024. Release of Transcript Restriction set for 9/9/2024. (crt,Primeaux, M) (Entered: 06/06/2024), (QC'ed on 06/07/2024, by Alexander , E) |
| 06/10/2024 | 31 (p.693) | Unopposed MOTION for Leave to File Amicus Brief with consent by Small Business Majority, Main Street Alliance, American Sustainable Business Council. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Memorandum / Brief, # 2 (p.397) Proposed pleading, # 3 (p.399) Proposed order)(Attorney William Brock Most added to party Small Business Majority(pty:am), Attorney William Brock Most added to party Main Street Alliance(pty:am), Attorney William Brock Most added to party American Sustainable Business Council(pty:am))(aty,Most, William) (Entered: 06/10/2024), |

| | | |
|---|---|---|
| | | (QC'ed on 06/10/2024, by Crick , S) |
| 06/10/2024 | 32 (p.716) | Ex Parte MOTION for Carrie Flaxman to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5968559) by American Sustainable Business Council, Main Street Alliance, Small Business Majority. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,Most, William) (Entered: 06/10/2024), (QC'ed on 06/10/2024, by Crick , S) |
| 06/10/2024 | 33 (p.720) | Ex Parte MOTION for Kaitlyn Golden to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5968570) by American Sustainable Business Council, Main Street Alliance, Small Business Majority. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,Most, William) (Entered: 06/10/2024), (QC'ed on 06/10/2024, by Crick , S) |
| 06/10/2024 | 34 (p.724) | Unopposed MOTION for Leave to File Brief of Amici Curae with consent by American Civil Liberties Union of Louisiana, American Civil Liberties Union, National Women's Law Center. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Memorandum / Brief Proposed Brief of Amici Curae, # 2 (p.397) Proposed order)(Attorney Charles Andrew Perry added to party American Civil Liberties Union of Louisiana(pty:selreq), American Civil Liberties Union(pty:selreq), National Women's Law Center(pty:selreq))(aty,Perry, Charles) Modified on 6/11/2024 to modify docket text. Crick, S). (Entered: 06/10/2024), (QC'ed on 06/11/2024, by Crick , S) |
| 06/10/2024 | 35 (p.764) | MOTION for Gillian Thomas to Appear Pro Hac Vice (Admission fee: $105, receipt number BLAWDC-5969209) by American Civil Liberties Union, American Civil Liberties Union of Louisiana, National Women's Law Center. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Proposed order, # 2 (p.397) Certificate of good standing)(aty,Perry, Charles) (Entered: 06/10/2024), (QC'ed on 06/11/2024, by Crick , S) |
| 06/10/2024 | 36 (p.769) | MOTION for Gaylynn Ann Burroughs to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5969214) by American Civil Liberties Union, American Civil Liberties Union of Louisiana, National Women's Law Center. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Proposed order, # 2 (p.397) Certificate of good standing)(aty,Perry, Charles) (Entered: 06/10/2024), (QC'ed on 06/11/2024, by Crick , S) |
| 06/10/2024 | 37 (p.774) | MOTION for Ming-Qi Chu to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5969215) by American Civil Liberties Union, American Civil Liberties Union of Louisiana, National Women's Law Center. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Proposed order, # 2 (p.397) Certificate of good standing)(aty,Perry, Charles) (Entered: 06/10/2024), (QC'ed on 06/11/2024, by Crick , S) |
| 06/10/2024 | 38 (p.780) | MOTION for Lindsey Kaley to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5969217) by American Civil Liberties Union, American Civil Liberties Union of Louisiana, National Women's Law Center. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,Perry, Charles) (Entered: 06/10/2024), (QC'ed on 06/11/2024, by Crick , S) |

| 06/10/2024 | 39 (p.786) | MOTION for Laura Narefsky to Appear Pro Hac Vice (Admission fee: $105, receipt number ALAWDC-5969218) by American Civil Liberties Union, American Civil Liberties Union of Louisiana, National Women's Law Center. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/10/2024. (Attachments: # 1 (p.29) Certificate of good standing, # 2 (p.397) Proposed order)(aty,Perry, Charles) (Entered: 06/10/2024), (QC'ed on 06/11/2024, by Crick , S) |
|---|---|---|
| 06/11/2024 | 40 (p.791) | REPLY to Response to Motion re 11 (p.441) MOTION for Preliminary Injunction filed by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. (Attachments: # 1 (p.29) Second Caraway Declaration, # 2 (p.397) Second Ridderhoff Declaration)(aty,Blomberg, Daniel) (Entered: 06/11/2024), (QC'ed on 06/11/2024, by Crick , S) |
| 06/11/2024 | | REMARK: A duplicate charge was incurred during a new filing. A refund of the duplicate payment of $105.00, receipt #ALAWDC-5969209, has been processed in pay.gov this date. The attorney is advised to verify the refund on their statement. (crt,Burns, P) (Entered: 06/11/2024) |
| 06/12/2024 | 41 (p.814) | MINUTES for proceedings held before Judge David C Joseph. MOTION HEARING held on 6/12/2024 re 11 (p.441) MOTION for Preliminary Injunction filed by Catholic University of America, United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles. After considering oral argument, the applicable law, and memoranda submitted, the Court took 11 (p.441) Motion for Preliminary Injunction under advisement. The Court invited supplemental briefing on any issues addressed in oral argument by Friday, June 14, 2024. (Court Reporter: Cathleen E Marquardt) (crt,LaCombe, L) (Entered: 06/12/2024) |
| 06/13/2024 | 42 (p.815) | ORDER granting 32 (p.716) Motion to Appear Pro Hac Vice for appearance of Carrie Flaxman for American Sustainable Business Council, Main Street Alliance, Small Business Majority. Signed by Magistrate Judge Thomas P LeBlanc on 6/13/2024. (crt,Jones, P) (Entered: 06/13/2024) |
| 06/13/2024 | 43 (p.816) | ORDER granting 33 (p.720) Motion to Appear Pro Hac Vice for appearance of Kaitlyn Golden for American Sustainable Business Council, Main Street Alliance, Small Business Majority. Signed by Magistrate Judge Thomas P LeBlanc on 6/13/2024. (crt,Jones, P) (Entered: 06/13/2024) |
| 06/13/2024 | 44 (p.817) | ORDER granting 35 (p.764) Motion to Appear Pro Hac Vice for appearance of Gillian Thomas for American Civil Liberties Union Foundation. Signed by Magistrate Judge Thomas P LeBlanc on 6/13/2024. (crt,Crick, S) (Entered: 06/13/2024) |
| 06/13/2024 | 45 (p.818) | ORDER granting 36 (p.769) Motion to Appear Pro Hac Vice for appearance of Gaylynn Ann Burroughs for National Womens Law Center. Signed by Magistrate Judge Thomas P LeBlanc on 6/13/2024. (crt,Crick, S) (Entered: 06/13/2024) |
| 06/13/2024 | 46 (p.819) | ORDER granting 37 (p.774) Motion to Appear Pro Hac Vice for appearance of Ming-Qi Chu for American Civil Liberties Union Foundation. Signed by Magistrate Judge Thomas P LeBlanc on 6/13/2024. (crt,Crick, S) (Entered: 06/13/2024) |
| 06/13/2024 | 47 (p.820) | ORDER granting 38 (p.780) Motion to Appear Pro Hac Vice for appearance of Lindsey Kaley for American Civil Liberties Union Foundation. Signed by |

| | | |
|---|---|---|
| | | Magistrate Judge Thomas P LeBlanc on 6/13/2024. (crt,Crick, S) (Entered: 06/13/2024) |
| 06/13/2024 | 48 (p.821) | ORDER granting 39 (p.786) Motion to Appear Pro Hac Vice for appearance of Laura Narefsky for National Womens Law Center. Signed by Magistrate Judge Thomas P LeBlanc on 6/13/2024. (crt,Crick, S) (Entered: 06/13/2024) |
| 06/13/2024 | 49 (p.822) | ORDER granting 31 (p.693) Motion for Leave to File. Signed by Magistrate Judge Thomas P LeBlanc on 6/13/2024. (crt,Crick, S) (Entered: 06/13/2024) |
| 06/13/2024 | 50 (p.823) | BRIEF OF AMICI CURIAE re 11 (p.441) MOTION for Preliminary Injunction filed by American Sustainable Business Council, Main Street Alliance, Small Business Majority. (crt,Crick, S) (Entered: 06/13/2024) |
| 06/14/2024 | 51 (p.838) | SUPPLEMENTAL MEMORANDUM in Opposition re 11 (p.441) MOTION for Preliminary Injunction filed by Charlotte Burrows, Equal Employment Opportunity Commission. (Attachments: # 1 (p.29) Exhibit Memorandum Opinion & Order in Tennessee v EEOC)(aty,Schwei, Daniel) (Entered: 06/14/2024), (QC'ed on 06/17/2024, by Crick , S) |
| 06/14/2024 | 52 (p.876) | SUPPLEMENTAL MEMORANDUM in Support re 11 (p.441) MOTION for Preliminary Injunction filed by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. (aty,Blomberg, Daniel) (Entered: 06/14/2024), (QC'ed on 06/17/2024, by Crick , S) |
| 06/17/2024 | 53 (p.886) | MEMORANDUM ORDER: IT IS ORDERED that the MOTION FOR PRELIMINARY INJUNCTION [Doc. 17], filed by the States of Louisiana and Mississippi, and the MOTION FOR PRELIMINARY INJUNCTION [Doc. 11] filed by the United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, and Catholic University of America are GRANTED IN PART. IT IS FURTHER ORDERED that this preliminary injunction postpones the effective date of the Final Rule's requirement that covered entities provide accommodation for the elective abortions of employees that are not necessary to treat a medical condition related to pregnancy. IT IS FURTHER ORDERED that the EEOC is preliminarily enjoined with respect to the above-listed parties from: (i) initiating any investigation into claims that a covered employer has failed to accommodate an elective abortion that is not necessary to treat a medical condition related to pregnancy; and (ii) issuing any Notice of Right to Sue with respect to the same. Signed by Judge David C Joseph on 6/17/2024. (crt,LaCombe, L) (Entered: 06/17/2024) (Entered: 06/17/2024) |
| 06/24/2024 | 54 (p.918) | SUMMONS Returned Executed by Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America. Charlotte Burrows served on 5/29/2024, answer due 6/20/2024; Equal Employment Opportunity Commission served on 5/29/2024, answer due 6/20/2024. (aty,Blomberg, Daniel) (Entered: 06/24/2024), (QC'ed on 06/25/2024, by Crick , S) |
| 06/24/2024 | 54 | SUMMONS Returned Executed by Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America Charlotte Burrows served on 5/29/2024, answer due 7/29/2024; Equal |

| | | |
|---|---|---|
| | | Employment Opportunity Commission served on 5/29/2024, answer due 7/29/2024. ADMINISTRATIVE ENTRY as document electronically filed in error as 54 Summons Returned Executed. (crt,Crick, S) Modified on 6/25/2024 to add document number.(Crick, S). (Entered: 06/25/2024) |
| 06/24/2024 | | NOTICE of Corrective Action to Daniel H Blomberg on behalf of Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops regarding 54 Summons Returned Executed,. Action taken: Terminated 54 Summons Return Executed. Docketed Summons Return Executed as to USA to capture correct answer due date. (crt,Crick, S) (Entered: 06/25/2024) |
| 06/26/2024 | 55 (p.929) | PROPOSED ORDER/JUDGMENT *Consolidating Related Cases* by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. (Attachments: # 1 (p.29) Proposed order)(aty,Blomberg, Daniel) Modified on 6/26/2024 to capture motion event. (Crick, S). (Entered: 06/26/2024), (QC'ed on 06/26/2024, by Crick , S) |
| 06/26/2024 | | Set/Reset Deadlines as to 55 (p.929) Proposed Order. Motion Ripe Deadline set for 6/26/2024. (crt,Crick, S) (Entered: 06/26/2024) |
| 06/26/2024 | 56 (p.933) | NOTICE of Filing Proposed Consolidation Order by Charlotte Burrows, Equal Employment Opportunity Commission (Attachments: # 1 (p.29) Proposed order)(aty,Schwei, Daniel) Modified on 6/26/2024 (Crick, S). (Entered: 06/26/2024), (QC'ed on 06/26/2024, by Crick , S) |
| 06/26/2024 | | Set/Reset Deadlines as to 56 (p.933) Proposed Order. Motion Ripe Deadline set for 6/26/2024. (crt,Crick, S) (Entered: 06/26/2024) |
| 06/27/2024 | 57 (p.938) | CONSOLIDATION ORDER. Case 2:24-cv-0629 & 2:24-cv-0691 are CONSOLIDATED for purpose of discovery and pre-trial motion practice. The matters are REFERRED to the magistrate judge for a scheduling conference. Signed by Judge David C Joseph on 6/27/2024. (crt,Crick, S) (Entered: 06/28/2024) |
| 07/01/2024 | 58 | ELECTRONIC ORDER: Considering the 57 (p.938) Consolidation Order issued by the District Judge, a Scheduling Conference is set for 7/25/2024 at 01:30 PM by telephone before Magistrate Judge Thomas P LeBlanc in this matter, *United States Conference of Catholic Bishops et al v. EEOC, et al,* (2:24-cv-00691), and in *State of Louisiana et al v. EEOC* (2:24-cv-00629). The parties will discuss preliminary coordination of pretrial matters; this conference will not result in the selection of a trial date. Counsel are to call the Chambers Teleconference Line at 877-336-1274, Access Code 7066014. Signed by Magistrate Judge Thomas P LeBlanc on 7/1/2024. (crt,Crawford, Andrea) (Entered: 07/01/2024), (QC'ed on 07/02/2024, by Jones , P) |
| 07/02/2024 | 59 (p.940) | MOTION for Extension of Time to File Answer re 1 (p.29) Complaint,,, with opposition by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 7/2/2024. (Attachments: # 1 (p.29) Proposed order)(aty,Widas, Alexandra) (Entered: 07/02/2024), (QC'ed on 07/02/2024, by Crick , S) |
| 07/03/2024 | 60 (p.944) | MEMORANDUM in Opposition re 59 (p.940) MOTION for Extension of Time to File Answer re 1 (p.29) Complaint,,, with opposition filed by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. (aty,Blomberg, Daniel) (Entered: 07/03/2024), |

| | | |
|---|---|---|
| | | <span style="color:green">(QC'ed on 07/03/2024, by Bunting , M)</span> |
| 07/10/2024 | 61 (p.948) | ORDER granting 59 (p.940) Motion for Extension of Time to Answer re 1 (p.29) Complaint with opposition. Charlotte Burrows answer due 8/30/2024. Signed by Magistrate Judge Thomas P LeBlanc on 7/10/2024. (crt,Crick, S) (Entered: 07/11/2024) |
| 07/15/2024 | 62 (p.949) | MOTION to Alter Judgment, MOTION to Amend/Correct 53 (p.886) Order on Motion for Preliminary Injunction, with opposition (Motion Ripe Deadline set for 7/15/2024.) by Charlotte Burrows and Equal Employment Opportunity Commission. Motions referred to Thomas P LeBlanc. (Attachments: # 1 (p.29) Memorandum / Brief)(aty,Widas, Alexandra) Modified docket text on 7/16/2024 (Bunting, M). (Entered: 07/15/2024), <span style="color:green">(QC'ed on 07/16/2024, by Bunting , M)</span> |
| 07/16/2024 | | Motions Transferred regarding 62 (p.949) MOTION to Alter Judgment MOTION to Amend/Correct 53 (p.886) Order on Motion for Preliminary Injunction,,,, with opposition . Motions referred to Judge David C Joseph. (crt,Bunting, M) (Entered: 07/16/2024) |
| 07/16/2024 | 63 (p.963) | NOTICE of Motion Setting regarding: 62 (p.949) MOTION to Alter Judgment MOTION to Amend/Correct 53 (p.886) Order on Motion for Preliminary Injunction,,,, with opposition . Motions referred to Judge David C Joseph. (crt,Bunting, M) (Entered: 07/16/2024) |
| 07/18/2024 | 64 (p.964) | *Joint* RULE 26(f) Report by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops, Equal Employment Opportunity Commission and Charlotte Burrows . (aty,Blomberg, Daniel) Modified filers on 7/19/2024 (Bunting, M). (Entered: 07/18/2024), <span style="color:green">(QC'ed on 07/19/2024, by Bunting , M)</span> |
| 07/25/2024 | 65 | MINUTES for proceedings held before Magistrate Judge Thomas P LeBlanc: A SCHEDULING CONFERENCE was held on 7/25/2024 in connection with both 24-cv-00691 and 24-cv-00629. Participating by telephone were: Daniel H. Blomberg and Andrea R. Butler for plaintiffs in 24-cv-00691; J. Benjamin Aguinaga for plaintiffs in 24-cv-00629; and Laura B. Bakst and Alexandra Widas for the EEOC in both actions. Following discussions with counsel, an interim scheduling order was achieved to facilitate early-stage joint dispositive motions, including addressing filing of the administrative record, discovery, and related matters. See the separately docketed Interim Scheduling Order for deadlines and additional pertinent information. (jud,LeBlanc, Thomas P) (Entered: 07/25/2024), <span style="color:green">(QC'ed on 07/30/2024, by Jones , P)</span> |
| 07/26/2024 | 66 (p.979) | ORDER, IT IS ORDERED that On or before AUGUST 26, 2024, the Equal Employment Opportunity Commission (EEOC) shall compile the entirety of the administrative record pertaining to this matter, file same into the record. On or before SEPTEMBER 16, 2024, the State Plaintiffs and the Bishops Plaintiffs shall file any motion to supplement or complete the administrative record or shall file a certificate that the administrative record as filed by the EEOC is the complete administrative record. On or before OCTOBER 10, 2024, the parties shall file their respective dispositive motions. On or before NOVEMBER 12, 2024, the parties shall file their respective responses to the dispositive motions. On or before DECEMBER 10, 2024, the parties shall file their respective repliesto the responses to the dispositive motions. (SEE PDF FOR COMPLETE DETAILS AND OTHER DEADLINES) (Compliance Deadline set for 8/26/2024., Second Compliance |

<span style="color:red">25-30398.19</span>

| | | |
|---|---|---|
| | | Deadline set for 9/16/2024., Dispositive Motions due by 10/10/2024.) Signed by Magistrate Judge Thomas P LeBlanc on 7/26/2024. (crt,Jones, P) (Entered: 07/26/2024) |
| 08/05/2024 | 67 (p.983) | MEMORANDUM in Opposition re 62 (p.949) MOTION to Alter Judgment MOTION to Amend/Correct 53 (p.886) Order on Motion for Preliminary Injunction,,,, with opposition filed by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops. (Attachments: # 1 (p.29) Exhibit Oral Argument Transcript)(aty,Blomberg, Daniel) (Entered: 08/05/2024), (QC'ed on 08/06/2024, by Crick , S) |
| 08/12/2024 | 68 (p.1085) | REPLY to Response to Motion re 62 (p.949) MOTION to Alter Judgment MOTION to Amend/Correct 53 (p.886) Order on Motion for Preliminary Injunction,,,, with opposition filed by Charlotte Burrows, Equal Employment Opportunity Commission. (aty,Schwei, Daniel) (Entered: 08/12/2024), (QC'ed on 08/13/2024, by Crick , S) |
| 08/13/2024 | 69 (p.1094) | RULING AND ORDER: IT IS ORDERED that the RULE 59 MOTION TO ALTER OR AMEND JUDGMENT filed in USCCB, et al v. EEOC, et al, [Doc. 62] is DENIED. Signed by Judge David C Joseph on 8/13/2024. (crt,LaCombe, L) (Entered: 08/13/2024) |
| 08/19/2024 | 70 (p.1100) | Unopposed MOTION Leave to File Administrative Record Directly With Clerk of Court and Waiver of Hard Copy Requirement by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 8/19/2024. (Attachments: # 1 (p.29) Proposed order)(aty,Bakst, Laura) (Entered: 08/19/2024), (QC'ed on 08/20/2024, by Crick , S) |
| 08/19/2024 | | Motions Transferred regarding 70 (p.1100) Unopposed MOTION Leave to File Administrative Record Directly With Clerk of Court and Waiver of Hard Copy Requirement . Motions referred to Judge David C Joseph. (crt,Crick, S) (Entered: 08/20/2024) |
| 08/19/2024 | | Motions Transferred regarding 70 (p.1100) Unopposed MOTION Leave to File Administrative Record Directly With Clerk of Court and Waiver of Hard Copy Requirement . Motions referred to Magistrate Judge Thomas P LeBlanc. (crt,Crick, S) (Entered: 08/20/2024) |
| 08/26/2024 | 71 (p.1106) | NOTICE of Filing of Certified Administrative Record by Charlotte Burrows, Equal Employment Opportunity Commission (Attachments: # 1 (p.29) Exhibit Certification of the Administrative Record, # 2 (p.397) Exhibit Index of the Administrative Record)(aty,Widas, Alexandra) (Entered: 08/26/2024), (QC'ed on 08/27/2024, by Crick , S) |
| 08/27/2024 | | MANUAL ATTACHMENT received from Daniel Schwei, Laura B Bakst, Alexandra Widas on behalf of Equal Employment Opportunity Commission regarding 71 (p.1106) Notice (Other),. The original manual attachments will be maintained in the division of the presiding judge, until expiration of appeal delays. (crt,Savoy, A) (Entered: 08/27/2024) |
| 09/13/2024 | 72 (p.5828) | Joint MOTION for Leave to File Excess Pages by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops, Equal Employment Opportunity Commission, Charlotte Burrows. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for |

| | | |
|---|---|---|
| | | 9/13/2024. (Attachments: # 1 (p.29) Proposed order Extending Page Limits)(aty,Blomberg, Daniel) Modified on 9/16/2024 to add filers. (Crick, S). (Entered: 09/13/2024), (QC'ed on 09/16/2024, by Crick , S) |
| 09/13/2024 | | Motions Transferred regarding 72 (p.5828) Joint MOTION for Leave to File Excess Pages . Motions referred to Judge David C Joseph. (crt,Crick, S) (Entered: 09/16/2024) |
| 09/16/2024 | 73 (p.5835) | NOTICE of Certification Regarding Administrative Record by Catholic University of America, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles, United States Conference of Catholic Bishops re 71 (p.1106) Notice (Other), 66 (p.979) Order,,,,, Set Deadlines,,,, (aty,Blomberg, Daniel) (Entered: 09/16/2024), (QC'ed on 09/16/2024, by Crick , S) |
| 09/16/2024 | 74 (p.5839) | ORDER granting 72 (p.5828) Motion for Leave to File Excess Pages. Signed by Judge David C Joseph on 9/16/2024. (crt,Crick, S) (Entered: 09/16/2024) |
| 09/16/2024 | | (Court only) ***Set ATTENTION Flag. See 74 (p.5839) Order setting page limitations. (crt,Crick, S) (Entered: 09/16/2024) |
| 10/10/2024 | 75 (p.5841) | MOTION to Dismiss Plaintiffs' complaint, MOTION for Summary Judgment by All Defendants. (Attachments: # 1 (p.29) Memorandum / Brief, # 2 (p.397) Statement of material facts, # 3 (p.399) Exhibit Lage Declaration, # 4 (p.402) Exhibit Hudson Declaration (Bishops), # 5 (p.404) Exhibit Hudson Declaration (States), # 6 (p.411) Proposed order)(aty,Bakst, Laura) Modified on 10/15/2024 to indicate 80 (p.9251) SEALED Declaration Hudson submitted. (Crick, S). (Entered: 10/10/2024), (QC'ed on 10/11/2024, by Crick , S) |
| 10/10/2024 | 76 (p.5922) | Unopposed MOTION to Seal Attached Document re 75 (p.5841) Motion to Dismiss by All Defendants. Motion Ripe Deadline set for 10/10/2024. (Attachments: # 1 (p.29) Proposed SEALED exhibit, # 2 (p.397) Proposed order)(aty,Widas, Alexandra) Modified on 10/11/2024 to create docket entry relationship. (Crick, S). (Entered: 10/10/2024), (QC'ed on 10/11/2024, by Crick , S) |
| 10/10/2024 | 77 (p.5927) | MOTION for Partial Summary Judgment, MOTION for *Permanent Injunction* by All Plaintiffs. (Attachments: # 1 (p.29) Memorandum / Brief, # 2 (p.397) Declaration of Daniel H. Blomberg, # 3 (p.399) Declaration of Father Ronald Kunkel, # 4 (p.402) Declaration of Theresa Ridderhoff, # 5 (p.404) Declaration of James Steven Brown, # 6 (p.411) Declaration of Father Joseph Caraway, # 7 (p.417) Declaration of Maureen K. Fontenot)(aty,Blomberg, Daniel). Added MOTION for Permanent Injunction on 10/11/2024 (Crick, S). (Entered: 10/10/2024), (QC'ed on 10/11/2024, by Crick , S) |
| 10/11/2024 | 78 (p.6812) | NOTICE of Motion Setting regarding: 75 (p.5841) MOTION to Dismiss Plaintiffs' complaint MOTION for Summary Judgment , 77 (p.5927) MOTION for Partial Summary Judgment *and Permanent Injunction* MOTION for Permanent Injunction. Motions referred to Judge David C Joseph. (crt,Crick, S) (Entered: 10/11/2024) |
| 10/15/2024 | | (Court only) ***Deadlines/Hearings terminated. Motion Ripe Deadline terminated. (crt,LaCombe, L) (Entered: 10/15/2024) |
| 10/15/2024 | 79 (p.6813) | ORDER granting 76 (p.5922) Motion to Seal Attached Document. Signed by Judge David C Joseph on 10/15/2024. (crt,Crick, S) (Entered: 10/15/2024) |
| 10/15/2024 | | |

| | | |
|---|---|---|
| | 80 (p.9251) | SEALED Exhibit Declaration Hudson re 75 (p.5841) MOTION to Dismiss Plaintiffs' complaint MOTION for Summary Judgment by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America. (crt,Crick, S) (Entered: 10/15/2024) |
| 11/12/2024 | 81 (p.6814) | MEMORANDUM in Opposition re 77 (p.5927) MOTION for Partial Summary Judgment *and Permanent Injunction* MOTION for Permanent Injunction filed by Equal Employment Opportunity Commission, Charlotte Burrows. (Attachments: # 1 (p.29) Exhibit Second Lage Declaration, # 2 (p.397) Exhibit Second Hudson Declaration)(aty,Bakst, Laura) Modified on 11/13/2024 to indicate 82 (p.6881) Proposed SEALED Exhibit submitted. (Crick, S). Modified on 11/13/2024 to indicate 85 (p.9259) SEALED Second Hudson Declaration submitted.(Crick, S). (Entered: 11/12/2024), (QC'ed on 11/13/2024, by Crick , S) |
| 11/12/2024 | 82 (p.6881) | Unopposed MOTION to Seal Attached Exhibit to 81 (p.6814) Memorandum in Opposition by All Defendants. Motion Ripe Deadline set for 11/12/2024. (Attachments: # 1 (p.29) Proposed SEALED Exhibit, # 2 (p.397) Proposed order)(aty,Widas, Alexandra) Modified on 11/13/2024 to create docket entry relationship.(Crick, S). (Entered: 11/12/2024), (QC'ed on 11/13/2024, by Crick , S) |
| 11/12/2024 | 83 (p.6886) | MEMORANDUM in Opposition re 75 (p.5841) MOTION to Dismiss Plaintiffs' complaint MOTION for Summary Judgment filed by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America. (Attachments: # 1 (p.29) Declaration of James Steven Brown, # 2 (p.397) Declaration of Father Joseph Caraway, # 3 (p.399) Declaration of Father Ronald Kunkel, # 4 (p.402) Declaration of Maureen Fontenot, # 5 (p.404) Declaration of Theresa Ridderhoff)(aty,Blomberg, Daniel) (Entered: 11/12/2024), (QC'ed on 11/13/2024, by Crick , S) |
| 11/13/2024 | 84 (p.7529) | ORDER granting 82 (p.6881) Motion to Seal Attached Document. Signed by Judge David C Joseph on 11/13/2024. (crt,Crick, S) (Entered: 11/13/2024) |
| 11/13/2024 | 85 (p.9259) | SEALED Second Hudson Declaration by Equal Employment Opportunity Commission, Charlotte Burrows re 81 (p.6814) Memorandum in Opposition to Motion. (crt,Crick, S) (Entered: 11/13/2024) |
| 11/19/2024 | 86 (p.7530) | Unopposed MOTION for Leave to File BRIEF OF AMICI CURIAE re 75 (p.5841) Motion to Dismiss & 77 (p.5927) Motion for Partial Summary Judgment by Small Business Majority, Main Street Alliance, American Sustainable Business Council. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 11/19/2024. (Attachments: # 1 (p.29) Memorandum in Support, # 2 (p.397) Proposed Order, # 3 (p.399) PROPOSED Amicus Brief)(aty,Most, William) Modified on 11/20/2024 to create docket entry relationship and modify docket text. (Crick, S). (Entered: 11/19/2024), (QC'ed on 11/20/2024, by Crick , S) |
| 11/19/2024 | | Motions Transferred regarding 86 (p.7530) Unopposed MOTION for Leave to File BRIEF OF AMICI CURIAE re 75 (p.5841) Motion to Dismiss & 77 (p.5927) Motion for Partial Summary Judgment. Motions referred to Judge David C Joseph. (crt,Crick, S) (Entered: 11/20/2024) |
| 11/20/2024 | 87 (p.7560) | ORDER granting 86 (p.7530) Motion for Leave to File Amicus Brief. Signed by Judge David C Joseph on 11/20/2024. (crt,Crick, S) (Entered: 11/20/2024) |
| 11/20/2024 | | |

| | | |
|---|---|---|
| | 88 (p.7562) | BRIEF OF *AMICI CURIAE* in Opposition to 77 (p.5927) MOTION for Partial Summary Judgment *and Permanent Injunction* MOTION for Permanent Injunction & in Support of 75 (p.5841) MOTION to Dismiss Plaintiffs' complaint MOTION for Summary Judgment filed by Small Business Majority, Main Street Alliance, American Sustainable Business Council. (crt,Crick, S) (Entered: 11/20/2024) |
| 12/10/2024 | 89 (p.7581) | REPLY to Response to Motion re 75 (p.5841) MOTION to Dismiss Plaintiffs' complaint MOTION for Summary Judgment filed by Equal Employment Opportunity Commission, Charlotte Burrows. (aty,Widas, Alexandra) (Entered: 12/10/2024), (QC'ed on 12/11/2024, by Crick , S) |
| 12/10/2024 | 90 (p.7619) | REPLY to Response to Motion re 77 (p.5927) MOTION for Partial Summary Judgment *and Permanent Injunction* MOTION for Permanent Injunction filed by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America. (Attachments: # 1 (p.29) Declaration of Daniel Blomberg, # 2 (p.397) Declaration of James Brown, # 3 (p.399) Declaration of Maureen Fontenot)(aty,Blomberg, Daniel) (Entered: 12/10/2024), (QC'ed on 12/11/2024, by Crick , S) |
| 12/18/2024 | 91 (p.7865) | NOTICE of Appendix of Administrative Record Materials Cited in Parties' Summary Judgment Briefs by Equal Employment Opportunity Commission, Charlotte Burrows (Attachments: # 1 (p.29) Appendix of Cited Administrative Record Materials, # 2 (p.397) Exhibit Exs. 1-14, # 3 (p.399) Exhibit Exs. 15-33)(aty,Widas, Alexandra) (Entered: 12/18/2024), (QC'ed on 12/18/2024, by Crick , S) |
| 01/14/2025 | 92 (p.9049) | ORDER granting 70 (p.1100) Motion For Leave to File Administrative Record Directly with Clerk of Court & Waiver of Hard Copy Requirement. Signed by Magistrate Judge Thomas P LeBlanc on 1/14/2025. (crt,Crick, S) (Entered: 01/15/2025) |
| 01/15/2025 | 93 (p.9051) | ORDER granting 34 (p.724) Motion for Leave to File. Signed by Magistrate Judge Thomas P LeBlanc on 1/15/2025. (crt,Crick, S) (Entered: 01/15/2025) |
| 01/15/2025 | 94 (p.9053) | MEMORANDUM in Opposition re 11 (p.441) MOTION for Preliminary Injunction filed by American Civil Liberties Foundation of Louisiana, American Civil Liberties Union Foundation, National Womens Law Center. (crt,Crick, S) (Entered: 01/15/2025) |
| 01/29/2025 | 95 | ELECTRONIC MINUTE ENTRY: Status Conference set for 2/24/2025 at 10:30 AM in Lafayette, Courtroom 1 before Judge David C Joseph. Signed by Judge David C Joseph on 1/29/2025. (crt,LaCombe, L) (Entered: 01/29/2025) |
| 01/29/2025 | 96 | ELECTRONIC MINUTE ENTRY: Status Conference set for 2/24/2025 at 10:30 AM in Lafayette, Courtroom 1 before Judge David C Joseph. Signed by Judge David C Joseph on 1/29/2025. (crt,LaCombe, L) (Entered: 01/29/2025) |
| 02/05/2025 | 97 (p.9088) | NOTICE of of Supplemental Authority by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America re 77 (p.5927) MOTION for Partial Summary Judgment *and Permanent Injunction* MOTION for Permanent Injunction (aty,Blomberg, Daniel) (Entered: 02/05/2025), (QC'ed on 02/05/2025, by Crick , S) |
| 02/05/2025 | 98 | |

| | | ELECTRONIC MINUTE ENTRY: Status Conference RESET for 2/25/2025 at 10:00 AM via Zoom Video conference before Judge David C Joseph. A Zoom invitation will be forwarded to all counsel of record. Signed by Judge David C Joseph on 2/5/2025. (crt,LaCombe, L) (Entered: 02/05/2025) |
|---|---|---|
| 02/20/2025 | 99 (p.9092) | NOTICE of Supplemental Authority by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America re 77 (p.5927) MOTION for Partial Summary Judgment *and Permanent Injunction* MOTION for Permanent Injunction (aty,Blomberg, Daniel) (Entered: 02/20/2025), (QC'ed on 02/20/2025, by Crick , S) |
| 02/24/2025 | 100 (p.9096) | Unopposed MOTION to Stay re 98 Minute Entry,, Set Hearings, by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 2/24/2025. (Attachments: # 1 (p.29) Exhibit Position of EEOC Acting Chair Lucas)(aty,Schwei, Daniel) (Entered: 02/24/2025), (QC'ed on 02/25/2025, by Crick , S) |
| 02/24/2025 | 101 (p.9100) | RESPONSE to Motion re 100 (p.9096) Unopposed MOTION to Stay re 98 Minute Entry,, Set Hearings, filed by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America. (aty,Blomberg, Daniel) (Entered: 02/24/2025), (QC'ed on 02/25/2025, by Crick , S) |
| 02/25/2025 | 102 | ELECTRONIC ORDER denying 100 (p.9096) Motion to Stay. Signed by Judge David C Joseph on 2/25/2025. (jud,Joseph, David) (Entered: 02/25/2025), (QC'ed on 02/25/2025, by LaCombe , L) |
| 02/25/2025 | 103 (p.9104) | MINUTES for proceedings held before Judge David C Joseph. STATUS CONFERENCE held on 2/25/2025. The Court held a status conference to discuss the parties' pending motions. After discussion, the Court entered certain Orders, which are filed under separate cover. (Court Reporter: VTC) (crt,LaCombe, L) (Entered: 02/25/2025) |
| 02/25/2025 | 104 (p.9105) | ORDER: IT IS ORDERED that, within twenty-one (21) days of today's date, the Equal Employment Opportunity Commission, through the Department of Justice, shall file any supplements, corrections, amendments, or modifications to the pending motions and/or responses in the above-captioned matters in light of the recent change in the presidential administration and the Position of Acting Chair Lucas Regarding the Commission's Final Regulations Implementing the Pregnant Workers Fairness Act, submitted to the Court on February 24, 2025. IT IS FURTHER ORDERED that the Plaintiffs will have fourteen (14) days to respond to any supplemental filing(s) of the EEOC. Signed by Judge David C Joseph on 2/25/2025. (crt,LaCombe, L) (Entered: 02/25/2025) |
| 03/11/2025 | 105 (p.9107) | MOTION to Withdraw Alexandra Widas as Attorney by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 3/11/2025. (Attachments: # 1 (p.29) Proposed order)(aty,Widas, Alexandra) (Entered: 03/11/2025), (QC'ed on 03/11/2025, by Crick , S) |
| 03/17/2025 | 106 (p.9110) | ORDER granting 105 (p.9107) Motion to Withdraw as Attorney. Attorney Alexandra Widas terminated. Signed by Magistrate Judge Thomas P LeBlanc on 3/17/2025. (crt,Crick, S) (Entered: 03/17/2025) |
| 03/25/2025 | 107 | ELECTRONIC MINUTE ENTRY: Counsel is directed to file a notice on or before the close of business on March 26, 2025, advising the Court whether Defendants |

| | | |
|---|---|---|
| | | intend to file supplemental briefing as requested in this Court's February 25, 2025 Order. [Doc. 98; 2:24-cv-0629]; [Doc. 104; 2:24-cv-0691]. Signed by Judge David C Joseph on 3/25/2025. (crt,LaCombe, L) (Entered: 03/25/2025) |
| 03/26/2025 | 108 (p.9111) | NOTICE by Equal Employment Opportunity Commission, Charlotte Burrows re 107 Minute Entry, (aty,Bakst, Laura) (Entered: 03/26/2025), (QC'ed on 03/26/2025, by Crick , S) |
| 03/28/2025 | 109 (p.9114) | NOTICE of Supplemental Authority by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America re 77 (p.5927) MOTION for Partial Summary Judgment *and Permanent Injunction* MOTION for Permanent Injunction (aty,Blomberg, Daniel) (Entered: 03/28/2025), (QC'ed on 03/28/2025, by Crick , S) |
| 04/01/2025 | 110 (p.9118) | MOTION to Substitute Attorney Karima A. Ortolano in place of Laura B. Bakst by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 4/1/2025. (Attachments: # 1 (p.29) Proposed Order)(Attorney Karima Ortolano added to party Equal Employment Opportunity Commission(pty:dft), Attorney Karima Ortolano added to party Charlotte Burrows(pty:dft))(aty,Ortolano, Karima) (Entered: 04/01/2025), (QC'ed on 04/01/2025, by Crick , S) |
| 04/04/2025 | 111 (p.9121) | ORDER granting 110 (p.9118) Motion to Substitute Attorney. Added attorney Karima Ortolano for Charlotte Burrows,Karima Ortolano for Equal Employment Opportunity Commission. Attorney Laura B Bakst terminated. Signed by Magistrate Judge Thomas P LeBlanc on 4/4/2025. (crt,Crick, S) (Entered: 04/04/2025) |
| 04/28/2025 | 112 (p.9122) | NOTICE of Supplemental Authority by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America re 77 (p.5927) MOTION for Partial Summary Judgment *and Permanent Injunction* MOTION for Permanent Injunction (aty,Blomberg, Daniel) (Entered: 04/28/2025), (QC'ed on 04/28/2025, by Crick , S) |
| 05/21/2025 | 113 (p.9126) | MEMORANDUM ORDER: IT IS ORDERED that 70 (p.1100) Motion for Summary Judgment and 77 (p.5927) Motion for Partial Summary Judgment and Permanent Injunction are GRANTED IN PART. IT IS FURTHER ORDERED that the Motion to Dismiss, or in the Alternative for Summary Judgment [Doc. 68] filed by the EEOC in the matter entitled State of Louisiana, et al v. EEOC, No. 2:24-cv-00629, and the Motion to Dismiss, or in the Alternative, for Summary Judgment [Doc. 75] filed by the EEOC in the matter entitled United States Conference of Catholic Bishops, et al v. EEOC, et al, No. 2:24-cv-00691, are hereby DENIED. IT IS FURTHER ORDERED that the Preliminary Injunction, [Doc. 47, States Lawsuit]; [Doc. 53, Bishops Lawsuit], currently in place in these matters shall remain in place until final dismissal of these matters or further order of the Court. IT IS FURTHER ORDERED that the Court will conduct an in-person status conference with the parties on June 17, 2025, at 10:00 a.m. This Memorandum Order therefore constitutes a FRCP 54(b) partial final and appealable judgment as to the abortion accommodation mandate VACATED herein, and the FINAL RULE is therefore REMANDED to the EEOC for action consistent with the Court's findings. Signed by Judge David C Joseph on 5/21/2025. (crt,LaCombe, L) (Entered: 05/21/2025) |
| 05/21/2025 | | Set Hearings: Status Conference set for 6/17/2025 at 10:00 AM in Lafayette, Courtroom 1 before Judge David C Joseph. See Memorandum Order [Doc. 113] (crt,LaCombe, L) (Entered: 05/21/2025) |

| | | |
|---|---|---|
| 05/21/2025 | 114 (p.9166) | FRCP 54(b) PARTIAL FINAL JUDGMENT. IT IS ORDERED that the Court finds no just reason for delaying entry of final judgment on the partial vacatur and remand ordered herein, and that this Judgment therefore constitutes a FRCP 54(b) partial final and appealable judgment. The FINAL RULE is therefore REMANDED to the EEOC for action consistent with the Court's findings. The Court retains jurisdiction over all remaining claims and issues not resolved by this Judgment. Signed by Judge David C Joseph on 5/21/2025. (crt,LaCombe, L) (Entered: 05/21/2025) |
| 06/04/2025 | 115 (p.9169) | MOTION to Substitute Attorney Yuri S. Fuchs in place of Karima A. Ortolano by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/4/2025. (Attachments: # 1 (p.29) Proposed order)(Attorney Yuri Fuchs added to party Equal Employment Opportunity Commission(pty:dft), Attorney Yuri Fuchs added to party Charlotte Burrows(pty:dft))(aty,Fuchs, Yuri) (Entered: 06/04/2025), (QC'ed on 06/04/2025, by Crick , S) |
| 06/05/2025 | 116 (p.9172) | MOTION to Withdraw Daniel Schwei as Attorney by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 6/5/2025. (Attachments: # 1 (p.29) Proposed order)(aty,Schwei, Daniel) (Entered: 06/05/2025), (QC'ed on 06/05/2025, by Crick , S) |
| 06/16/2025 | 117 (p.9175) | ORDER granting 115 (p.9169) Motion to Substitute Attorney. Attorney Karima Ortolano terminated. Signed by Magistrate Judge Thomas P LeBlanc on 6/16/2025. (crt,Crick, S) (Entered: 06/16/2025) |
| 06/16/2025 | 118 (p.9176) | ORDER granting 116 (p.9172) Motion to Withdraw as Attorney. Attorney Daniel Schwei terminated. Signed by Magistrate Judge Thomas P LeBlanc on 6/16/2025. (crt,Chavis, J) (Entered: 06/16/2025) |
| 06/17/2025 | 119 (p.9177) | MINUTES for proceedings held before Judge David C Joseph. STATUS CONFERENCE held in chambers on 6/17/2025. The Court set briefing deadlines for the Bishops Plaintiffs to file a renewed motion for summary judgment pertaining to their remaining claims. Any motions are to be filed no later than August 22, 2025; any responses will be due on or before September 11, 2025; and any replies are due on or before September 25, 2025. Motions and responses shall not exceed thirty (30) pages, and replies shall not exceed ten (10) pages. (crt,LaCombe, L) (Entered: 06/20/2025) |
| 07/09/2025 | 120 (p.9179) | DOCUMENT RESUBMITTED IN ITS ENTIRETY - MOTION to Substitute Attorney Jacob S. Siler in place of Yuri S. Fuchs by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 7/9/2025. (Attachments: # 1 (p.29) Text of proposed order)(Attorney Jacob S. Siler added to party Equal Employment Opportunity Commission(pty:dft), Attorney Jacob S. Siler added to party Charlotte Burrows(pty:dft))(aty,Siler, Jacob) Modified to reflect deficient status on 7/9/2025 (Bunting, M). Modified to reflect resubmitted on 7/9/2025 (Bunting, M). (Entered: 07/09/2025), (QC'ed on 07/09/2025, by Bunting , M) |
| 07/09/2025 | 121 (p.9182) | NOTICE of Deficiency to Jacob S. Siler on behalf of Charlotte Burrows regarding 120 (p.9179) MOTION to Substitute Attorney Jacob S. Siler in place of Yuri S. Fuchs . Reason: A motion to withdraw or to substitute counsel must be signed by or have consent of the withdrawing attorney. Please refer to LR83.2.11. See also LR5.7.08 regarding electronic filing of documents requiring signatures of more than one party. The motion cannot be referred to chambers until this deficiency is corrected. (crt,Bunting, M) (Entered: 07/09/2025) |

| | | |
|---|---|---|
| 07/09/2025 | 122 (p.9183) | MOTION to Substitute Attorney Jacob S. Siler in place of Yuri S. Fuchs by All Defendants. Motions referred to Thomas P LeBlanc. Motion Ripe Deadline set for 7/9/2025. (Attachments: # 1 (p.29) Text of proposed order)(aty,Siler, Jacob) (Entered: 07/09/2025), (QC'ed on 07/09/2025, by Bunting , M) |
| 07/09/2025 | | (Court only) ***Motions terminated: 120 (p.9179) MOTION to Substitute Attorney Jacob S. Siler in place of Yuri S. Fuchs filed by Charlotte Burrows, Equal Employment Opportunity Commission. Reason for termination: Documents resubmitted in its entirety. See 122 (p.9183) (crt,Bunting, M) (Entered: 07/09/2025) |
| 07/14/2025 | 123 (p.9186) | ORDER granting 122 (p.9183) Motion to Substitute Attorney. Attorney Yuri Fuchs terminated. Signed by Magistrate Judge Thomas P LeBlanc on 7/14/2025. (crt,Crick, S) (Entered: 07/14/2025) |
| 07/15/2025 | 124 (p.9187) | NOTICE OF APPEAL as to 114 (p.9166) Judgment, 113 (p.9126) Order on Motion to Dismiss, Order on Motion for Summary Judgment, Order on Motion for Partial Summary Judgment, Order on Motion for Permanent Injunction, by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America. (Filing fee $605, receipt number ALAWDC-6329528) (aty,Blomberg, Daniel) (Entered: 07/15/2025), (QC'ed on 07/16/2025, by WalkerSld , B) |
| 07/15/2025 | 125 (p.9191) | MOTION for Preliminary Injunction *Pending Appeal per Fed. R. App. P. 8* by All Plaintiffs. Motion Ripe Deadline set for 7/15/2025. (Attachments: # 1 (p.29) Memorandum / Brief, # 2 (p.397) Proposed order)(aty,Blomberg, Daniel) (Entered: 07/15/2025), (QC'ed on 07/15/2025, by Whitener , M) |
| 07/16/2025 | | NOTICE of Appeal Transcript Order Requirement regarding 124 (p.9187) Notice of Appeal. Pursuant to FRAP 10(b), the Appellant must file the transcript order form regardless of whether transcripts are necessary. Access the 5th Circuit site by clicking here. Hover over the Forms Fees & Guides tab, Forms, Court Reporter Forms, Transcript Order Form.<br><br>In following the instructions on the form, please note manual notification to the court reporter and the 5th Circuit Court of Appeals is STILL REQUIRED. (crt,WalkerSld, B) (Entered: 07/16/2025) |
| 07/16/2025 | 126 | ELECTRONIC MINUTE ENTRY: re 125 (p.9191) MOTION for Preliminary Injunction *Pending Appeal per Fed. R. App. P. 8*: Responses due 30 days from the filing of 125 (p.9191) Motion for Preliminary Injunction Pending Appeal. Replies are due 14 days from the filing of Response. Issued by Judge David C Joseph on 7/16/2025. (crt,Taylor, L) (Entered: 07/16/2025) |
| 07/16/2025 | | (Court only) ***Deadlines/Hearings terminated. Motion Ripe Deadline terminated [Doc. 125]. (crt,Hardwick, M) (Entered: 07/16/2025) |
| 07/25/2025 | | USCA Case Number 25-30398 for 124 (p.9187) Notice of Appeal, filed by Catholic University of America, United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles. (crt,WalkerSld, B) (Entered: 07/25/2025) |
| 07/30/2025 | 127 (p.9206) | APPEAL TRANSCRIPT REQUEST by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America for Preliminary Injunction Hearing held on 6/12/2024 before |

| | | |
|---|---|---|
| | | Judge David C Joseph. Court Reporter Cathleen Marquardt (aty,Blomberg, Daniel) Modified on 7/30/2025 to reflect filing indicates: Transcript is already on file in the Clerk's Office (WalkerSld, B). (Entered: 07/30/2025), (QC'ed on 07/30/2025, by WalkerSld , B) |
| 07/30/2025 | 128 (p.9208) | APPEAL TRANSCRIPT REQUEST by United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, Catholic University of America for Motion Hearing and Status Conference held on 6/5/2024 before Judge David C Joseph. Court Reporter Myra Primeaux (aty,Blomberg, Daniel) Modified on 7/30/2025 to reflect filing indicates: Transcript is already on file in the Clerk's Office (WalkerSld, B). (Entered: 07/30/2025), (QC'ed on 07/30/2025, by WalkerSld , B) |
| 07/30/2025 | | Set Deadline for Clerk re 124 (p.9187) Notice of Appeal: Certify Appeal Record (25-30398) by Clerk to COA 8/14/2025. (crt,WalkerSld, B) (Entered: 07/30/2025) |
| 08/07/2025 | 129 (p.9210) | MEMORANDUM ORDER of USCA as to 124 (p.9187) Notice of Appeal, filed by Catholic University of America, United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lafayette, Society of the Roman Catholic Church of the Diocese of Lake Charles that an administrative stay is GRANTED, and this appeal will be forwarded to the next available calendar for oral argument. (crt,WalkerSld, B) (Entered: 08/08/2025) |

United States Conference of Catholic Bishops et al v. Equal Employment Opportunity Commission et al (2:24-cv-00691-DCJ-TPL)

# Tab 2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| **THE STATE OF LOUISIANA, ET AL** | **CIVIL DOCKET NO. 2:24-cv-00629** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** | **MAGISTRATE JUDGE THOMAS P. LEBLANC** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| **UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, ET AL** | **CIVIL DOCKET NO. 2:24-cv-00691** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ET AL** | **MAGISTRATE JUDGE THOMAS P. LEBLANC** |

## <u>MEMORANDUM ORDER</u>

Before the Court are two consolidated MOTIONS FOR PRELIMINARY INJUNCTION filed by, respectively: (i) the States of Louisiana and Mississippi in the matter entitled *State of Louisiana, et al v. EEOC*, 2:24-cv-00629-DCJ-TPL (the "*States* lawsuit") [Doc. 17]; and (ii) four entities affiliated with the Roman Catholic church[1] in *USCCB v. EEOC, et al*, 2:24-cv-00691-DCJ-TPL (the "*Bishops* lawsuit") [Doc. 11] (collectively, the "Motions"). In both Motions, Plaintiffs ask this Court to preliminary enjoin

---

[1] The Plaintiff entities in the *Bishops* lawsuit are the United States Conference of Catholic Bishops ("USCCB"), Society of the Roman Catholic Church of the Diocese of Lake Charles ("Diocese of Lake Charles"), Society of the Roman Catholic Church of the Diocese of Lafayette ("Diocese of Lafayette"), and Catholic University of America ("Catholic University") (collectively, the "*Bishops* Plaintiffs"). The defendants in the *Bishops* lawsuit are EEOC and Charlotte Burrows, Chair of the EEOC, sued in her official capacity only.

25-30398.886

Defendants from enforcing an Equal Employment Opportunity Commission ("EEOC") Final Rule that implements and interprets the Pregnant Workers Fairness Act ("PWFA" or "Act"), 42 U.S.C. § 2000gg, *et seq.*, and Title VII, 42 U.S.C. § 2000e, *et seq.*, to the extent that it requires employers to accommodate the purely elective abortions of employees. All Plaintiffs also ask this Court to postpone pending judicial review the effective date of the portion of the Final Rule mandating that covered employers provide workplace accommodation for purely elective abortions. 5 U.S.C. § 705

After careful consideration of the arguments of the parties, the record before the Court, and the governing law, the Court finds that the EEOC has exceeded its statutory authority to implement the PWFA and, in doing so, both unlawfully expropriated the authority of Congress and encroached upon the sovereignty of the *States* Plaintiffs. Plaintiffs' Motions are therefore GRANTED IN PART, and the Court issues a preliminary injunction against the EEOC as set forth below.

#### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In December 2022, Congress passed, and President Biden signed, the PWFA as part of the year-end consolidated appropriations package. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. 117-328 (2022), 136 Stat. at 6084; 42 U.S.C. §§ 2000gg – 2000gg-6. Aimed at addressing gaps in existing legislation regarding protections for pregnant workers, the PWFA adopts an accommodation regime similar to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, for pregnant workers and adopts the powers, remedies, and procedures of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-4 *et seq.*, as enforcement measures.

25-30398.887

Principally, the PWFA requires employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 2000gg-1(1). The PWFA defines "known limitation" as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

In effect, the PWFA prohibits employers from denying employment opportunities due to a covered employee's need for a reasonable accommodation or retaliating against an employee for requesting or using a reasonable accommodation. 42 U.S.C. §§ 2000gg-1(3), (5). Nor can an employer "require a qualified employee to take leave, whether paid or unpaid, if another reasonable accommodation can be provided to the known limitation." 42 U.S.C. § 2000gg-1(4). The PWFA adopts the ADA's definitions for "reasonable accommodation" and "undue hardship," as well as the ADA's "interactive process" for determining a proper accommodation. 42 U.S.C. § 2000gg(7). It also specifically provides that employers cannot "require a qualified employee ... to accept an accommodation other than any reasonable accommodation arrived at through the interactive process." 42 U.S.C. § 2000gg-1(2). The PWFA's requirements apply to any private employer with 15 or more employees and government employers, including the States of Louisiana and Mississippi ("covered entities"). 42 U.S.C. § 2000gg. Pursuant to Section 5 of the Fourteenth Amendment, the PWFA also specifically waives the Eleventh Amendment immunity of state employers for covered employment-related actions. 42 U.S.C. § 2000gg-4.

25-30398.888

As part of the Act, Congress tasked the EEOC with issuing regulations to carry out the PWFA and directed that such regulations "shall provide examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-3. On August 11, 2023, the EEOC proposed a rule that would require covered employers – including States – to accommodate, among other things, elective abortions. 88 Fed. Reg. 54,714 (Aug. 11, 2023) (Proposed Rule). Specifically, the EEOC stated in the proposed rule that "having ... an abortion" constitutes an "example[] of pregnancy, childbirth, or related medical condition[]" and that employers are therefore required to provide employees with reasonable accommodations for abortions under the PWFA (the "abortion accommodation mandate"). *Id.* On April 19, 2024, the EEOC issued the final regulation implementing the PWFA. *Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (hereafter, "Final Rule"). Despite widespread opposition,[2] the Final Rule included the abortion accommodation mandate.

On May 13, 2024, the *States* Plaintiffs filed the instant lawsuit against the EEOC, asserting that the abortion accommodation mandate of the Final Rule violates the Administrative Procedure Act ("APA") and the Constitution. [Doc. 1, ¶ 82]. In their Motion for Preliminary Injunction, filed on June 3, 2024 [Doc. 17], the *States* Plaintiffs challenge the Final Rule with respect to any duty "to accommodate purely

---

[2] Specifically, more than 54,000 individuals and organizations submitted comments opposing the Proposed Rule's abortion accommodation mandate, including Plaintiffs Louisiana, Mississippi, USCCB, and Catholic University.

25-30398.889

elective abortions,[3] including those that would be prohibited by [that] State's law" in light of state legislation that restricts and limits abortion following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228, 213 L.Ed.2d 545 (2022).[4] EEOC responded on June 9, 2024. [Doc. 21].[5]

---

[3] The *States* Plaintiffs define "purely elective abortions" as "medically unnecessary abortions in violation of Louisiana and Mississippi law." [Doc. 17-1, p. 15].

[4] EEOC filed a Motion to Transfer [Doc. 5] in the *States* case, seeking to transfer the matter to the United States District Court for the District of Columbia on grounds venue is not proper in this district. The Court denied the Motion and stated its reasons on the record at the June 5, 2024, hearing. [Doc. 28].

[5] Louisiana prohibits all abortions except those that are determined to be medically necessary to prevent the death or substantial risk of death of the mother. *See* La. R.S. § 40:1061, La. R.S. § 14:87.7, and La. R.S. § 14:87.8.1. The Louisiana Legislature has expressly set forth the State's policy with respect to abortion:

> § 1061.1. Legislative intent; construction of abortion provisions law regulating abortion:
>
> A. (1) It is the intention of the Legislature of Louisiana to regulate, prohibit, or restrict abortion to the fullest extent permitted by the decisions of the Supreme Court of the United States. The legislature does solemnly declare, find, and reaffirm the longstanding public policy of this state that every unborn child is a human being from the moment of conception and is, therefore, a legal person for purposes under the laws of this state and Constitution of Louisiana.
>
> (2) The legislature further finds and declares that the longstanding policy of this state to protect the right to life of every unborn child from conception by prohibiting abortion is impermissible only because of the decisions of the Supreme Court of the United States and that, therefore, if those decisions of the Supreme Court of the United States are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the public policy of this state to prohibit abortions shall be enforced.

La. R.S. § 40:1061.1.

Mississippi prohibits all abortions except those that are "necessary for the preservation of the mother's life or "where the pregnancy was caused by rape." *See* Miss. Code Ann. § 41-41-45; Miss. Code Ann. § 97-3-3.

Page **5** of **32**

25-30398.890

On May 22, 2024, the *Bishops* Plaintiffs filed their Complaint [Doc. 1], along with a Motion for Preliminary Injunction.[6] [Doc. 11]. In their Motion, the *Bishops* Plaintiffs allege that the Final Rule requires them to knowingly accommodate employees when they obtain abortions, even where such accommodations are contrary to their sincerely held religious beliefs; prohibits the *Bishops* Plaintiffs from taking adverse actions against employees or faculty that advocate for abortion accommodation, even where such actions are required by the Bishops' beliefs; and requires the *Bishops* Plaintiffs to change their religious speech and messaging concerning abortion in ways that support abortion. EEOC responded to the Motion on June 5, 2024. [Doc. 29]. Reply briefs to both Motions were filed on June 11, 2024 [Doc. 32, 24-cv-00629]; [Doc. 40, 24-cv-00691].

The Court conducted a hearing on June 5, 2024, to address a limited consolidation pursuant to FRCP 42(a)(2) of the *States* and *Bishops* cases for purposes of hearing and adjudicating the preliminary injunction Motions. With no objection from any party, the cases were consolidated for purposes of the two Rule 65 Motions and, thereafter, jointly conducting pretrial discovery and motions practice. [Doc. 18, 24-cv-00629]; [Doc. 28, 24-cv-00691]. Oral argument on the preliminary injunction Motions was conducted on June 12, 2024, [Doc. 33, 24-cv-00629]; [Doc. 41, 24-cv-00691], followed by the filing of the parties' supplemental, post-hearing memoranda.

---

[6] The *Bishops* lawsuit was originally assigned to Judge James D. Cain, Jr. in the Lake Charles Division. Given the related nature of the *States* and *Bishops* cases, the *Bishops* case was transferred to this Court on May 24, 2024. [Doc. 15].

25-30398.891

[Docs. 45, 46, 24-cv-00629]; [Docs. 51, 52, 24-cv-00691]. All briefing and argument on the issues having now been completed, the Motions are ripe for review.

LAW AND ANALYSIS

### I. Article III Standing

Standing is "built on a single basic idea – the idea of the separation of power." *Food & Drug Administration, et al. v. Alliance for Hippocratic Medicine, et al.*, --- S. Ct. ---, 2024 WL 2964140, at *5 (June 13, 2024). "Article III requires a plaintiff to show that she has suffered an injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Haaland v. Brackeen*, 599 U.S. 255, 291-92, 143 S. Ct. 1609, 216 L.Ed.2d 254 (2023); *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 924 (5th Cir. 2023); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff can demonstrate a cognizable injury in a pre-enforcement challenge only if it establishes that: (1) it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) "there exists a credible threat of prosecution thereunder." *Braidwood*, 70 F.4th at 925, *citing Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S. Ct. 2334, 189 L.Ed.2d 246 (2014). The two key questions in most standing disputes are injury-in-fact and causation. *FDA*, 2024 WL 2964140, at *1. The party or parties invoking the Court's jurisdiction bear the burden of satisfying the Article III requirement by demonstrating that they have standing to adjudicate their claims in federal court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Finally, "[t]he manner and degree of evidence" required is "less" in the earlier stages

25-30398.892

of litigation; the Plaintiffs need "only" be "likely" to ultimately show "each element of standing." *Speech First v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020).

## A.     The *States* Plaintiffs

EEOC argues that the *States* Plaintiffs lack standing on grounds their alleged injuries are speculative; any compliance costs are unproven; the Final Rule does not interfere with the enforcement of any State laws; and the *States* Plaintiffs have not demonstrated any speech injury. Louisiana and Mississippi argue they will suffer imminent injury-in-fact should the abortion accommodation mandate of the Final Rule take effect, because of increased regulatory burdens, increased compliance costs under penalty of enforcement actions, and damage to their sovereignty and free speech rights.

"If, in a suit challenging the legality of government action, the plaintiff is himself an object of the action, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019). *See also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) (under the "ordinary rule," a party that is the "object[ ] of the [r]egulation[] may challenge it."). Here, Louisiana and Mississippi – as employers and without the shield of Eleventh Amendment sovereign immunity – are directly regulated by the PWFA and the Final Rule. Therefore, if implemented in excess of Congressional authorization, the Final Rule will "cause[] [the States] injury, and … a judgment preventing ... the action will redress it." *Lujan*, 504 U.S. at 561–62; *EEOC*, 933 F.3d at 449.

25-30398.893

Moreover, while EEOC argues the costs identified by the *States* Plaintiffs are "unproven," the Final Rule itself notes such costs arise independently from any accommodation expenses. 89 Fed. Reg. 29,177 ("Administrative costs, which include rule familiarization, posting new EEO posters, and updating EEO policies and handbooks, represent additional, one-time direct costs to covered entities."). The *States* Plaintiffs proffer declarations evidencing that changing State policies alone will cost the States, at minimum, an estimated $500 and 120 employee hours in training costs, legal expenses, administrative costs, and productivity losses.[7] For Article III standing purposes, such compliance costs are classic "pocketbook injury" redressable through a pre-enforcement APA rule challenge. *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). Thus, aside from any employee or DOJ enforcement lawsuits under the PWFA, the States demonstrate that the unrecoverable costs of "[m]oving into compliance" with the abortion accommodation mandate of the Final Rule are cognizable and alone sufficient to constitute an injury-in-fact. *Wages & White Lion Investments, LLC v. United States Food and Drug Administration*, 16 F.4th 1130, 1142 (5th Cir. 2021) (holding that regulatory compliance costs are unrecoverable and therefore amount to irreparable harm "because federal agencies generally enjoy sovereign immunity for any monetary damages"); *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 194 (5th Cir. 2023) (finding that the plaintiff's financial

---

[7] *See* Declaration of Sandra Schober, Deputy Undersecretary of the Administrative Services Division at the Louisiana Department of Justice, Office of the Attorney General, [Doc. 17-2, ¶¶ 15–18]; Declaration of Kelly Hardwick, State Personnel Director for the State of Mississippi and Executive Director of the Mississippi State Personnel Board, [Doc. 17-3, ¶¶ 10–12].

25-30398.894

harm was irreparable in an APA challenge where "[t]here [was] no suggestion ... that [the plaintiff] could overcome the FDA's sovereign immunity to recover costs"); *Restaurant Law Center v. United States Department of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (A general rule of thumb is that the "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm.").

While the States argue that compliance harms alone are sufficient to establish standing, more fundamental is the States' concern that the EEOC's implementation of the Final Rule to include an abortion accommodation mandate: (i) was not authorized by Congress in the PWFA; (ii) exceeds the rule-making power of the executive branch; and (iii) interferes with the States' ability to enforce their laws and implement the chosen public policies of their citizens. Generally, states have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction – this involves the power to create and enforce a legal code, both civil and criminal." *Texas v. Miguel Cardona, et al.*, 2024 WL 2947022, at *11 (N.D. Tex. 6/11/24) (O'Connor, J.), *citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). "Pursuant to that interest, states may have standing based on: (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *Cardona*, 2024 WL 2947022, at *11, *citing Texas v. United States (DAPA)*, 809 F.3d 134, 171 (5th Cir. 2015). Each of these federal "intrusions are analogous to pressure to change state law." *Cardona*, 2024 WL 2947022, at *11, *citing DAPA*, 809 F.3d at 153. *See also Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433, 446-47 (5th Cir. 2019) (being pressured to change state

25-30398.895

law constitutes an injury because states have a sovereign interest in the power to create and enforce a legal code).  More specifically, "[b]ecause a state alone has the right to create and enforce its legal code, only the state has the kind of direct stake necessary to satisfy standing in defending the standards embodied in that code." *Cardona*, 2024 WL 2947022, at *11, *citing Texas v. Becerra*, 623 F. Supp. 3d 696, 714 (N.D. Tex. 2022) (Hendrix, J.).

Here, the people of both Mississippi and Louisiana, through the democratic process, have unambiguously expressed their opposition to purely elective abortions by passing laws prohibiting the same.  Louisiana law specifically requires the state to "protect the right to life of every unborn child from conception by prohibiting abortion." La. R.S. § 40:1061.  Mississippi's laws prohibit all abortions except those that are "necessary for the preservation of the mother's life" or "where the pregnancy was caused by rape."  *See* Miss. Code Ann. § 41-41-45; Miss. Code Ann. § 97-3-3.  And the Supreme Court has confirmed that the states are free to regulate abortion in accordance with the democratic process. *Dobbs*, 597 U.S. at 292.

The *States* Plaintiffs now posit that an administrative agency of the executive branch of the federal government, without Congressional authorization, has exceeded its authority through the rule-making process in a way that subverts the will of the citizens of Louisiana and Mississippi.  Therefore, in addition to the increased regulatory burden that "typically satisfies the injury in fact requirement," *Contender Farms*, 779 F.3d at 266, the *States* Plaintiffs contend, in essence, that the EEOC's abortion accommodation mandate undermines their sovereignty and the democratic process within those states.  Because the principles of federalism afford the states a

25-30398.896

sovereign interest in creating and enforcing their own laws and public policy, the *States* Plaintiffs clearly have Article III standing to challenge the Final Rule.

Considering that the *States* Plaintiffs have demonstrated harm in the form of regulatory burden, increased costs to implement the abortion accommodation mandate, and damage to their sovereignty, the Court finds that the *States* Plaintiffs have standing to challenge the Final Rule's abortion accommodation mandate.

### B.      The *Bishops* Plaintiffs

Chiefly, the *Bishops* Plaintiffs argue that under the abortion accommodation mandate of the Final Rule, they must knowingly violate their sincerely held beliefs regarding what they term the "moral evil" of "direct" abortion or risk liability and face years-long expensive and entangling litigation by both the EEOC and private parties. The *Bishops* Plaintiffs allege immediate harm in that they must take steps to begin complying with the Final Rule – including changing their employment policies and practices, and training employees regarding the new policies and practices – to avoid noncompliance by the Final Rule's effective date, which could subject them to open-ended liability, investigations, and litigation by applicants, employees, former employees, and the EEOC.  [Doc. 1, ¶ 127].

To support their claim of imminent harm, the *Bishops* Plaintiffs proffer several declarations[8] that demonstrate the profound convictions of their members and

---

[8]      *See also* Declaration of J. Steven Brown, Professor of Mechanical Engineering, Senior Vice Provost for Academic Administration, and Dean of Graduate Studies at Catholic University of America [Doc. 11-3]; Declaration of Maureen K. Fontenot, Chancellor/Director of Human Resources for the Society of the Roman Catholic Church of the Diocese of Lafayette [Doc. 11-4]; Declaration of Father Ronald Kunkel, Executive Director of USCCB's Secretariat

25-30398.897

employers on the subject of abortion.  Take, for instance, the Declaration of Father Joseph Caraway, Chancellor of The Society of the Roman Catholic Church of the Diocese of Lake Charles, who attests that the mission of the Diocese of Lake Charles includes "expressing and carrying out the Church's beliefs in the sanctity and dignity of human life."  [Doc. 11-2, ¶¶ 2-6].  Father Caraway declares that the Diocese has adopted the Ethical and Religious Directives for Catholic Health Care Services, DOLC Polices and Guidelines at 103, Diocese of Lake Charles (Aug. 2023), which recognize that "[t]he Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning," and direct that "[a]bortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted[.]"  *Id.* at ¶ 6. Father Caraway explains:

> 9.  The Diocese does not and will not provide any workplace accommodation for an employee to obtain a direct abortion.  Obtaining a direct abortion is grounds for adverse employment action, up to and including termination.
>
> 10.  The Diocese will take appropriate adverse employment action against any employee who encourages another person to obtain a direct abortion or to request an accommodation for a direct abortion.
>
> 11.  The Diocese does not and will not permit its employees to advocate in favor of abortion or abortion accommodations in the workplace or outside of it.
>
> 12.  The Diocese will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines Catholic teachings about direct abortion or to the Diocese's policies with respect to abortion.

---

of Doctrine and Canonical Affairs [Doc. 11-5]; and Declaration of Theresa Ridderhoff, Associate General Secretary in the Office of the General Secretariat of USCCB [Doc. 11-6].

25-30398.898

13. I am aware that the EEOC has issued a final rule implementing the Pregnant Workers Fairness Act. *See Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29096 (Apr. 19, 2024). This rule does not adequately exempt religious employers like the Diocese. I regard EEOC's rule as threatening the Diocese with penalties, lawsuits, investigations, and other burdens unless the Diocese alters its employment policies and practices regarding abortion that are described above.

*Id.* at ¶¶ 9-13.

EEOC argues the *Bishops* Plaintiffs lack standing on grounds that any enforcement threat from EEOC is highly speculative and unlikely given that the *Bishops* Plaintiffs identify no employee who has sought an accommodation or leave for an abortion or who has filed an EEOC charge for the denial of such request, nor have they identified any EEOC enforcement actions brought against any employer in such a circumstance. Thus, EEOC argues the *Bishops* Plaintiffs have presented nothing more than an abstract, unripe claim, for which there is no hardship in declining review in this Court, given their ability to raise all of the same arguments as defenses in the event an employee ever files an EEOC charge.

The Fifth Circuit rejected the same argument by the EEOC in *Braidwood*. The *Braidwood* plaintiffs sought a declaratory judgment that EEOC's guidance interpreting statutory prohibitions on sex discrimination to include sexual orientation and gender identity violated the First Amendment and the Religious Freedom Restoration Act ("RFRA"). 70 F.4th at 919-21. Although it was undisputed that the plaintiffs' employment policies facially violated the EEOC's policies, the policies had not been enforced against any individual employee. *Id.* at 921. As it does here, EEOC catalogued a laundry list of hypothetical scenarios necessary for the

25-30398.899

plaintiffs to adequately allege injury, arguing that, until an employment action culminated in an actual charge filed with the EEOC and EEOC decided to pursue that charge, the plaintiffs could not establish standing. *Id.* at 926. Discrediting EEOC's argument, the Fifth Circuit explained:

> Plaintiffs' credible-threat analysis is quite simple. First, they admit they are breaking EEOC guidance, which the EEOC does not seriously contest. They posit statutory and constitutional issues with the laws under which they are at risk of being prosecuted: Those issues, they allege, are already forcing plaintiffs to choose either to restrict their religious practices or to risk potential penalties. And the EEOC's actions in *Harris*, which the EEOC won under a less violative set of facts, indicate that plaintiffs, too, have a legitimate fear of prosecution, chilling their rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion). Finally, the EEOC refuses to declare affirmatively that it will not enforce Title VII against the plaintiffs' policies on homosexual and transgender behavior.

*Id.* at 926–27. *See also Franciscan All. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022) (where plaintiff refused to offer gender-reassignment surgeries or abortions in violation of an HHS regulation enacted pursuant to the Patient Protection and Affordable Care Act, and HHS steadfastly refused to promise that it would not enforce the Rule, court held plaintiff had standing to challenge the rule, noting "the loss of freedoms guaranteed by the First Amendment … and RFRA … constitute per se irreparable harm."), *citing Opulent Life Church v. City of Holly Springs.*, 697 F.3d 279, 294 (5th Cir. 2012).

Here, too, the *Bishops* Plaintiffs posit that their deeply held religious beliefs will not permit them to comply with the abortion accommodation mandate; they raise statutory and constitutional issues with the mandate under which they are at risk of

25-30398.900

being prosecuted; they cite EEOC's arguments in this case that RFRA exceptions must be handled on a case-by-case basis; and they argue a legitimate fear of prosecution in light of EEOC's demonstrated violations of Catholic University's religious exemptions in *EEOC v. Catholic Univ.*, 83 F.3d 455, 466 (D.C. Cir. 1996). And they cite the specific finding by the *Braidwood* court, rejecting the EEOC's argument that plaintiffs should be required to raise any RFRA or constitutional claim as a defense, finding that the potential harms were obvious and redressable by judicial relief. *Id.* at 929–30.

Similarly, forcing the *Bishops* Plaintiffs to address their religious exceptions on a case-by-case basis – which, as a practical matter, would require them to wait until an EEOC investigation has opened and then retain attorneys to investigate the claim and assert individual defenses against the EEOC – presents, at a minimum, a substantial likelihood of added regulatory burden and compliance costs. *Braidwood* made it clear that forcing religious employers to "choose between two untenable alternatives: either (1) violate Title VII and obey their convictions, or (2) obey Title VII and violate their convictions," constitutes injury. *Id.* at 937. Considering the foregoing, the Court finds that the *Bishops* Plaintiffs have standing to challenge the abortion accommodation mandate of the Final Rule.

## II.   Motion for Preliminary Injunction

To obtain a preliminary injunction, a movant must establish: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of irreparable injury if the injunction is not issued; (iii) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (iv) that the

25-30398.901

grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (citation omitted). "The first two factors of the traditional standard are the most critical. And [t]here is authority that likelihood of success on the merits … is the most important of the preliminary injunction factors." *Career Colleges & Sch. Of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 233 (5th Cir. 2024) (internal quotation marks and quoted sources omitted). It is well-established that the decision regarding whether to grant preliminary injunctive relief is committed to the district court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).

Under the APA, courts may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 704, 706(2); *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).[9] Here, the EEOC "must point to explicit Congressional authority justifying [its] decisions." *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019). In an APA challenge, "the core inquiry" is "whether the proposed agency rule is a lawful extension of the statute under which the agency purports to act." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir.

---

[9] "[A]n agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L.Ed.2d 369 (1986). *See also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, 102 L.Ed.2d 493 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019) ("To be sure, agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions.").

2023).  The answer lies in statutory interpretation.  *Id.*  Only where the statutory text shows that EEOC has "clear congressional authorization" to enact a regulation can such a regulation withstand judicial scrutiny.  *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724, 142 S. Ct. 2587, 2614 (2022) ("*EPA*"), *quoting Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324, 134 S. Ct. 2427, 189 L.Ed.2d 372 (2014).

### A.      Substantial Likelihood of Success on the Merits

#### 1.      The *States* Plaintiffs

##### a.      Statutory Authority

The Court's inquiry starts with the fact that the text of the PWFA makes no reference to abortion; it does not contain the word "abortion" even once.  However, EEOC argues that because Title VII protects employees who choose to have (or not to have) an abortion – and because Congress enacted the PWFA with identical language as Title VII for the express purpose of expanding Title VII's protections – the PWFA must also be understood to protect employees who choose to have (or not to have) an abortion.[10]  But EEOC rests its argument entirely on its own enforcement guidelines on pregnancy discrimination and two pre-*Dobbs* lower court decisions wherein

---

[10]      Specifically, EEOC points to Congress's amendment of Title VII in 1978, which clarifies that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" 42 U.S.C. § 2000e(k).  In that same subsection, Congress provided that "[t]his subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion."  *Id.*  EEOC argues that the latter sentence confirms that abortion is included within the preceding statutory phrase "pregnancy, childbirth, or related medical conditions" in Title VII, and that because the same phrasing is used in the PWFA, Congress clearly intended for the PWFA to include accommodation for abortion.

25-30398.903

employers were barred from taking adverse actions against employees because the employees "contemplated having, or chose to have, an abortion" under Title VII, contending that these two cases comprise "settled" law on the issue.[11]  89 Fed. Reg. 29,110, 29,152 n.296.

The Court is not persuaded by EEOC's textual interpretation of the abortion accommodation mandate for several reasons.  First, "[h]ornbook canons of statutory construction require that every word in a statute be interpreted to have meaning, and Congress's use and withholding of terms within a statute is taken to be intentional." *U.S. Chamber of Commerce. v. U.S. Dep't of Labor*, 885 F.3d 360, 381 (5th Cir. 2018). Thus, we must begin with the presumption that Congress's decision <u>not</u> to include any reference to abortion in the PWFA was intentional.  Indeed, while the PWFA explicitly cross-references provisions of Title VII throughout, the PWFA does not incorporate Title VII's amended pregnancy provision.  42 U.S.C. § 2000e(k).  And although Congress directed that certain terms incorporated in PWFA from the ADA "shall be construed as such terms are construed" thereunder, 42 U.S.C. § 2000gg(7), no provision of the PWFA requires incorporation of the "pregnancy, childbirth, or related medical conditions" language of 42 U.S.C. § 2000e(k).

---

[11]     *See* Enforcement Guidance on Pregnancy Discrimination, at (I)(A)(4)(c) & n.58; https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues (providing that the term "pregnancy, childbirth, or related medical conditions" includes current pregnancy, past pregnancy, potential or intended pregnancy, and related medical conditions); *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3rd Cir. 2008) (holding that Title VII, as amended by the PDA, prohibits an employer from discriminating against a female employee because she has exercised her right to have an abortion); *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (finding the termination of a pregnant employee because she contemplated having an abortion violated the PDA).

25-30398.904

The parties argue extensively in their briefing about whether an abortion is a "condition" or a "procedure." As a matter of basic statutory interpretation using plain-meaning analysis, the Plaintiffs clearly have the stronger position. The decision to obtain a purely elective abortion is not undertaken to treat a "medical condition" related to pregnancy or childbirth. It is thus better described as a medical "procedure," as Plaintiffs suggest. And the EEOC's arguments to the contrary amount to little more than semantic gymnastics.

This notwithstanding, the Court sees this issue as even more straightforward. "Abortion" is a term that is readily understood by everyone. If Congress had intended to mandate that employers accommodate elective abortions under the PWFA, it would have spoken clearly when enacting the statute, particularly given the enormous social, religious, and political importance of the abortion issue in our nation at this time (and, indeed, over the past 50 years). The Court is therefore not persuaded, on the record before it, that Congress could reasonably be understood to have granted the EEOC the authority to interpret the scope of the PWFA in a way that imposes a nationwide mandate on both public and private employers – irrespective of applicable abortion-related state laws enacted in the wake of *Dobbs* – to provide workplace accommodation for the elective abortions of employees.

In this sense, EEOC's use of its regulatory power to insert the issue of abortion into a law designed to ensure healthy pregnancies for America's working mothers squarely implicates the "major questions doctrine" as enunciated by the Supreme Court. *EPA*, 597 U.S. at 724. The major questions doctrine applies when an "agenc[y] assert[s] highly consequential power beyond what Congress could reasonably be

25-30398.905

understood to have granted." *Id.*, *quoting Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324, 134 S. Ct. 2427, 189 L.Ed.2d 372 (2014) (internal quotation marks omitted). Under this commonsense principle, courts should "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *EPA*, 597 U.S. at 729 ("We also find it 'highly unlikely that Congress would leave' to 'agency discretion' the decision of how much coal-based generation there should be over the coming decades."); *See also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123, 120 S. Ct. 1291, 1296, 146 L.Ed.2d 121 (2000) ("It is highly unlikely that Congress would leave the determination as to whether the sale of tobacco products would be regulated, or even banned, to the FDA's discretion in so cryptic a fashion.").

EEOC contends that the major questions doctrine has no relevance in this case, arguing the abortion accommodation mandate presents an "ordinary question of statutory interpretation," and imposes "general workplace protections for workers who choose to, and choose not to, have an abortion." [Doc. 29, p. 26, 24-cv-00691]. EEOC goes on to assert that the agency "was not exercising its own discretion" in deciding what conditions are covered or the scope of any religious exceptions but rather was enforcing "policy decisions" made by "Congress itself." *Id.* The Court finds these arguments disingenuous. Since the Supreme Court decision of *Roe v. Wade* in 1973, abortion has been one of the most important social, religious, and political issues of our time and is a major issue in every federal election. *See Dobbs*, 597 U.S. at 223 ("Abortion presents a profound moral issue on which Americans hold sharply conflicting views."); *Dobbs*, 597 U.S. at 337 ("Abortion is a profoundly difficult and

25-30398.906

contentious issue because it presents an irreconcilable conflict between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life. The interests on both sides of the abortion issue are extraordinarily weighty.") (Kavanaugh, J, concurring).  *See also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 850, 112 S. Ct. 2791, 2806, 120 L.Ed.2d 674 (1992) ("Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage."), *overruled by Dobbs*, 597 U.S. at 302.  Indeed, a 2023 Gallup poll reported that a record high 28% of registered voters say they will only vote for candidates for major offices who share their position on abortion.[12]  Accordingly, EEOC must point to "clear congressional authorization" to extend the PWFA to impose an abortion accommodation mandate on public and private employers.  *Utility Air*, 573 U.S. at 324.  Not only is the EEOC unable to point to any language in the PWFA empowering it to mandate the accommodation of elective abortions, but there can be little doubt in today's political environment that any version of the PWFA that included an abortion accommodation requirement would have failed to pass Congress.  The Court therefore finds that the EEOC's arguments fail at this stage of the proceeding.

Second, EEOC's "smattering of lower court opinions" addressing abortion in the context of Title VII hardly qualifies as a judicial consensus "so broad and unquestioned that we must presume Congress knew of and endorsed it."  *BP p.l.c. v.*

---

[12]  https://news.gallup.com/poll/507527/abortion-remains-potent-issue-pro-choice-voters.aspx.

25-30398.907

*Mayor & City Council of Baltimore,* 141 S. Ct. 1532, 1541 (2021), *citing Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 350-52, 125 S. Ct. 694, 704, 160 L.Ed.2d 708 (2005) (a "supposed judicial consensus" that "boils down to the decisions of two Courts of Appeals" is not sufficiently "broad and unquestioned" to support congressional ratification).

However, one judicial opinion this Court *can* presume Congress was aware of when it passed the PWFA was the *Dobbs* decision. Title VII was amended in 1978 to include anti-discrimination protection for pregnancy, childbirth, and related conditions. The EEOC's implementing regulations incorporated the constitutional protection of abortion established in *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L.Ed.2d 147 (1973). But the PWFA was enacted in December 2022, six months after the Supreme Court decided *Dobbs*, which removed abortion as a constitutional concern and expressly returned the issue to the States. With *Dobbs* and all of its implications fresh in the minds of lawmakers, it is not credible that Congress clearly intended that the PWFA include an abortion accommodation mandate.

And if there were any remaining doubt, the legislative history unambiguously confirms that Congress specifically <u>did not</u> intend for the PWFA to require employers to accommodate abortion. Indeed, lawmakers from both sides of the aisle expressly stated that the PWFA does not address abortion. The Democratic sponsor of the PWFA, Senator Bob Casey, emphasized in response to concerns that abortion might be at issue: "I want to say for the record … that under the [PWFA], the [EEOC] could not – could not – issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law."

25-30398.908

168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Republican Senator Steve Daines similarly noted that "Senator Casey's statement reflects the intent of Congress in advancing the [PWFA] today. This legislation should not be misconstrued by the EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress." 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022). And Republican Senator Bill Cassidy, also a sponsor of the PWFA, likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Additionally, after concerns were raised about the PWFA's initial failure to include a religious exemption, Senator Cassidy confirmed on the Senate floor that the PWFA "allows employers to make employment decisions based on firmly held religious beliefs." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

At its core, this is a textbook case of a federal administrative agency exceeding its statutory authority in a way that both usurps the role of Congress and violates authority vested in the states under the principles of federalism. Considering the foregoing, this Court finds a likelihood of success of the merits that EEOC's textual interpretation of the PWFA to include an abortion accommodation mandate exceeds that agency's Congressional authorization.

### b. State Sovereignty and Free Speech

As discussed above, because the abortion accommodation mandate forces the *States* Plaintiffs to provide (and fund) accommodations for elective abortions that directly conflict with the States' own laws and policies, the abortion accommodation mandate "is destructive of state sovereignty." *Garcia v. San Antonio Metro. Transit*

25-30398.909

*Auth.*, 469 U.S. 528, 554 (1985). The people of Louisiana and Mississippi, through their elected representatives, have chosen to enact legislation and promote public policy that is antithetical to the directives of the abortion accommodation mandate. The *States* Plaintiffs therefore adequately demonstrate that they are likely to succeed on their claims that the abortion accommodation mandate violates the principles of federalism and encroaches on state sovereignty.

Finally, although the First Amendment does not confer rights on States, the "Supreme Court has made clear that the government (state and otherwise) has a 'right' to speak on its own behalf." *Missouri v. Biden*, 83 F.4th 350, 372 (5th Cir.), *cert. granted sub nom. Murthy v. Missouri*, 144 S. Ct. 7, 217 L.Ed.2d 178 (2023), *citing Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229, 120 S. Ct. 1346, 146 L.Ed.2d 193 (2000). The abortion accommodation mandate unquestionably impedes on the authority of Louisiana and Mississippi to control their own messaging with respect to the issue of abortion within their borders.

For the foregoing reasons, the Court concludes that the *States* Plaintiffs satisfy their burden of showing that they are likely to succeed on the merits of their claims that the abortion accommodation mandate of the Final Rule is arbitrary and capricious and exceeds the EEOC's statutory authority.[13]

---

[13]    The Court's findings with respect to the textual analysis of the abortion accommodation mandate are equally applicable to the *Bishops* Plaintiffs, who make the same argument.

25-30398.910

### 2. The *Bishops* Plaintiffs

### a. Free Speech and Religious Exceptions

The *Bishops* Plaintiffs start with the premise that their religious teachings do not allow their employees to speak or act in ways that conflict with fundamental Roman Catholic beliefs. In this manner, the *Bishops* Plaintiffs contend that the abortion accommodation mandate prohibits them from taking adverse employment actions against employees or faculty that advocate for abortion; requires the *Bishops* Plaintiffs to change their religious speech in ways that supports elective abortion; and requires them to knowingly accommodate employees when they obtain elective abortions. The *Bishops* Plaintiffs also argue that EEOC unlawfully narrowed the religious exemptions found in the PWFA and Title VII. EEOC responds that the *Bishops* Plaintiffs have submitted no evidence demonstrating that these alleged injuries will occur imminently, or that the EEOC would proceed with an enforcement action against them. EEOC also argues that the *Bishops* Plaintiffs have a host of available defenses – including the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*, and the ministerial exception – that can be urged if and when a charge is filed against them. Thus, EEOC contends that the *Bishops* Plaintiffs cannot establish that the Final Rule's interpretation of religious exceptions injures them, or that the Final Rule fails to offer sufficient protection for the conduct that violates the Final Rule. The Court disagrees.

25-30398.911

The text of the PWFA directly incorporates Title VII's religious exemption and makes the entire PWFA "subject to" the exemption. 42 U.S.C. § 2000gg-5(b).[14] Title VII states: "This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). The *Bishops* Plaintiffs argue that Title VII thus exempts religious entities from the requirements of the entire "subchapter" – *e.g.*, all of Title VII, not merely one category of claims – protecting religious employers from *any* Title VII claim if an employer made an employment decision based on an individual's particular religious belief, observance, or practice. *See, e.g., EEOC v. Mississippi Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980) (barring a sex-discrimination investigation under Title VII where a religious employer "applied its policy of preferring Baptists over non-Baptists."); *Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 132 (3d Cir. 2006) (religious exemption bars sex-discrimination claim); *Bear Creek*, 571 F. Supp. 3d at 591 ("The plain text of [the religious] exemption" bars sex-discrimination claims "when [a religious employer] refuses to employ an individual … based on religious observance, practice, or belief).

But the Final Rule takes a narrower view of Section 107(b), as follows:

> Under the Commission's interpretation of section 107(b), the PWFA does not fully exempt qualifying religious organizations from making

---

[14] The religious exception of the PWFA is contained in Section 107(b) and provides as follows:

(b) Rule of construction

This chapter is subject to the applicability to religious employment set forth in section 2000e-1(a) of this title.

42 U.S.C.A. § 2000gg-5(b).

Page **27** of **32**

25-30398.912

reasonable accommodations. This is analogous to section 702(a), which likewise does not operate as a total exemption from Title VII's requirements.

Under section 702(a), for example, qualifying religious organizations are exempt from Title VII's prohibition against discrimination on the basis of religion, but, as U.S. courts of appeals have recognized, qualifying religious organizations are still subject to the law's prohibitions against discrimination on the basis of race, color, sex, and national origin, and they may not engage in related retaliation. If a qualifying religious organization asserts as a defense to a claim under the PWFA that it took the challenged action on the basis of religion and that section 107(b) should apply, the merits of any such asserted defense will therefore be determined on a case-by-case basis consistent with the facts presented and applicable law.

Final Rule, 29096-01, 29146-29147 (internal citation omitted). Thus, EEOC contends that the PWFA exemption protects religious entities from claims of religious discrimination only. 89 Fed. Reg. at 29,146.

Clearly, EEOC failed to include a broad religious exception in the Final Rule, and, as the *Bishops* Plaintiffs argue, EEOC's interpretation of the PWFA religious exception – inasmuch as it mirrors the religious exception in Title VII, an anti-discrimination statute – does not square with the PWFA. Where, as here, the *Bishops* Plaintiffs' arguments and declarations supporting their Motion portend protracted investigations and litigation concerning the applicability of religious exceptions, thereby forcing the *Bishops* Plaintiffs to address their religious exceptions on a case-by-case basis, they have shown, at a minimum, an injurious regulatory burden. Under these circumstances, and because (as discussed *supra*) the EEOC has clearly exceeded its authority in including the abortion accommodation mandate in the Final Rule, the Court concludes the *Bishops* Plaintiffs have demonstrated a substantial

25-30398.913

likelihood of success on their claims of statutory and constitutional overreach by an administrative agency.

### B. Substantial Threat of Irreparable Injury

"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is certainly impending." *Lujan*, 504 U.S. at 565, n.2 (internal quotation marks omitted). Accordingly, "threatened injury must be certainly impending to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient. *Clapper*, 568 U.S. at 1147. *See also Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S. Ct. 1717, 109 L.Ed.2d 135 (1990).

Both the *States* and *Bishops* Plaintiffs argue that, for the same reasons they have standing to sue, they face a substantial threat of irreparable injury if an injunction against the abortion accommodation mandate of the Final Rule is not issued. The *States* Plaintiffs point to the thousands of female state employees for which the Final Rule would potentially require the States to make workplace accommodations for elective abortions – accommodations that are not currently provided.[15] The *States* Plaintiffs argue that the abortion accommodation for purely elective abortions would thus cause irreparable harm to the States in the form of compliance costs, infringement of state sovereignty, and compelled speech. The *Bishops* Plaintiffs contend the same with respect to compliance costs, religious infringement, and compelled speech. *See, infra*, pp. 12-13.

---

[15] *See* Schober Declaration at ¶ 14 [Doc. 17-2, ¶ 14]; Hardwick Declaration at ¶ 9 [Doc. 17-3, ¶ 9].

25-30398.914

For the same reasons this Court finds that the *States* and *Bishops* Plaintiffs have standing to challenge the abortion accommodation mandate, it finds that the States will suffer specific and irreparable injuries if the abortion accommodation mandate is not enjoined. And the June 18, 2024, effective date of the Final Rule means that such potential injuries are immediate.

### C. Balance of Equities and Public Interest

The parties present important competing interests and equities. The PWFA, as enacted by Congress, "eliminate[s] discrimination and promote[s] women's health and economic security," H.R. Rep. No. 117-27, at 1, objectives that were bi-partisan and broadly supported by Congress. EEOC argues that an injunction would interfere with Congress's judgment about how best to achieve those objectives. But considering the findings made herein – that EOOC has likely exceeded its statutory authority in including an abortion accommodation mandate in the Final Rule – and considering the abortion-related laws and policies promulgated and effected by duly elected representatives of the people of the *States* Plaintiffs, as well as the deeply held religious beliefs of the *Bishops* Plaintiffs, the Court finds that the harm to the *States* Plaintiffs and *Bishops* Plaintiffs of allowing the abortion accommodation mandate to take effect outweighs any harm to the EEOC if the mandate is enjoined. And, of course, the Court's decision in this matter in no way limits, impedes, or otherwise affects those covered employers who choose to implement employment policies or practices to provide leave or other workplace accommodation for the elective abortions of employees. The balance of equities and public interest weigh in favor of the Plaintiffs.

25-30398.915

## CONCLUSION

Considering the foregoing,

IT IS HEREBY ORDERED that the MOTION FOR PRELIMINARY INJUNCTION [Doc. 17], filed by the States of Louisiana and Mississippi, and the MOTION FOR PRELIMINARY INJUNCTION [Doc. 11] filed by the United States Conference of Catholic Bishops, Society of the Roman Catholic Church of the Diocese of Lake Charles, Society of the Roman Catholic Church of the Diocese of Lafayette, and Catholic University of America are GRANTED IN PART.

IT IS FURTHER ORDERED that this preliminary injunction postpones the effective date of the Final Rule's requirement that covered entities provide accommodation for the elective abortions of employees that are not necessary to treat a medical condition related to pregnancy.[16] The scope of the injunction shall apply to:

1) The States of Louisiana and Mississippi and any agency thereof;

2) Any covered entity under the Final Rule with respect to all employees whose primary duty station is located in Louisiana or Mississippi; and

3) The *Bishops* Plaintiffs.

The postponement shall remain in effect until final judgment is entered in the consolidated cases, respectively.

---

[16] To avoid any uncertainty, terminations of pregnancy or abortions stemming from the underlying treatment of a medical condition related to pregnancy are not affected by this preliminary injunction. Such procedures are clearly "related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4). Covered employers are therefore required to provide accommodation to the extent set forth in the PWFA.

25-30398.916

IT IS FURTHER ORDERED that the EEOC is preliminarily enjoined with respect to the above-listed parties from: (i) initiating any investigation into claims that a covered employer has failed to accommodate an elective abortion that is not necessary to treat a medical condition related to pregnancy; and (ii) issuing any Notice of Right to Sue with respect to the same.

THUS, DONE AND SIGNED in Chambers on this 17th day of June 2024.

_____

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE

25-30398.917

# Tab 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

|  |  |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, *et al.,*<br><br>*Plaintiffs,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *et al.,*<br><br>*Defendants.* | No. 2:24-cv-691-DCJ-TPL |

**DECLARATION OF FATHER RONALD KUNKEL IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

I, Father Ronald Kunkel, pursuant to 28 U.S.C. § 1746, state and declare:

1.      I am over eighteen years of age and fully competent to make this declaration. I have not been convicted of a felony or crime of dishonesty.

2.      I make this declaration based on my personal knowledge, training, and experience of the United States Conference of Catholic Bishops ("USCCB"), our organization, our ministry, our religious beliefs and practices, and the Roman Catholic Church.

3.      I am the Executive Director of the USCCB's Secretariat of Doctrine and Canonical Affairs. In that role, I oversee and manage the work of the Secretariat in its responsibility to support the Committee on Doctrine and provide theological and pastoral consultation to bishops and USCCB offices and departments. I have served in my role at USCCB since 2021.

4.      I have a doctorate of sacred theology from the University of Saint Mary of the Lake in Mundelein, Illinois, a licentiate of sacred theology from the Pontifical Athenaeum of Saint Anselm in Rome, and a bachelor of sacred theology from the Pontifical Gregorian University in Rome. I have been a member of the Academy of Catholic Theology, the Catholic Theological Society of

1

America, the American Academy of Religion, the Society for Catholic Liturgy, and the Fellowship of Catholic Scholars.

5. I was ordained to the priesthood in the Roman Catholic Church in 2000.

6. Previously I have served as associate pastor of St. Peter parish in Skokie, Illinois and associate pastor and director of liturgy at Holy Name Cathedral in Chicago. I have also served at the University of St. Mary of the Lake as an instructor of systematic theology, assistant professor of dogmatic theology, director of sacred liturgy, and associate professor of dogmatic theology.

## Catholic Teaching on Human Dignity

7. USCCB is an assembly of the hierarchy of Catholic bishops who jointly exercise pastoral functions on behalf of the Christian faithful of the Catholic Church in the United States and the U.S. Virgin Islands. Bishops are ordained members of the clergy who have taken a promise of obedience to God. USCCB develops all of our programs, policies, and procedures in accord with the teachings of the Catholic Church, including its moral and ethical teachings on the inviolable dignity of every human life.

8. These teachings include Catholic doctrine about abortion, contraception, sterilization, artificial reproductive technologies such as in vitro fertilization, and cooperation with acts that are intrinsically immoral.

9. Authoritative Catholic teachings are located in sacred Scripture and sacred tradition and are set forth and specified in the Catechism of the Catholic Church, documents of ecumenical councils (such as the Second Vatican Council), papal encyclicals, directives issued by bishops' conferences, and other teaching documents of the Church. *See generally* Catechism of the Catholic Church §§ 888-892 ("CCC") (describing the teaching office of the Church); *Dei verbum*, ¶ 10 (Nov. 18, 1965), https://www.vatican.va/archive/hist_councils/ii_vatican_council/documents/vat-ii_const_19651118_dei-verbum_en.html (describing how "[s]acred tradition and Sacred Scripture form one sacred deposit of the word of God, committed to the Church," and explaining that "the

2

25-30398.7369

task of authentically interpreting the word of God, whether written or handed on, has been entrusted exclusively to the teaching office of the Church, whose authority is exercised in the name of Jesus Christ"). These authoritative teachings are binding on all members of the Catholic Church.

10. The Catholic Church teaches that all people are created in the image and likeness of God and are thus imbued with inalienable human dignity. CCC §§ 357, 1701. The Congregation for the Doctrine of the Faith ("CDF"), which is charged with "promot[ing] and safeguard[ing] the doctrine on the faith and morals in the whole Catholic world," Art. 48, Apostolic Constitution on the Roman Curia (1988), has explained it thus: "From the moment of conception, the life of every human being is to be respected in an absolute way because man is the only creature on earth that God has 'wished for himself' and the spiritual soul of each man is 'immediately created' by God[.] … Human life is sacred because from its beginning it involves 'the creative action of God' and it remains forever in a special relationship with the Creator, who is its sole end." Congregation for the Doctrine of the Faith, *Donum Vitae*, Introduction ¶ 5 (Feb. 22, 1987) (footnotes omitted), https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_198702 22_respect-for-human-life_en.html.

11. Since its beginnings, the Catholic Church has taught that this dignity extends to the preborn—a dignity rooted in both Scripture and the natural law. *See, e.g.*, *Psalms* 139:16; *Jeremiah* 1:4-5; *Luke* 1:39-45; Pope Saint John Paul II, *Evangelium vitae*, ¶ 62 (Mar. 25, 1995), https://www.vatican.va/content/john-paul-ii/en/encyclicals/documents/hf_jp-ii_enc_25031995_evangelium-vitae.html.

12. This doctrine is also reflected in the Catechism of the Catholic Church, which reaffirms that life begins at conception: "Human life must be respected and protected absolutely from the moment of conception. From the first moment of his existence, a human being must be recognized as having the rights of a person—among which is the inviolable right of every innocent being to life." CCC § 2270.

13. The Catholic Church has accordingly always taught that abortion is an "unspeakable crime" and a grave sin. Pope St. Paul VI, *Gaudium et Spes*, ¶ 51 (Dec. 7, 1965),

3

25-30398.7370

https://www.vatican.va/archive/hist_councils/ii_vatican_council/documents/vat-ii_const_19651207_gaudium-et-spes_en.html. The *Didache*, one of the oldest extant Christian writings outside Scripture, and which is itself older than some portions of the New Testament, teaches, "You shall not murder a child by abortion[.]" St. Augustine, a fifth-century Bishop of Hippo in Africa who has been formally recognized as a doctor of the Church, likewise condemned abortion as "cruel." And Tertullian, who is often referred to as "the father of Latin theology" wrote in his *Apologia* in 197 AD: "In our case, a murder being once for all forbidden, we may not destroy even the fetus in the womb … To hinder a birth is merely a speedier man-killing; nor does it matter whether you take away a life that is born, or destroy one that is coming to birth." *Id.* at 9:8.

14.     Sections 2270 and 2271 of the Catechism of the Catholic Church affirm that life begins at conception and that directly intending to take innocent human life is gravely immoral. "Direct abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law." CCC § 2271. *See also* Section 2274 ("Since it must be treated from conception as a person, the embryo must be defended in its integrity, cared for, and healed, as far as possible, like any other human being.").

15.     In the landmark encyclical *Evangelium vitae*, Pope St. John Paul II invoked the authoritative teaching power of the ordinary magisterium of the Church to declare as doctrine that it is "morally unacceptable to encourage, let alone impose, the use of methods such as … abortion in order to regulate births." *Id.* ¶ 91.

16.     Pope St. John Paul II condemned the act of abortion in the strongest possible terms:

> Therefore, by the authority which Christ conferred upon Peter [the first Pope] and his Successors [subsequent Popes], in communion with the Bishops-who on various occasions have condemned abortion and who in the aforementioned consultation, albeit dispersed throughout the world, have shown unanimous agreement concerning this doctrine-I declare that direct abortion, that is, abortion willed as an end or as a means, always constitutes a grave moral disorder, since it is the deliberate killing of an innocent human being. This doctrine is based upon the natural law and upon the written Word of God, is transmitted by the Church's Tradition and taught by the ordinary and universal Magisterium.

*Id.* ¶ 62.

4

17.    *Evangelium vitae* went on to proclaim: "No circumstance, no purpose, no law whatsoever can ever make licit an act which is intrinsically illicit, since it is contrary to the Law of God which is written in every human heart, knowable by reason itself, and proclaimed by the Church." *Id.*

18.    Pope Pius XI, in his encyclical *Casti connubii*, taught that "it is the duty of public authority by appropriate laws and sanctions to defend the lives of the innocent," particularly those who "cannot defend themselves," such as "infants hidden in the mother's womb." *Id.* ¶ 67 (Dec. 31, 1930), https://www.vatican.va/content/pius-xi/en/encyclicals/documents/hf_p-xi_enc_19301231_casti-connubii.html.

19.    The CDF's *Declaration on Procured Abortion* reiterates the Church's teaching, insists that innocent life be protected by the State, and warns that "man can never obey a law which is in itself immoral, and such is the case of a law which would admit in principle the liceity of abortion." *Declaration on Procured Abortion* § 22 (1974).

20.    This prohibition on abortion—meaning the direct taking of the child's life—extends to situations in which the mother faces serious or grave illness during pregnancy. Even in these circumstances, directly acting on the child in order to end its life "is against the precept of God and the law of nature: 'Thou shalt not kill[.]'" *Casti Connubii*, ¶ 30. Thus, it remains gravely immoral to perform an abortion for the sake of preserving the life of the mother. This in no way means, however, that the Church is indifferent to the life of the mother or her needs, especially where her health and life are in danger. She, like her child, is endowed with the inalienable right to life, which must also be respected and protected. Through the moral principal of double effect, the mother may morally receive life-sustaining treatment, even where that treatment has the unintended (if not foreseeable) effect of ending the life of the child. For example, in the case of an ectopic pregnancy, the affected portion of the fallopian tubes may permissibly be removed—even if it means certain death for the child. The same is true were a woman suffering from uterine cancer to undergo a hysterectomy—the intention behind removing the uterus is to treat the cancer, not to end the child's life, even if that is also a foreseeable consequence. These actions neither intend to

5

25-30398.7372

directly end the life of the child, nor are they in their nature a direct attack on the child's life. Because these procedures do not involve "the deliberate and direct killing" of the child, *Humanae Vitae*, ¶ 58, they are not properly called an abortion at all.

21.     The penalty under canon law in the Catholic Church for procuring, or helping one to procure, an abortion is automatic excommunication (*latae sententiae*). 1983 Code c. 1398, 1323. The very act of procuring an abortion results in the punishment of excommunication rather than the remedial penalty having to be applied by Church authority. An excommunicated member must refrain from receiving the Eucharist (the Body and Blood of Christ offered to the faithful at every Mass) until the excommunication is lifted. The Church continues to extend the forgiving power of God's grace to these individuals through the sacrament of confession, but ordinarily requires them to seek reconciliation from a bishop to have the excommunication lifted.

22.     Thus, the Church treats not only the act of obtaining an abortion, but also the "[f]ormal cooperation in an abortion," as "a grave offense." CCC § 2272.

23.     The Church extends these teachings on human dignity to certain fertility treatments that compromise the dignity of the preborn child, the dignity of marriage, or both. The Church (and USCCB) recognize that married couples experiencing infertility and loss through miscarriage carry a heavy cross of suffering that must be acknowledged and assisted with through accompaniment and love. Children are the "supreme gift of marriage," *Gaudium et Spes*, ¶ 50, and the desire for children is a natural good that speaks to our deep desire to be co-operators in God's life-giving plan. The Church (and USCCB) accordingly encourages the use of many fertility treatments that help the conjugal act achieve its procreative end while also respecting the dignity of any child conceived through that union. *See, e.g.*, *Donum Vitae*, ¶¶II.B.6-7; Congregation for the Doctrine of the Faith, *Dignitas Personae*, ¶¶ 12-13 (Sept. 8, 2008), https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_200812 08_dignitas-personae_en.html.

24.     However, as a "supreme gift," the child's dignity must never be violated and his rights respected. These rights include the right "to be the fruit of the specific act of the conjugal love of

6

25-30398.7373

his parents," and "the right to be respected as a person from the moment of his conception." CCC § 2378 (quoting *Donum Vitae*, ¶ I.8). Certain methods of artificial reproductive technologies violate these rights, thus compromising the dignity of the child. Directly participating in, or knowingly cooperating with, those methods is thus considered gravely immoral.

25. In vitro fertilization ("IVF"), for instance, may "involve the killing of [human] embryos," and "[t]he killing of innocent human creatures, even if carried out to help others, constitutes an absolutely unacceptable act." *Evangelium Vitae*, ¶ 63. IVF is also often accompanied by pre-implantation genetic diagnosis and selective reduction procedures, whereby embryos with certain characteristics are identified not for purposes of healing the identified condition, but for purposes of screening and inevitable discarding. This, too, compromises the right of the embryonic person to life, as well as to his innate dignity as a person created in the image and likeness of God, regardless of disability or other status. *See, e.g.*, *Donum Vitae*, ¶ I.2-3; *Dignitas Personae*, ¶ 15. And even where embryos are not destroyed, but frozen "in order to preserve the life of an embryo—cryopreservation," it "*constitutes an offence against the respect due to human beings* by exposing them to grave risks of death or harm to their physical integrity and depriving them, at least temporarily, of maternal shelter and gestation, thus placing them in a situation in which further offences and manipulation are possible." *Donum Vitae*, ¶ I.6; *Dignitatis Personae* ¶¶ 18-19.

26. IVF, as well as other reproductive methods such as artificial insemination and practices like surrogacy also violate the rights of the child whenever they involve gametes—or, in the case of surrogacy, a womb—contributed by a person other than the child's biological parents. This process, known as "heterologous artificial insemination and fertilization," is "gravely immoral" because it "infringe[s] the child's right to be born of a father and mother known to him and bound to each other by marriage." CCC § 2376; *Donum Vitae*, ¶ II.A.1 ("The child has the right to be conceived, carried in the womb, brought into the world and brought up within marriage: it is through the secure and recognized relationship to his own parents that the child can discover his own identity and achieve his own proper human development.").

7

27. But even when only the biological parents are involved, methods of reproduction taking place outside the conjugal act violate the dignity of any ensuing children, rendering them objects "made by human hands," rather than "fellow persons equal in dignity to their parents and destined for eternal happiness with God." USCCB, *Life-giving Love in an Age of Technology* at 5-6 (2009), https://www.usccb.org/upload/lifegiving-love-age-technology-2009.pdf; CCC § 2377 (means of reproduction outside the conjugal act "entrusts the life and identity of the embryo into the power of doctors and biologists and establishes the domination of technology over the origin and destiny of the human person. Such a relationship of domination is in itself contrary to the dignity and equality that must be common to parents and children.").

28. Finally, regardless of whether a third party is involved, these methods are "morally unacceptable" because they "separate procreation from the fully human context of the conjugal act." *Evangelium Vitae*, ¶ 14. The Church teaches that marriage has two principal purposes: the procreative, as embodied in the command to "be fruitful and multiply," Genesis 1:28, and the unitive, as encapsulated in the imagery of the married couple becoming "one flesh," Genesis 2:24, Matthew 19:5; *see Gaudium et Spes* ¶ 50. Both purposes are brought to their apex in an act of marital love that is a completely free and open gift of each spouse to the other in his or her entirety, holding nothing back—including each spouse's fertility. Such an act of complete self-gift expresses openness to being a co-operator with God in the creation of new life (procreative), while also strengthening the marital bond by fully uniting the spouses as one (unitive). *See* Pope St. Paul VI, *Humanae Vitae*, ¶ 12 (July 25, 1968), https://www.vatican.va/content/paul-vi/en/encyclicals/documents/hf_p-vi_enc_25071968_humanae-vitae.html. The "inseparable connection …between the two meanings of the conjugal act, the unitive meaning and the procreative meaning," is "willed by God and unable to be broken by man on his own initiative." *Donum Vitae*, ¶ II.B.4.a. Reproductive methods like IVF, artificial insemination, and surrogacy do precisely that, intentionally "dissociat[ing] the sexual act from the procreative act," and thus "remain morally unacceptable." CCC § 2377; *Donum Vitae* ¶ II.B.4.b-c; *Life-giving Love*, *supra* at 5 (surrogacy involves "delegate[ing]" part of the parental role "to others").

8

29. For similar reasons, the Catholic Church also teaches that contraception and sterilization, both of which seek to eliminate the procreative aspect of the conjugal act completely—are intrinsic evils. *See* CCC § 2370. As Pope St. Paul VI explained in a 1968 encyclical, God is the "source" of all human life. *Humanae vitae* ¶ 13. Therefore, "an act of mutual love which impairs the capacity to transmit life which God the Creator, through specific laws, has built into it, frustrates His design which constitutes the norm of marriage, and contradicts the will of the Author of life." *Id.* As a result, Pope St. Paul VI "declare[d] that the direct interruption of the generative process already begun and, above all, all direct abortion, even for therapeutic reasons, are to be absolutely excluded as lawful means of regulating the number of children." *Id.* ¶ 14. "Equally to be condemned, as the magisterium of the Church has affirmed on many occasions, is direct sterilization, whether of the man or of the woman, whether permanent or temporary." *Id.*

30. The Catechism also instructs that Catholic institutions have a duty to avoid the sin of "scandal." The Church defines scandal as "an attitude or behavior which leads another to do evil," and can be caused "by laws or institutions." CCC §§ 2284, 2286; *see Matthew* 18:6. The Church also teaches that "[s]candal is grave when given by those who by nature or office are obliged to teach and educate others." *Id.* § 2285.

**USCCB's Teaching and Advocacy for Beliefs on Human Dignity**

31. In accordance with these teachings on human dignity, USCCB provides religious teaching, training, leadership, and advocacy supporting the sanctity of human life and opposing the act of abortion. This includes encouraging and enabling programs to meet the needs of pregnant women, children, persons with disabilities, those who are sick or dying, and all who have been involved in abortion. It also includes coordinating with and supporting dioceses nationwide to implement major pro-life programs.

9

25-30398.7376

32. USCCB has established a Committee on Pro-Life Activities. The Committee is currently chaired by Bishop Michael F. Burbidge, who is joined on the committee by seven other bishops. Five other bishops and two archbishops serve as consultants.

33. USCCB has also established a Secretariat of Pro-Life Activities, which has a staff of nine USCCB employees responsible for ministry development, education, outreach, communications, and public policy.

34. USCCB helps lead the *People of Life* campaign to spread the good news about the Church's efforts to teach respect for all human life from the moment of conception until natural death. The campaign works in four major areas: public information and education, prayer and worship, public policy, and pastoral care.

35. USCCB also helps lead numerous prolife events. For instance, in October, the Catholic Church in the United States celebrates *Respect Life Month*, and the first Sunday of October is designated as *Respect Life Sunday*. To support those annual observances, the USCCB Secretariat of Pro-Life Activities provides materials for Catholics to use in their parishes, schools, or ministries to help others understand the value of human life.

36. USCCB also provides an online resource library containing a wide variety of public religious resources dedicated to expressing its religious pro-life beliefs, including sermons, prayers, educational information, and policy advocacy materials.

37. USCCB has a webpage dedicated to its pro-life advocacy. *See Abortion*, USCCB, https://perma.cc/7KEV-58L5. On this webpage, it also provides information about Project Rachel, a Catholic ministry to women and men of all or no faiths who have been harmed by abortion, as well as links to religious and counseling resources available to them, including Sacramental Reconciliation.

38. At a very practical level, USCCB has issued a series of ethical and religious directives to inform the provision of health services in every U.S. Catholic health institution. These directives prohibit providing, promoting, or condoning abortions, abortion-inducing drugs, contraceptives, certain forms of assisted reproductions such as in-vitro fertilization, and sterilization. A true and

10

25-30398.7377

correct copy of these directives is attached as Exhibit 1, USCCB Ethical and Religious Directives for Catholic Health Care Services at 18-19 (Nos. 41, 42, 45, 47, 52, & 53).

39.     Directive 45 states:

> Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and the implantation of the embryo.

Ex. 1 at 18.

40. Directive 47 states:

> Operations, treatments, and medications that have as their direct purpose the cure of a proportionally serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

*Id.* at 19.

41.     USCCB's Committee on Doctrine has also issued further guidance on Directive 45's application its Memorandum, *The Distinction Between Abortion and Legitimate Medical Procedures*, dated June 23, 2010. A true and correct copy of this memorandum is attached hereto as Exhibit 2. In that memorandum, the Committee on doctrine explained that a key theological distinction in determining whether a procedure is a direct abortion is whether the procedure "*directly* targets the life of the unborn child" or "*indirectly* and unintentionally (although foreseeably) results in the death of an unborn child." Ex. 2 at 2-3.

42.     The USCCB Ethical and Religious Directives further instruct Catholic healthcare institutions to "distinguish [themselves] by service to and *advocacy for*" people who are "at the margins of our society" and "particularly vulnerable to discrimination," such as "the poor, the uninsured and underinsured; children and the *unborn*; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees." Ex. 1 at 9 (No. 3) (emphasis added).

43.     USCCB also publishes resources on its website concerning the Church's position on licit and illicit fertility treatments and providing resources to the faithful seeking guidance on this

25-30398.7378

issue. *See, e.g.*, *Life-giving Love*, *supra*; John M. Haas, Ph.D., *Begotten not Made: A Catholic View of Reproductive Technology*, ; USCCB, *Infertility*, https://www.usccb.org/topics/natural-family-planning/infertility#:~:text=The%20Church%2C%20with%20sincere%20compassion,divine%20plan%20for%20married%20love (containing resources for couples experiencing infertility); USCCB, *Seven Considerations While Navigating Infertility*,https://www.usccb.org/navigating-infertility.

44. USCCB also works with dioceses across the country to facilitate National Family Planning (NFP) Awareness Week, a week-long educational program taking place every year during the anniversary of *Humanae Vitae*'s publication. Among other things, NFP Awareness Week seeks to educate the faithful on the beauty of fertility measures that co-operate with God's plan for human sexuality, as well as to provide resources explaining why certain methods such as IVF and surrogacy are inconsistent with human dignity. *See* USCCB, *NFP Awareness Week*, https://www.usccb.org/topics/natural-family-planning/national-nfp-awareness-week.

### Application to USCCB's Employment Policies and Practices

45. USCCB strongly supports laws and policies helping healthy pregnancies and childbirth, such as provisions of the Pregnant Workers Fairness Act. USCCB believes that it is obligated to adopt appropriate life-affirming policies and practices in its own workplaces.

46. This also means USCCB may not adopt an employment policy or practice that contradicts the Church's teachings regarding the dignity of human life, including the prohibition of promoting, encouraging, or endorsing abortions, the prohibition against fertility treatments that violate the dignity of the child and marriage, contraception, or sterilization.

47. Indeed, as an assembly of the Church's hierarchical leadership in the United States, USCCB has a clear responsibility to faithfully embody the teaching of the Church in how it operates its ministry. *See*, *e.g.*, CCC § 2285

12

25-30398.7379

48.     USCCB cannot accommodate or support direct abortion, immoral fertility treatments, contraception, or sterilization within its workplace. USCCB does not provide any employee benefits that would be contrary to the teachings of the Catholic Church. And it requires its employees to act with conscious regard and respect for USCCB's Catholic character and to refrain from conduct or advocacy either inside or outside the workplace that publicly conflicts with USCB's adherence to Catholic teachings.

49.     Knowingly accommodating the choice to obtain an abortion within USCCB's own ministry, and to treat the choice to obtain an abortion just as it would the choice to give birth to one's child, would directly and substantially undermine USCCB's Catholic witness and beliefs. The same holds true regarding the accommodation of immoral fertility treatments, contraception, or sterilization.

50.     Knowingly accommodating the choice to obtain an abortion within USCCB's own ministry, and to treat the choice to obtain an abortion just as it would the choice to give birth to one's child, would also constitute the sin of scandal. The same holds true regarding the accommodation of immoral fertility treatments, contraception, or sterilization.

51.     Thus, USCCB cannot comply with any requirements in the EEOC Final Rule to knowingly provide accommodations for employees to obtain abortions, pursue immoral fertility treatments, or seek out contraception or sterilization.

52.     USCCB must be able to fully express its support for preborn human dignity and its corresponding opposition to direct abortion and fertility treatments that compromise the dignity of the child in its employment policies and practices. It must also be able to give voice to its firm and longstanding opposition to contraception, which violates the sanctity of the marital act. Thus, USCCB cannot comply with any prohibitions in the EEOC Final Rule that would limit those religious practices.

53.     USCCB's expression of its beliefs would be burdened if it were required to employ individuals who undermined the teachings of the Catholic Church in the workplace.

54.     In accordance with its religious beliefs:

13

25-30398.7380

a. USCCB does not and will not provide any workplace accommodation if an employee obtains a direct abortion, pursues an immoral fertility treatment, or seeks care related to contraception or sterilization. Obtaining a direct abortion, pursuing immoral fertility treatments, and seeking care for contraception or sterilization is grounds for adverse employment action, up to and including termination.

b. USCCB will take appropriate adverse employment action against any employee who encourages another person to obtain a direct abortion or to request an accommodation for a direct abortion, who encourages another person to pursue immoral fertility treatments or to request an accommodation for such a treatment, or who encourages another person to begin using contraception or seek sterilization or to request an accommodation for care related to contraception.

c. USCCB does not and will not permit its employees to advocate in favor of abortion, immoral fertility treatments, contraception, sterilization—or accommodations for the same—in the workplace or outside of it.

d. USCCB will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines Catholic teachings about direct abortion, immoral fertility treatments, contraception, and sterilization, or to USCCB's policies with respect to those issues.

55. USCCB takes a pastoral approach to its ministry and will minister even to wayward employees in a manner that, where appropriate and possible, encourages reconciliation and restoration. But USCCB will not knowingly accommodate the choice to obtain or support abortion, immoral fertility treatments, contraception, or sterilization, and will take appropriate employment action to ensure as much. USCCB believes that it would be complicit in grave sin if it knowingly accommodated abortions, immoral fertility treatments, contraception, or sterilization, or if it changed its workplace policies and practices to cease expressing and enforcing its opposition to abortion, immoral fertility treatments, contraception, and sterilization in how it manages its ministry.

14

25-30398.7381

56.   Moreover, if USCCB were to knowingly accommodate abortions, immoral fertility treatments, contraception, or sterilization by its employees or cease expressing its opposition to these topics, it would cause scandal and lead other Catholic individuals and ministries astray. *See* CCC §§ 2284, 2286.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on this 7th day of November, 2024.

Rev. Ronald Kunkel
_____
Rev. Ronald Kunkel, S.Th.D.

15

# <u>Tab 4</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

|  |  |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, *et al.,*<br><br>*Plaintiffs,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *et al.,*<br><br>*Defendants.* | No. 2:24-cv-691-DCJ-TPL |

**DECLARATION OF THERESA RIDDERHOFF IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

I, Theresa Ridderhoff, pursuant to 28 U.S.C. § 1746, state and declare:

1. I am over eighteen years of age and fully competent to make this declaration. I have not been convicted of a felony or crime of dishonesty.

2. I make this declaration based on my personal knowledge and experience of the United States Conference of Catholic Bishops ("USCCB"), our organization, our ministry, and our religious beliefs and practices. My statements about the history of the USCCB are drawn from organizational and historical documents kept in the regular course of business which I believe to be correct.

3. Since 2018, I have served as one of the Associate General Secretaries in the Office of the General Secretariat of the USCCB. The USCCB General Secretary supports the work of the President and Vice President of the Conference. All administrative matters proper to the Conference and its activity are coordinated through the USCCB General Secretariat. The Office of the General Secretary follows closely the work of the Conference committees and is responsible for the coordination of activities and staff. The General Secretariat is also responsible for the

1

preparation and arrangements for meetings of the Administrative Committee and of the general membership and for the maintenance of the Conference files and archives.

4. In my role, I function as the chief operations officer for the ongoing management of USCCB. I am a member of USCCB's Executive Leadership team, which, in collaboration with staff, conducts the regular business of the General Secretariat.

5. Previously, I served as Executive Director of the USCCB Office of Human Resources.

6. In my role, I am familiar with USCCB's Human Resources practices, including compliance with federal workplace regulations. I am also familiar with the financial and employee resources of USCCB.

7. Altogether, I have worked for USCCB for over thirteen years.

### History, Organization, and Structure of USCCB

8. USCCB is an assembly of the hierarchy of bishops in the Catholic Church. USCCB seeks to unify, coordinate, encourage, promote, and carry on Catholic activities in the United States; to organize and conduct religious, charitable, and social welfare work at home and abroad; to aid in education; to care for immigrants; and generally to further these goals through education, publication, and advocacy.

9. USCCB traces its origins back over a century. In 1917, the U.S. bishops formed the National Catholic War Council to enable U.S. Catholics to contribute funds and commit personnel to provide spiritual care and recreation services to servicemen during World War I. In 1919, Pope Benedict XV urged the hierarchy to join him in working for peace and social justice. In response, the bishops organized the National Catholic Welfare Council and set up the first Administrative Committee of seven members to handle the Council's business between plenary meetings. The headquarters were established in Washington, D.C., and a general secretary with some staff was appointed.

10. In 1922, the word "Conference" replaced "Council" in the organization's title, underlining the fact that it was consultative rather than legislative. At the same time, the National

2

25-30398.7431

Catholic Welfare Conference was created to address such concerns as education, immigration, and social action.

11. This model continued until 1966 when the National Conference of Catholic Bishops ("NCCB") and the United States Catholic Conference ("USCC") were established. The NCCB attended to the Church's own affairs in this country. Its committees were exclusively bishops and their secretariats. In USCC, the bishops collaborated with other Catholics to address issues that concern the Church as part of the larger society. Its committees also included lay people, clergy and religious.

12. On July 1, 2001, the NCCB and the USCC combined to form the USCCB. USCCB continues the work done by both previous organizations.

13. USCCB's mission is to support the ministry of bishops with an emphasis on evangelization, by which the bishops exercise in a communal and collegial manner certain pastoral functions entrusted to them by the Lord Jesus of sanctifying, teaching, and governing. *See* Pope St. Paul VI, *Lumen gentium*, Ch. 3, § 21, (Nov. 21, 1964), https://perma.cc/HV26-6FD7. By evangelizing, the Church seeks to bring about in all Catholics such an enthusiasm for their faith that, in living their faith in Jesus and strengthened by the sacraments, most especially the celebration of the Eucharist, they freely share that faith with others to transform the world.

14. USCCB has numerous standing committees. Each standing committee is given a mandate based on USCCB's goals with corresponding responsibilities and relationships to address how the committee should fulfill its mission in relationship to those goals.

15. For example, USCCB has a Committee on Pro-Life Activities, currently led by Bishop Michael F. Burbidge, and a Secretariat of Pro-Life Activities. This Committee exists to proclaim that human life is a precious gift from God; that each person who receives this gift has responsibilities toward God, self and others; and that society, through its laws and social institutions, must protect and nurture human life at every stage of its existence.

16. The Committee provides a resource library containing dozens of public religious resources dedicated to expressing USCCB's religious pro-life beliefs, including sermons, prayers,

3

25-30398.7432

educational information, and policy advocacy materials. It also maintains a webpage dedicated to its pro-life advocacy specifically on the topic of abortion. A true and correct copy of that webpage, titled *Abortion*, USCCB, https://perma.cc/7KEV-58L5, is attached hereto as Exhibit 1. Among other resources, this webpage provides information about Project Rachel, one of the Catholic Church's ministries in the United States to women and men of all or no faiths who have been harmed by abortion. It also contains links to religious and counseling resources available to those impacted by abortion, including Sacramental Reconciliation.

17. Under the guidance and direction of the Committee on Pro-Life Activities, the Secretariat of Pro-Life Activities works to teach respect for all human life from conception to natural death, and to organize for its protection. To achieve this end, the Secretariat among other things provides education to members of the faithful and the public on prolife issues, encourages and enables programs to meet the needs of pregnant women, children, persons with disabilities, those who are sick or dying, and all who have been involved in abortion, and coordinates/advises on public policy efforts concerning these issues.

18. USCCB's Committee on Doctrine has also issued a series of Ethical and Religious Directives for Catholic Healthcare Services to inform the provision of health services in every U.S. Catholic health institution, which prohibit providing, promoting, or condoning direct abortions.

19. The USCCB also participates in numerous prolife events, including the annual March for Life and Respect Life Month.

### Employment at USCCB

20. USCCB is headquartered in Washington, D.C.

21. USCCB relies heavily on the gifts and talents of laypeople to carry out its pastoral mission. As of October 4, 2024, USCCB has 308 employees. Approximately 192 of these employees are laywomen, which represents about 62 percent of USCCB's workforce. I understand that many of USCCB's employees would qualify as ministers for purposes of the First Amendment's ministerial exception. But it is my understanding that others would not qualify because their job functions and expectations are almost entirely focused on non-religious matters

4

and do not require them to lead our organization, conduct worship services or other religious ceremonies or rituals, or otherwise serve as a messenger or teacher of USCCB's Catholic faith. Further, like many Catholic ministries, USCCB employs both Catholics and non-Catholics, which I believe is true for the other Catholic plaintiffs in this case as well.

22. USCCB maintains a Personnel Policies and Procedures Manual ("Manual"), last updated in April 2024, which functions as its employee handbook. A true and correct copy of this Manual is attached hereto as Exhibit 2.

23. The Manual's provisions apply to all USCCB employees. All employees sign an acknowledgement of the Manual as part of their onboarding process, in which they affirm that they will abide by its terms.

### Employment Practices

24. The Manual is designed to "describe[ ] and promote[ ] a workplace where each employee is treated fairly and justly and, in a manner, consistent with Church teaching. [USCCB's] aim is to create a workplace where employees are valued and given the widest possible latitude, consistent with their abilities and the Conference's needs, to contribute to the organization." Ex. 2 at 6 (Policy No. 1-A). Indeed, USCCB takes a pastoral approach to its ministry, and ministers to its employees in a way that encourages—where necessary, appropriate, and possible—reconciliation.

25. The Manual states that USCCB "advocates and promotes the teaching of the Nation's Catholic Bishops, and by serving the Bishops, serves the Catholic people of the United States. For these reasons, Conference employees should act always with conscious regard to and respect for the Conference's religious and professional character and should refrain from conduct or advocacy inside or outside the workplace that publicly conflicts with or undermines that teaching." *Id.*

26. For the same reasons, all posted regular full-time job descriptions for USCCB employees require them to demonstrate willingness and ability to understand, respect and contribute to the USCCB mission and to fulfill job duties in accordance with its Catholic identity.

5

25-30398.7434

27.     Similarly, given that USCCB abides by the teachings of the Catholic Church and exists to serve the Bishops and American Catholics, the Manual provides that USCCB "will not provide any [employee] benefit in any circumstance in which the benefit or the provision of the benefit would be contrary to the authentic teaching of the Catholic Church." *Id.* at 37 (Policy No. 3-A).

28.     USCCB has a religious mission, rooted in Catholic faith and doctrine, to protect both mothers and their preborn children. Indeed, USCCB celebrates and seeks to further the goal of advancing the well-being of pregnant women and their preborn children and ameliorating challenges associated with having children. Because of these religious commitments, it strongly supports laws and policies like the Pregnant Workers Fairness Act's provisions that help facilitate healthy pregnancies and childbirth.

29.     At the same time, USCCB has a religious belief that it would be complicit in the grave sin of abortion and would cause scandal and undermine its Catholic witness and beliefs if it knowingly accommodated an employee's abortion or if it changed its workplace policies and practices to cease expressing and enforcing its opposition to abortion. The same holds true regarding the accommodation of reproductive practices the Catholic Church believes are immoral, such as in vitro fertilization (IVF), artificial insemination, surrogacy, contraception, and sterilization.

30.     USCCB believes that its religious obligation to communicate the Church's teachings regarding abortion would be undermined were it forced to alter its employment policies to prohibit employees from expressing the Church's teaching on abortion to other employees or prospective employees who choose to seek an abortion. The same holds true regarding reproductive practices the Catholic Church believes are immoral, including IVF, artificial insemination, surrogacy, sterilization, and contraception.

31.     Because of these religious commitments, USCCB does not and will not provide any workplace accommodation for an employee to obtain a direct abortion. Instead, obtaining a direct abortion is grounds for adverse employment action, up to and including termination. The same holds true regarding reproductive practices the Catholic Church believes are immoral.

6

32. Further, because of its religious commitments, USCCB will take appropriate adverse employment action against any employee who encourages another person to obtain a direct abortion or to request an accommodation for a direct abortion. The same holds true regarding reproductive practices the Catholic Church believes are immoral.

33. Moreover, because of its religious commitments, USCCB does not and will not permit employees to advocate for abortion or abortion accommodations in or outside the workplace. The same holds true regarding reproductive practices the Catholic Church believes are immoral.

34. Finally, because of its religious commitments, USCCB may take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines Catholic teachings about direct abortion or immoral reproductive practices or USCCB's policies regarding abortion or immoral reproductive practices.

35. USCCB's expression of its beliefs would be burdened if it were required to employ individuals who undermined the teachings of the Catholic Church in the workplace, or who required USCCB's leadership to knowingly accommodate conduct or advocacy the Church believes to be gravely sinful. This is true for several reasons. For one, Scripture teaches that a house divided against itself cannot stand. *Mark* 3:25. Having USCCB's representatives engage in conduct or advocacy opposing the core moral teachings of the Catholic Church at issue in this case—teachings that USCCB exists to express and carry out—would harm the integrity and the religious message of USCCB's ministry. Requiring USCCB to accommodate conduct and advocacy contrary to its teachings and beliefs at issue in this case would also directly undermine USCCB's ministry and compromise its fidelity to fundamental Catholic principles. Together, these burdens would severely harm USCCB's witness to the Church and to the broader world. It is to prevent these harms that USCCB is clear that its employees are expected to exhibit respect for USCCB's religious character and refrain from conduct or advocacy inside or outside the workplace that publicly conflicts with or undermines Catholic teaching.

25-30398.7436

**Impact of EEOC's Final Rule**

36. I am aware that the Equal Employment Opportunity Commission ("EEOC") has issued a final rule implementing the Pregnant Workers Fairness Act. *See Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024). This rule does not adequately exempt religious employers like USCCB. I regard EEOC's rule as threatening USCCB with penalties, lawsuits, investigations, and other burdens unless USCCB alters its employment policies and practices regarding abortion and the reproductive practices that are described above.

37. USCCB has multiple employees who assist with ensuring that USCCB complies with federal regulations, including reviewing new regulations, drafting new policies and procedures, updating existing policies and procedures, communicating information about regulations to other USCCB employees and stakeholders, and creating new training materials. This includes employees in USCCB's Human Resources & Careers office and the General Counsel's office.

38. USCCB also regularly consults with paid outside counsel about issues affecting USCCB's workplace, including how to ensure compliance with federal regulations.

39. Based on my experience with USCCB Human Resources practices and work with the USCCB's Office of General Counsel, I conservatively estimate that the amount of overall USCCB-employee time necessary to review, understand, analyze, and implement the requirements contained in the Final Rule regarding direct abortion and immoral reproductive practices, if USCCB were to choose to take all of those actions, is well over 100 hours. This estimate includes the time required to evaluate each of the Final Rule's abortion-accommodation requirements in light of USCCB's religious beliefs and mission, and for employees to speak with USCCB's outside counsel, confer internally, devise new policies, create and hold new trainings, update written materials regarding the policies, and communicate about the policies with other USCCB employees and stakeholders.

40. I conservatively estimate that legal fees associated with USCCB's consultations with outside counsel about complying with these requirements in the Final Rule would be well over $500.

8

25-30398.7437

25-30398.7438

I declare under penalty of perjury that the foregoing is true and correct.


Executed on this  8th  day of November, 2024.


                                      _____

                                        Theresa Ridderhoff

# **Tab 5**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

THE STATE OF LOUISIANA, ET AL                    CIVIL DOCKET NO. 2:24-cv-00629

VERSUS                                           JUDGE DAVID C. JOSEPH

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION                           MAGISTRATE JUDGE THOMAS P. LEBLANC

**********************************************************************************

UNITED STATES CONFERENCE OF                      CIVIL DOCKET NO. 2:24-cv-00691
CATHOLIC BISHOPS, ET AL

VERSUS                                           JUDGE DAVID C. JOSEPH

EQUAL EMPLOYMENT                                 MAGISTRATE JUDGE THOMAS P.
OPPORTUNITY COMMISSION,                          LEBLANC
ET AL

## MEMORANDUM ORDER

Before the Court are cross-motions for summary judgment in the above-captioned cases in which the respective plaintiffs seek partial vacatur of the EEOC's Final Rule implementing the Pregnant Worker Fairness Act ("PWFA"), 42 U.S.C. § 2000gg, *et seq.* Among other issues, the Plaintiff States of Mississippi and Louisiana, as well as four organizations affiliated with the Roman Catholic Church, posit that an "abortion accommodation mandate" included in the Final Rule was not authorized by Congress. For the reasons discussed below, the record before the Court clearly establishes that the EEOC has exceeded its statutory authority to implement the PWFA and, in doing so, both unlawfully expropriated the authority of Congress and

Page **1** of **40**

25-30398.9126

encroached upon the sovereignty of the Plaintiff States under basic principles of federalism.  42 U.S.C. § 2000gg, *et seq.*  For the reasons discussed below, the Court vacates the "abortion accommodation mandate" as described herein and remands this matter to the EEOC to revise the Final Rule and all related Implementing Regulations and Guidance in accordance with this Order.

The issues before the Court are raised in four cross-motions for summary judgment in the above-captioned consolidated matters.  In the matter entitled *State of Louisiana, et al v. EEOC*, No. 2:24-cv-00629-DCJ-TPL (the *"States* Lawsuit"), there is (i) a MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT [Doc. 68] filed by Defendant Equal Employment Opportunity Commission ("EEOC"); and (ii) a MOTION FOR SUMMARY JUDGMENT [Doc. 70] filed by the Plaintiff States of Louisiana and Mississippi (the "*States* Plaintiffs").  In the matter entitled *United States Conference of Catholic Bishops, et al v. EEOC, et al*, No. 2:24-cv-00691-DCJ-TPL (the "*Bishops*" Lawsuit), there is (i) a MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT [Doc. 75] filed by the EEOC; and (ii) a MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION [Doc. 77] filed by the four entities affiliated with the Roman Catholic Church[1] (the "*Bishops* Plaintiffs") (collectively, the

---

[1]      The Plaintiff entities in the *Bishops* lawsuit are the United States Conference of Catholic Bishops ("USCCB"), Society of the Roman Catholic Church of the Diocese of Lake Charles ("Diocese of Lake Charles"), Society of the Roman Catholic Church of the Diocese of Lafayette ("Diocese of Lafayette"), and Catholic University of America ("Catholic University") (collectively, the "*Bishops* Plaintiffs").

The defendants in the *Bishops* lawsuit are EEOC and Charlotte Burrows, Chair of the EEOC, sued in her official capacity only.  Ms. Burrows was dismissed by President Trump on January 27, 2025, after the preliminary injunction was filed, and was replaced by Acting

"Motions").[2]  Invoking this Court's authority under Sections 706(2)(A)(B)&(C) of the Administrative Procedure Act, 5 U.S.C. §706, the Motions filed by the *States* and *Bishops* Plaintiffs seek vacatur of the abortion accommodation mandate of the *Implementation of the Pregnant Workers Fairness Act*, 29 C.F.R. § 1636, *et seq.* (hereinafter, the "Final Rule"),[3] which implements and interprets the PWFA.[4]  The Plaintiffs also seek conversion of the Court's June 17, 2024, preliminary injunction ("PI") into a permanent injunction prohibiting the EEOC from enforcing the Final Rule against them in such a manner as would require Plaintiffs to provide

---

Chair Andrea R. Lucas.  In addition to Ms. Lucas, the EEOC is currently staffed by Commissioner Kalpana Kotagal.

[2]  In response to the *States* Plaintiffs' Motion [Doc. 70, *States* Lawsuit], EEOC filed a response [Doc. 75, *States* Lawsuit], and the *States* Plaintiffs filed a reply brief [Doc. 88, *States* Lawsuit].  In response to the EEOC's Motion [Doc. 68, *States* Lawsuit], the *States* Plaintiffs filed a response [Doc. 76, *States* Lawsuit], and the EEOC filed a reply brief [Doc. 87, *States* Lawsuit].

In response to the *Bishops* Plaintiffs' Motion [Doc. 77, *Bishops* Lawsuit], the EEOC filed a response [Doc. 81, *Bishops* Lawsuit], and the *Bishops* Plaintiffs filed a reply brief [Doc. 90, *Bishops* Lawsuit].  In response to the EEOC's Motion [Doc. 75, *Bishops* Lawsuit], the *Bishops* Plaintiffs filed a response [Doc. 83, *Bishops* Lawsuit], and the EEOC filed a reply brief [Doc. 89, *Bishops* Lawsuit].  Additionally, the *Bishops* Plaintiffs subsequently filed several Notices of Supplemental Authority in Support of their Motion for Partial Summary Judgment and Permanent Injunction.

[3]  The regulations in the Final Rule were codified at 29 C.F.R. § 1636, *et seq.*  Appendix A to Part 1636, designated as "Interpretive Guidance on the Pregnant Workers Fairness Act," contains information concerning how the EEOC interprets the standards set forth in the Final Rule.  89 Fed. Reg. 209,096, *et seq.* (April 19, 2024) is the Federal Register's publication of the Final Rule and the Interpretive Guidance.  For purposes of this Ruling, the Court refers to the regulations as codified in the C.F.R. and the Interpretive Guidance at their citations in the Federal Register.

[4]  The *Bishops* Plaintiffs also argue that the "Final Rule and EEOC's interpretation" therein of Title VII, 42 U.S.C. § 2000e, *et seq.* also exceed the statutory authority granted under Title VII "because, like the PWFA, Title VII does not cover abortion."  [Doc. 1, *Bishops* Lawsuit, ¶ 150].

25-30398.9128

accommodation for the elective abortions of employees that are not necessary to treat a medical condition related to pregnancy.[5] The EEOC's motions seek dismissal of the Plaintiffs' claims in both cases.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts of this case are not disputed. In December 2022, the PWFA was passed into law as part of the year-end consolidated appropriations package. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. 117-328 (2022), 136 Stat. at 6084; 42 U.S.C. §§ 2000gg – 2000gg-6. Aimed at addressing gaps in existing legislation regarding protections for pregnant workers, the PWFA adopts an accommodation regime similar to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, for pregnant workers and adopts the powers, remedies, and procedures of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-4 *et seq.*, as enforcement measures.

Principally, the PWFA requires employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 2000gg-1(1). The PWFA defines "known limitation" as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

---

[5] Specifically, the *States* Plaintiffs seek summary judgment on Counts I-IV in their Complaint, and the *Bishops* Plaintiffs seek summary judgment on Counts I, III, V-VII, and IX-X in their Complaint.

25-30398.9129

In effect, the PWFA prohibits employers from denying employment opportunities due to a covered employee's need for a reasonable accommodation or retaliating against an employee for requesting or using a reasonable accommodation. 42 U.S.C. §§ 2000gg-1(3), (5).  Nor can an employer "require a qualified employee to take leave, whether paid or unpaid, if another reasonable accommodation can be provided to the known limitation."  42 U.S.C. § 2000gg-1(4).  The PWFA adopts the ADA's definitions for "reasonable accommodation" and "undue hardship," as well as the ADA's "interactive process" for determining a proper accommodation.  42 U.S.C. § 2000gg(7).  It also specifically provides that employers cannot "require a qualified employee ... to accept an accommodation other than any reasonable accommodation arrived at through the interactive process."  42 U.S.C. § 2000gg-1(2).  The PWFA's requirements apply to any private employer with 15 or more employees as well as government employers, including the States of Louisiana and Mississippi ("covered entities").  42 U.S.C. § 2000gg.  The PWFA allows private action after administrative remedies are exhausted, and the EEOC has investigative and enforcement powers under the PWFA as it does under Title VII.  42 U.S.C. § 2000gg-2.  Finally, pursuant to Section 5 of the Fourteenth Amendment, the PWFA also specifically waives the Eleventh Amendment immunity of state employers for covered employment-related actions.  42 U.S.C. § 2000gg-4.

As part of the Act, Congress tasked the EEOC with issuing regulations to carry out the PWFA and directed that such regulations "shall provide examples of reasonable accommodations addressing known limitations related to pregnancy,

25-30398.9130

childbirth, or related medical conditions." 42 U.S.C. § 2000gg-3. On August 11, 2023,

the EEOC proposed a rule that would require covered employers – including States

– to accommodate, among other things, elective abortions. 88 Fed. Reg. 54,714 (Aug.

11, 2023) (Proposed Rule). Specifically, the EEOC stated in the proposed rule that

"having ... an abortion" constitutes an "example[] of pregnancy, childbirth, or related

medical condition[]" and that employers are therefore required to provide employees

with reasonable accommodations for abortions under the PWFA (the "abortion

accommodation mandate"). *Id.* Despite widespread opposition,[6] on April 19, 2024,

the EEOC included the contested language in the Final Rule, which defines "related

medical conditions" as "medical conditions relating to ... pregnancy or childbirth," and

provides examples including "termination of pregnancy, including via miscarriage,

stillbirth, or abortion." 29 C.F.R. § 1636.3(b).[7] By inserting the definition of "related

---

[6]    Specifically, more than 54,000 individuals and organizations submitted comments
opposing the Proposed Rule's abortion accommodation mandate, including Plaintiffs
Louisiana, Mississippi, USCCB, and Catholic University.

[7]    29 C.F.R. 1636.3(b) defines "related medical conditions" as follows:

> (b) ***Pregnancy, childbirth, or related medical conditions.*** "Pregnancy"
> and "childbirth" refer to the pregnancy or childbirth of the specific employee
> in question and include, but are not limited to, current pregnancy; past
> pregnancy; potential or intended pregnancy (which can include infertility,
> fertility treatment, and the use of contraception); labor; and childbirth
> (including vaginal and cesarean delivery). "Related medical conditions" are
> medical conditions relating to the pregnancy or childbirth of the specific
> employee in question. The following are examples of conditions that are, or
> may be, "related medical conditions": ***termination of pregnancy,***
> ***including via miscarriage, stillbirth, or abortion***; ectopic pregnancy;
> preterm labor; pelvic prolapse; nerve injuries; cesarean or perineal wound
> infection; maternal cardiometabolic disease; gestational diabetes;
> preeclampsia; HELLP (hemolysis, elevated liver enzymes and low
> platelets) syndrome; hyperemesis gravidarum; anemia; endometriosis;
> sciatica; lumbar lordosis; carpal tunnel syndrome; chronic migraines;

25-30398.9131

medical conditions" from the Final Rule into the PWFA, the EEOC has taken the position that the PWFA requires covered entities to make reasonable accommodations to employees who receive an abortion and prohibits covered entities from taking adverse employment actions against employees who request or use accommodations in relation to receiving an abortion, unless the covered entity is entitled to an exemption or defense.

The *Bishops Plaintiffs* also contend that, while the PWFA incorporates the religious employer exemption from Title VII, *see* 29 C.F.R. § 1636.7(b), the Final Rule declines to adopt a blanket exemption for religious employers.[8]  Instead, the

---

> dehydration; hemorrhoids; nausea or vomiting; edema of the legs, ankles, feet, or fingers; high blood pressure; infection; antenatal (during pregnancy) anxiety, depression, or psychosis; postpartum depression, anxiety, or psychosis; frequent urination; incontinence; loss of balance; vision changes; varicose veins; changes in hormone levels; vaginal bleeding; menstruation; and lactation and conditions related to lactation, such as low milk supply, engorgement, plugged ducts, mastitis, or fungal infections. This list is non-exhaustive.

29 C.F.R. § 1636.3(b) (emphasis added).  Furthermore, the Interpretive Guidance provides the following guidance:

> 18. There are some medical conditions where the relation to pregnancy will be readily apparent. They can include, but are not limited to, lactation (including breastfeeding and pumping), miscarriage, stillbirth, ***having or choosing not to have an abortion***, preeclampsia, gestational diabetes, and HELLP (hemolysis, elevated liver enzymes and low platelets) syndrome.

89 Fed. Reg. 29,191 (emphasis added).

[8]  29 C.F.R. 1636.7(b) provides:

> (b) **Rule of construction.** The PWFA and this part are subject to the applicability to religious employment set forth in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1(a).

25-30398.9132

Interpretive Guidance to the Final Rule explains that the merits of an employer's defense that it took a proscribed action on the basis of religion will be determined on a "case-by-case" basis during the investigative phase. 89 Fed. Reg. 29,146-47. The Interpretive Guidance further explains that the EEOC does not have authority to "provide legally binding responses to employer inquiries about the potential applicability of religious or other defenses before" an individual files a charge of discrimination against a covered entity. *Id.* at 29, 147. Therefore, the Bishops Plaintiffs highlight that the determination of whether an employer has a valid religious exemption cannot occur until after an individual files a charge of discrimination and an EEOC investigation commences.

On May 13, 2024, the *States* Plaintiffs filed the instant lawsuit against the EEOC, asserting that the abortion accommodation mandate of the Final Rule violates the Administrative Procedure Act ("APA") and the Constitution. [Doc. 1, ¶ 82]. In a Motion for Preliminary Injunction filed on June 3, 2024 [Doc. 17], the *States* Plaintiffs challenged the Final Rule with respect to any duty "to accommodate purely elective abortions,[9] including those that would be prohibited by [that] State's law" in light of

---

    (1) Nothing in 42 U.S.C. 2000gg–5(b) or this part should be interpreted to limit a covered entity's rights under the U.S. Constitution.

    (2) Nothing in 42 U.S.C. 2000gg–5(b) or this part should be interpreted to limit an employee's rights under other civil rights statutes.

29 C.F.R. § 1636.7(b).

[9]    The *States* Plaintiffs define "purely elective abortions" as "medically unnecessary abortions in violation of Louisiana and Mississippi law." [Doc. 17-1, p. 15].

state legislation that restricts and limits abortion following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228, 213 L.Ed.2d 545 (2022).[10]

On May 22, 2024, the *Bishops* Plaintiffs filed their Complaint [Doc. 1], along with a Motion for Preliminary Injunction [Doc. 11]. In addition to alleging that the Final Rule exceeds congressional authority in the same manner urged by the States, the *Bishops* Plaintiffs further contend that the Final Rule requires them to knowingly

---

[10] Louisiana prohibits all abortions except those that are determined to be medically necessary to prevent the death or substantial risk of death of the mother. *See* La. R.S. § 40:1061, La. R.S. § 14:87.7, and La. R.S. § 14:87.8.1. The Louisiana Legislature has expressly set forth the State's policy with respect to abortion:

> § 1061.1. Legislative intent; construction of abortion provisions law regulating abortion:
>
> A.(1) It is the intention of the Legislature of Louisiana to regulate, prohibit, or restrict abortion to the fullest extent permitted by the decisions of the Supreme Court of the United States. The legislature does solemnly declare, find, and reaffirm the longstanding public policy of this state that every unborn child is a human being from the moment of conception and is, therefore, a legal person for purposes under the laws of this state and Constitution of Louisiana.
>
> (2) The legislature further finds and declares that the longstanding policy of this state to protect the right to life of every unborn child from conception by prohibiting abortion is impermissible only because of the decisions of the Supreme Court of the United States and that, therefore, if those decisions of the Supreme Court of the United States are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the public policy of this state to prohibit abortions shall be enforced.

La. R.S. § 40:1061.1.

Mississippi prohibits all abortions except those that are "necessary for the preservation of the mother's life" or "where the pregnancy was caused by rape." *See* Miss. Code Ann. § 41-41-45; Miss. Code Ann. § 97-3-3.

---

25-30398.9134

accommodate employees when they obtain abortions, even where such accommodations are contrary to their sincerely held religious beliefs; prohibits the *Bishops* Plaintiffs from taking adverse actions against employees or faculty that advocate for abortion accommodation, even where such actions are required by the *Bishops* Plaintiffs beliefs; and requires the *Bishops* Plaintiffs to change their religious speech and messaging concerning abortion in ways that support abortion. *Id.*

On June 5, 2024, the Court consolidated the *States* and *Bishops* cases pursuant to FRCP 42(a)(2) for purposes of hearing and adjudicating the preliminary injunction motions, and thereafter, jointly conducting pretrial discovery and motions practice. [Doc. 18, *States* Lawsuit]; [Doc. 28, *Bishops* Lawsuit]. On June 17, 2024, after oral argument and the filing of post-hearing memoranda, the Court granted in part the Motions for Preliminary Injunction filed by the *States* and *Bishops* Plaintiffs (the "PI Ruling"). [Doc. 47, *States* Lawsuit]; [Doc. 53, *Bishops* Lawsuit].

The Court's PI Ruling provides a blueprint of the Court's reasoning and analysis of the issues raised in the Motions. While decided under the Rule 65 standard for issuance of a preliminary injunction, the PI Ruling made several findings that are relevant to the instant Motions. Most importantly, the Court found that the Final Rule likely exceeds the EEOC's statutory authority under basic principles of statutory construction, noting that any analysis of the Final Rule must begin with the presumption that Congress's decision <u>not</u> to include any reference to abortion in the PWFA was intentional. And while the PWFA explicitly cross-references provisions of Title VII throughout, the PWFA does not incorporate Title

25-30398.9135

VII's amended pregnancy provision. [Doc. 47, *States* Lawsuit, p. 19]; [Doc. 53, *Bishops* Lawsuit, p. 19] (citations omitted in both). The PI Ruling also found that "[i]f Congress had intended to mandate that employers accommodate elective abortions under the PWFA, it would have spoken clearly when enacting the statute, particularly given the enormous social, religious, and political importance of the abortion issue in our nation at this time (and, indeed, over the past 50 years)." [Doc. 47, *States* Lawsuit, p. 20]; [Doc. 53, *Bishops* Lawsuit, p. 20]. Considering the foregoing, the Court concluded that, from a strictly textual standpoint, there is a complete lack of support for the EEOC's contention that Congress intended for abortion to be defined as a "medical condition" under the PWFA.

For largely the same reasons, the PI Ruling found the abortion accommodation mandate likely violates the "major questions doctrine," finding a lack of evidence in the text of the statute or its legislative history that, "Congress could reasonably be understood to have granted the EEOC the authority to interpret the scope of the PWFA in a way that imposes a nationwide mandate on both public and private employers – irrespective of applicable abortion-related state laws enacted in the wake of *Dobbs* – to provide workplace accommodation for the elective abortions of employees." [Doc. 47, *States* Lawsuit, p. 20]; [Doc. 53, *Bishops* Lawsuit, p. 20]. Accordingly, the Court determined that the EEOC's use of its regulatory power to insert the issue of abortion into a law designed to ensure healthy pregnancies for America's working mothers squarely implicates the "major questions doctrine" as enunciated by the Supreme Court. *EPA*, 597 U.S. at 724. (The major questions

25-30398.9136

doctrine applies when an "agenc[y] assert[s] highly consequential power beyond what Congress could reasonably be understood to have granted"). *Id.*

Specific to the issue of elective abortion, the Court found that,

… Since the Supreme Court decision of *Roe v. Wade* in 1973, abortion has been one of the most important social, religious, and political issues of our time and is a major issue in every federal election. *See Dobbs*, 597 U.S. at 223 ("Abortion presents a profound moral issue on which Americans hold sharply conflicting views."); *Dobbs*, 597 U.S. at 337 ("Abortion is a profoundly difficult and contentious issue because it presents an irreconcilable conflict between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life. The interests on both sides of the abortion issue are extraordinarily weighty.") (Kavanaugh, J, concurring). *See also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 850, 112 S. Ct. 2791, 2806, 120 L.Ed.2d 674 (1992) ("Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage."), *overruled by Dobbs*, 597 U.S. at 302. Indeed, a 2023 Gallup poll reported that a record high 28% of registered voters say they will only vote for candidates for major offices who share their position on abortion. Accordingly, EEOC must point to "clear congressional authorization" to extend the PWFA to impose an abortion accommodation mandate on public and private employers. *Utility Air*, 573 U.S. at 324. Not only is the EEOC unable to point to any language in the PWFA empowering it to mandate the accommodation of elective abortions, but there can be little doubt in today's political environment that any version of the PWFA that included an abortion accommodation requirement would have failed to pass Congress.

[Doc. 47, *States* Lawsuit, pp. 21-22]; [Doc. 53, *Bishops* Lawsuit, pp. 21-22].

With respect to the *States* Plaintiffs specifically, the Court further found that the Final Rule impedes the States' abilities to control their own messaging with respect to abortion, and thereby likely interferes with the States' abilities to enforce their laws and implement the chosen public policies of their citizens:

… [B]ecause the abortion accommodation mandate forces the *States* Plaintiffs to provide (and fund) accommodations for elective abortions

25-30398.9137

that directly conflict with the States' own laws and policies, the abortion accommodation mandate "is destructive of state sovereignty." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985). The people of Louisiana and Mississippi, through their elected representatives, have chosen to enact legislation and promote public policy that is antithetical to the directives of the abortion accommodation mandate. The *States* Plaintiffs therefore adequately demonstrate that they are likely to succeed on their claims that the abortion accommodation mandate violates the principles of federalism and encroaches on state sovereignty.

Finally, although the First Amendment does not confer rights on States, the "Supreme Court has made clear that the government (state and otherwise) has a 'right' to speak on its own behalf." *Missouri v. Biden*, 83 F.4th 350, 372 (5th Cir.), *cert. granted sub nom. Murthy v. Missouri*, 144 S. Ct. 7, 217 L.Ed.2d 178 (2023), *citing Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229, 120 S. Ct. 1346, 146 L.Ed.2d 193 (2000). The abortion accommodation mandate unquestionably impedes on the authority of Louisiana and Mississippi to control their own messaging with respect to the issue of abortion within their borders.

[Doc. 47, *States* Lawsuit, pp. 24-25]; [Doc. 53, *Bishops* Lawsuit, pp. 24-25].

And with respect to the *Bishops* Plaintiffs, the Court concluded that EEOC's failure to include a broad religious exception in the Final Rule likely runs afoul of the PWFA by forcing the *Bishops* Plaintiffs to address religious objections on a case-by-case basis, which – specifically with respect to the abortion accommodation mandate – would likely pose an injurious regulatory burden.  [Doc. 47, *States* Lawsuit, pp. 27-29]; [Doc. 53, *Bishops* Lawsuit, pp. 27-29].

At bottom, and after much deliberation, the Court found no merit to the EEOC's position with respect to its inclusion of the abortion accommodation mandate and the Court granted the respective Plaintiffs' motions, finding:

At its core, this is a textbook case of a federal administrative agency exceeding its statutory authority in a way that both usurps the role of Congress and violates authority vested in the states under the principles

25-30398.9138

of federalism. Considering the foregoing, this Court finds a likelihood of success of the merits that EEOC's textual interpretation of the PWFA to include an abortion accommodation mandate exceeds that agency's Congressional authorization.

[Doc. 47, *States* Lawsuit, p. 24]; [Doc. 53, *Bishops* Lawsuit, p. 24].

Accordingly, the Court postponed the effective date of the Final Rule insofar as it required the Plaintiffs and certain employers in the states of Louisiana and Mississippi to provide accommodation for the elective abortions of employees not necessary to treat a medical condition related to pregnancy. [Doc. 47, *States* Lawsuit, pp. 31-32]; [Doc. 53, *Bishops* Lawsuit, pp. 31-32].[11] It also preliminarily enjoined the EEOC with respect to these entities from: (i) initiating any investigation into claims that a covered employer has failed to accommodate an elective abortion that is not necessary to treat a medical condition related to pregnancy; and (ii) issuing any Notice of Right to Sue with respect to the same.[12] *Id.*

In the Motions now before the Court, the *States* and *Bishops* Plaintiffs seek vacatur of the abortion accommodation provision of the Final Rule and a permanent injunction, while the EEOC seeks dismissal of the Plaintiffs' claims in both cases. All issues having been fully briefed by the parties, and the parties now having provided the Court with the EEOC's administrative record, all issues are ripe for review.

---

[11] The effective date of the Final Rule is June 18, 2024. Final Rule, 89 Fed. Reg. 29096-01.

[12] To avoid any uncertainty, the Court also clarified that terminations of pregnancy or abortions stemming from the underlying treatment of a medical condition related to pregnancy were not affected by the preliminary injunction, as such procedures are clearly "related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4).

25-30398.9139

<u>LAW AND ANALYSIS</u>

## I.     The APA and Summary Judgment

The APA "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 61, 124 S. Ct. 2373, 159 L.Ed.2d 137 (2004), *quoting* 5 U.S.C. § 702.  The Act requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  APA cases are commonly resolved on summary judgment because whether an agency's decision is arbitrary and capricious is a legal question that the court can usually resolve on the agency's administrative record.  *Amin v. Mayorkas*, 24 F.4th 383, 390-91 (5th Cir. 2022).  Thus, the district court's only function is to determine whether, as a matter of law, the evidence in the administrative record permitted the agency's decision.  *Bloch v. Powell*, 227 F. Supp. 2d 25, 30 (D.D.C. 2002).  Because of the district court's limited role, "the standard set forth in Rule 56(c) does not apply" to its summary judgment review in cases brought under the APA.  *Yogi Metals Grp. Inc. v. Garland*, 567 F. Supp. 3d 793, 798 (S.D. Tex. 2021), *aff'd*, 38 F.4th 455 (5th Cir. 2022).  Rather, the court reviews the record only to determine whether the agency: (1) acted within its authority; (2) whether the agency explained its decision; (3) whether the record supports the facts on which the agency relied; and (4) whether the agency relied on the factors intended by Congress.  *Yogi Metals*, 567 F. Supp. 3d at 798, *citing Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.C.C. 1995).  Such cases generally

25-30398.9140

involve pure questions of law, with the district court functionally operating as an appellate tribunal over the agency. *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 741 F. Supp. 3d 568, 597 (N.D. Tex. 2024), *citing MRC Energy Co. v. U.S. Citizenship & Immigr. Servs.*, 2021 WL 1209188, at *3 (N.D. Tex. Mar. 31, 2021).

## II.   Article III Standing

Before any plaintiff may challenge an agency action under the APA, it bears the burden of demonstrating that it has standing to do so. *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019). Specifically, "Article III of the Constitution requires a plaintiff to show that she has suffered an injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Haaland v. Brackeen*, 599 U.S. 255, 291-92, 143 S. Ct. 1609, 216 L.Ed.2d 254 (2023); *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 924 (5th Cir. 2023); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff can demonstrate a cognizable injury in a pre-enforcement challenge only if it establishes that: (1) it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) "there exists a credible threat of prosecution thereunder." *Braidwood*, 70 F.4th at 925, *citing Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S. Ct. 2334, 189 L.Ed.2d 246 (2014). The two key questions in most standing disputes are injury-in-fact and causation. *FDA*, 2024 WL 2964140, at *1. The party or parties invoking the Court's jurisdiction bear the burden of satisfying the Article III requirement by demonstrating that they

25-30398.9141

have standing to adjudicate their claims in federal court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Although the Court discussed and found that the respective Plaintiffs had established standing for purposes of seeking a preliminary injunction, it is required to re-examine the Plaintiffs' standing at the summary judgment stage as well. *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014), *citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992) (the standard used to establish the three elements of standing is not constant but becomes gradually stricter as the parties proceed through "the successive stages of the litigation.").

## A. The *States* Plaintiffs

As they did at the preliminary injunction stage, the *States* Plaintiffs argue they will suffer imminent injury-in-fact should the abortion accommodation mandate of the Final Rule take effect, because of increased regulatory burdens, increased compliance costs under penalty of enforcement actions, and damage to their sovereignty and free speech rights. EEOC argues the *States* Plaintiffs do not have standing because their alleged injuries are too speculative; compliance costs do not establish standing; the Final Rule does not interfere with any State policy; the *States* Plaintiffs have not demonstrated any speech injury; and their injuries are not redressable. The undersigned disagrees.

The Fifth Circuit has made clear that, "[i]f, in a suit challenging the legality of government action, the plaintiff is himself an object of the action, there is ordinarily

Page **17** of **40**

little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019). *See also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) (under the "ordinary rule," a party that is the "object[] of the [r]egulation[] may challenge it."). Indeed, just recently, the Eighth Circuit, addressing the standing of seventeen states that sued the EEOC for APA violations with respect to the same provisions of the Final Rule, held that those states had standing to challenge the Final Rule as directly regulated entities. *State v. Equal Emp. Opportunity Comm'n*, 129 F.4th 452, 458 (8th Cir. 2025). Here, Louisiana and Mississippi – as employers and without the shield of Eleventh Amendment sovereign immunity – are, too, directly regulated by the PWFA and the Final Rule. Specifically, the Final Rule's abortion accommodation, when implemented, will increase the States' regulatory burdens in the form of compliance costs and manpower to change State regulations. 89 Fed. Reg. 29,112–13, 29,182 (EEOC_000098–99, 000168); *see Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 928 (5th Cir. 2023). The moment the mandate takes effect, the States will be forced to change their accommodation policies or face enforcement action. [Doc. 70-2, Schober Decl. ¶ 15]; [Doc. 70-4, Hardwick Decl. ¶¶ 10–12]. This increased burden, alone, is sufficient for standing. *See Contender Farms LLP v. U.S. Dep't of Agriculture*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement.").

Moreover, changing their policies would cost the States, at minimum, an estimated $500 and 120 employee hours in training costs, legal expenses,

25-30398.9143

administrative costs, and productivity losses, a fact proffered by the *States* Plaintiffs in several declarations of State employees. *See, e.g.*, [Doc. 70-2, Schober Decl. ¶¶ 15–18]; [Doc. 70-3, Keen-Schilling Decl. ¶ 7] (explaining that the same compliance costs likely would be borne by "all Louisiana state agencies"); [Doc. 70-4, Hardwick Decl. ¶¶ 10–12]. The Final Rule itself notes such costs arise independently from any accommodation expenses. *See* 89 Fed. Reg. 29,177 ("Administrative costs, which include rule familiarization, posting new EEOC posters, and updating EEO policies and handbooks, represent additional, one-time direct costs to covered entities."). For Article III standing purposes, such compliance costs are classic "pocketbook injury" redressable through a pre-enforcement APA rule challenge. *Collins v. Yellen*, 594 U.S. 220, 243 (2021).

That the EEOC has heretofore been preliminarily enjoined by order of this Court from enacting the Final Rule against the *States* Plaintiffs is of no moment. "Regulated entities that assert likely economic injury have standing even before the challenged regulatory action fully takes effect." *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 293 (3d Cir. 2015), *citing Sierra Club v. Morton*, 405 U.S. 727, 733–34 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing, with or without a specific statutory provision for judicial review.").

Finally, as the Court held in its PI Ruling, "because the abortion accommodation mandate forces the *States* Plaintiffs to provide (and fund) accommodations for elective abortions that directly conflict with the States' own laws

25-30398.9144

and policies, the abortion accommodation mandate 'is destructive of state sovereignty.'" [Doc. 47, *States* Lawsuit, pp. 24-25]; [Doc. 53, *Bishops* Lawsuit, pp. 24-25, both *citing Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985)]. The people of Louisiana and Mississippi, through their elected representatives, have chosen to enact legislation and promote public policy that is antithetical to the directives of the abortion accommodation mandate. Therefore, the *States* Plaintiffs adequately demonstrate that the abortion accommodation mandate violates the principles of federalism and encroaches on state sovereignty. For all of the foregoing reasons, the Court concludes that the *States* Plaintiffs have standing to challenge the abortion accommodation provision of the Final Rule at the summary judgment stage.

### B.    The *Bishops* Plaintiffs

Similarly, the Court previously found that the *Bishops* Plaintiffs had standing to challenge the abortion accommodation mandate of the Final Rule because they were likely to suffer immediate harm to avoid noncompliance by the Final Rule's effective date. Here, again, the *Bishops* Plaintiffs aver that their deeply held religious beliefs will not permit them to comply with the abortion accommodation mandate; they raise statutory and constitutional issues with the mandate under which they are at risk of being prosecuted; they cite EEOC's arguments in this case that any First Amendment and Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*, ("RFRA") exceptions to the Final Rule must be handled on a case-by-case basis; and they argue a legitimate fear of prosecution in light of EEOC's demonstrated violations

25-30398.9145

of Catholic University's religious exemptions in *EEOC v. Catholic Univ.*, 83 F.3d 455, 466 (D.C. Cir. 1996).

Specifically, the *Bishops* Plaintiffs argue that under the abortion accommodation mandate of the Final Rule, they must knowingly violate their sincerely held beliefs regarding what they term the "moral evil" of "direct" abortion or risk liability and face years-long expensive and entangling litigation by both the EEOC and private parties. The *Bishops* Plaintiffs allege immediate harm in that they must take steps to begin complying with the Final Rule – including changing their employment policies and practices, and training employees regarding the new policies and practices – to avoid noncompliance, which could subject them to open-ended liability, investigations, and litigation by applicants, employees, former employees, and the EEOC. [Doc. 1, *Bishops* Lawsuit, ¶ 127].

EEOC argues the *Bishops* Plaintiffs lack standing on grounds that any enforcement threat from EEOC is highly speculative and unlikely given that the *Bishops* Plaintiffs identify no employee who has sought an accommodation or leave for an abortion or who has filed an EEOC charge for the denial of such request, nor have they identified any EEOC enforcement actions brought against any employer in such a circumstance. Thus, EEOC argues the *Bishops* Plaintiffs have presented nothing more than an abstract, unripe claim, for which there is no hardship in declining review in this Court, given their ability to raise all of the same arguments as defenses in the event an employee ever files an EEOC charge.

25-30398.9146

The Fifth Circuit rejected the same argument by the EEOC in *Braidwood*. The *Braidwood* plaintiffs sought a declaratory judgment that EEOC's guidance interpreting statutory prohibitions on sex discrimination to include sexual orientation and gender identity violated RFRA. 70 F.4th at 919-21. Although it was undisputed that the plaintiffs' employment policies facially violated the EEOC's policies, the policies had not been enforced against any individual employee. *Id.* at 921. As it does here, EEOC catalogued a laundry list of hypothetical scenarios necessary for the plaintiffs to adequately allege injury, arguing that, until an employment action culminated in an actual charge filed with the EEOC and EEOC decided to pursue that charge, the plaintiffs could not establish standing. *Id.* at 926. Discrediting EEOC's argument, the Fifth Circuit explained:

> Plaintiffs' credible-threat analysis is quite simple. First, they admit they are breaking EEOC guidance, which the EEOC does not seriously contest. They posit statutory and constitutional issues with the laws under which they are at risk of being prosecuted: Those issues, they allege, are already forcing plaintiffs to choose either to restrict their religious practices or to risk potential penalties. And the EEOC's actions in *Harris*, which the EEOC won under a less violative set of facts, indicate that plaintiffs, too, have a legitimate fear of prosecution, chilling their rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion). Finally, the EEOC refuses to declare affirmatively that it will not enforce Title VII against the plaintiffs' policies on homosexual and transgender behavior.

*Id.* at 926–27. *See also Franciscan All. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022) (where plaintiff refused to offer gender-reassignment surgeries or abortions in violation of an HHS regulation enacted pursuant to the Patient Protection and Affordable Care Act, and HHS steadfastly refused to promise that it would not enforce

25-30398.9147

the Rule, the court held plaintiff had standing to challenge the rule, noting "the loss of freedoms guaranteed by the First Amendment … and RFRA … constitute per se irreparable harm."), *citing Opulent Life Church v. City of Holly Springs.*, 697 F.3d 279, 294 (5th Cir. 2012).

Here, too, the *Bishops* Plaintiffs posit that their deeply held religious beliefs will not permit them to comply with the abortion accommodation mandate and further argue that EEOC's policy of handling RFRA exceptions on a case-by-case basis is an actionable injury that demonstrates standing. In its PI Ruling, the Court concluded that because the EEOC failed to include a broad religious exception to the Final Rule, the *Bishops* Plaintiffs would be forced to litigate any religious objections to the abortion accommodation mandate on a case-by-case basis. The Court concluded that this alone would likely pose an injurious regulatory burden. [Doc. 47, *States* Lawsuit, pp. 27-29]; [Doc. 53, *Bishops* Lawsuit, pp. 27-29]. Thus, because the *Bishops* Plaintiffs are subject to religious exemptions only on a case-by-case basis, and – just like the *States* Plaintiffs – are each entities directly regulated by the PWFA, they likewise have standing under the Final Rule. *See Lujan*, 504 U.S. at 563 ("the 'injury in fact' test requires more than an injury to a cognizable interest … [i]t requires that the party seeking review be himself among the injured."); *State v. EEOC*, 129 F.4th at 457-58 (court held that seventeen states have standing to challenge the Final Rule where they are the object of the EEOC's regulatory action and are employers covered by the PWFA and the Final Rule).

25-30398.9148

### III. APA Claims

As referenced above, the APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Relevant here, in an APA challenge, "the core inquiry" is whether the proposed agency rule is a lawful extension of the statute under which the agency purports to act. *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *rev'd and remanded sub nom. on other grounds, Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). When exercising this duty, the central question is "always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S. Ct. 1863, 185 L.Ed.2d 941 (2013). To answer that question, courts must begin with the statute's text to fulfill the APA's mandate to "determin[e] the meaning of statutory provisions." *Loper Bright Ents. v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 219 L.Ed.2d 832 (2024); *Sackett v. EPA*, 598 U.S. 651, 671, 143 S. Ct. 1322, 215 L.Ed.2d 579 (2023). This inquiry is not mechanical or rigid. Instead, the plain, "ordinary meaning and structure of the law itself" governs. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436, 139 S. Ct. 2356, 204 L.Ed.2d 742 (2019).

#### A. The *States* Plaintiffs

In Count I of their Complaint, the *States* Plaintiffs allege that the Final Rule exceeds statutory authority by treating abortion as a condition of pregnancy. As they did at the PI stage, the parties argue extensively about whether an abortion is a "condition" or a "procedure," and again, the Court concludes that the Plaintiffs have

the stronger position on this argument. The *States* Plaintiffs focus on the words *pregnancy* and *childbirth* – both of which denote the healthy and safe birth of a child – and argue that to interpret the next term in the series – *related medical conditions* – to cover a pregnancy-ending procedure would thus be directly contrary to ordinary *ejusdem generis* principles.[13]

In its briefing, EEOC restates its previous arguments, including its chief textual argument that because Title VII protects employees who choose to have (or not to have) an abortion – and because Congress enacted the PWFA with identical language as Title VII for the express purpose of expanding Title VII's protections – the PWFA must also be understood to protect employees who choose to have (or not to have) an abortion.[14] But EEOC's argument is misplaced for several reasons. First,

---

[13]    "The *ejusdem generis* canon applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics ...." *United States v. Koutsostamatis*, 956 F.3d 301, 308 (5th Cir. 2020), citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012). Where it applies, *ejusdem generis* "limits general terms which follow specific ones to matters similar to those specified." *Koutsostamatis*, 956 F.3d at 308, *citing United States v. Aguilar*, 515 U.S. 593, 615, 115 S. Ct. 2357, 132 L.Ed.2d 520 (1995) (Scalia, J., concurring in part and dissenting in part) (quotation omitted). That is, when a list of specific X's is followed by the catchall phrase "other X's," *ejusdem generis* "implies the addition of *similar* after the word *other*." Scalia & Garner, *supra*, at 199.

[14]    Specifically, EEOC points to Congress's amendment of Title VII in 1978, which clarifies that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" 42 U.S.C. § 2000e(k). In that same subsection, Congress provided that "[t]his subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion." *Id.* EEOC argues that the latter sentence confirms that abortion is included within the preceding statutory phrase "pregnancy, childbirth, or related medical conditions" in Title VII, and that because the same phrasing is used in the PWFA, Congress clearly intended for the PWFA to include accommodation for abortion.

---

25-30398.9150

"[h]ornbook canons of statutory construction require that every word in a statute be interpreted to have meaning, and Congress's use and withholding of terms within a statute is taken to be intentional." *U.S. Chamber of Commerce v. U.S. Dep't of Lab.*, 885 F.3d 360, 381 (5th Cir. 2018). As the Court explained in its June 17, 2024, PI Ruling, "we must begin with the presumption that Congress's decision <u>not</u> to include any reference to abortion in the PWFA was intentional. Indeed, while the PWFA explicitly cross-references provisions of Title VII throughout, the PWFA does not incorporate Title VII's amended pregnancy provision. And although Congress directed that certain terms incorporated within the PWFA from the ADA 'shall be construed as such terms are construed' thereunder, no provision of the PWFA requires incorporation of the 'pregnancy, childbirth, or related medical conditions' language of 42 U.S.C. § 2000e(k)." [Doc. 47, p. 19] (internal citation omitted).[15]

Additionally as the Court pointed out in its PI Ruling, "EEOC rests its [Title VII] argument entirely on its own enforcement guidelines on pregnancy discrimination and two pre-*Dobbs* lower court decisions wherein employers were barred from taking adverse actions against employees because the employees 'contemplated having, or chose to have, an abortion' under Title VII, contending that these two cases comprise 'settled' law on the issue." [Doc. 47, *States* Lawsuit, pp.18-

---

[15] As further support for its textual argument, the *States* Plaintiffs point to several pages of words and their definitions contained within the administrative record – including "adverse;" "affect;" arise;" "relate to;" and "temporary" – but contend that the EEOC did not – and never considered – defining the word "condition." [Doc. 89-3, *States* Lawsuit, pp. 661-678]. The *States* Plaintiffs suggest that the word "condition" cannot be defined in a manner that contemplates the concept of elective abortion.

25-30398.9151

19]; [Doc. 53, *Bishops* Lawsuit, pp. 18-19].  *See also* 89 Fed. Reg. 29,110, 29,152 n.296.[16]  But the Court found that the EEOC's "smattering of lower court opinions" addressing abortion in the context of Title VII hardly qualifies as a judicial consensus "so broad and unquestioned that we must presume Congress knew of and endorsed it." [Doc. 47, *States* Lawsuit, pp.22-23]; [Doc. 53, *Bishops* Lawsuit, pp. 22-23].  *See BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1541 (2021), *citing Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 350-52, 125 S. Ct. 694, 704, 160 L.Ed.2d 708 (2005) (a "supposed judicial consensus" that "boils down to the decisions of two Courts of Appeals" is not sufficiently "broad and unquestioned" to support congressional ratification).

Moreover, EEOC's argument that the fact that Title VII pre-dates *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228, 213 L.Ed.2d 545 (2022) is "irrelevant" to the statutory inquiry is without merit, this Court having fully considered and rejected this argument at the PI stage.  [Doc. 47, *States* Lawsuit, p. 20]; [Doc. 53, *Bishops* Lawsuit, p. 20] ("The Court is therefore not persuaded, on the record before it, that Congress could reasonably be understood to have granted the

---

[16]     *See Enforcement Guidance on Pregnancy Discrimination and Related Issues*, U.S. Equal Employment Opportunity Commission, at (I)(A)(4)(c), n.58 (June 25, 2025), https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues (providing that the term "pregnancy, childbirth, or related medical conditions" includes current pregnancy, past pregnancy, potential or intended pregnancy, and related medical conditions); *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3rd Cir. 2008) (holding that Title VII, as amended by the PDA, prohibits an employer from discriminating against a female employee because she has exercised her right to have an abortion); *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (finding the termination of a pregnant employee because she contemplated having an abortion violated the PDA).

EEOC the authority to interpret the scope of the PWFA in a way that imposes a nationwide mandate on both public and private employers – irrespective of applicable abortion-related state laws enacted in the wake of *Dobbs* – to provide workplace accommodation for the elective abortions of employees."). It is undisputed that Title VII was amended in 1978 to include anti-discrimination protection for pregnancy, childbirth, and related conditions, and that the EEOC's Title VII implementing regulations incorporated the then-constitutional protections of certain abortion procedures as established in *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L.Ed.2d 147 (1973). However, the Court cannot simply ignore the fact that the PWFA was enacted just six months after the Supreme Court decided *Dobbs,* which removed abortion as a constitutional concern and expressly returned the issue to the States. Congress was well aware of the implications of *Dobbs* when it passed the PWFA, and had it wanted to include an abortion accommodation provision in the PWFA, it surely would have done so.

As discussed above, the PI Ruling also found that the Final Rule implicates the "major questions doctrine" as described by the Supreme Court. *See, e.g., W. Virginia v. EPA*, 597 U.S. 697, 723, 142 S. Ct. 2587, 2609, 213 L.Ed.2d 896 (2022) (internal citations omitted) ("Thus, in certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there. To convince us otherwise, something more than a merely plausible textual basis for the agency action is necessary."). As recently explained by the Fifth Circuit, "[i]n its

modern formulation, the major questions doctrine rests on the principle that administrative agencies have no independent constitutional provenance. They 'are creatures of statute. They accordingly possess only the authority that Congress has provided.'" *All. for Fair Bd. Recruitment v. Sec. & Exch. Comm'n*, 125 F.4th 159, 181 (5th Cir. 2024), *citing NFIB v. OSHA*, 595 U.S. 109, 117, 142 S. Ct. 661, 211 L.Ed.2d 448 (2022) (per curiam). "Because [an] agency has no inherent or implied authority, its powers to make major decisions must come only from unequivocal statutory text." *All. for Fair Bd. Recruitment*, 125 F.4th at 181.

Given the political, social, and religious significance of the abortion issue in this country, the PI Ruling explained that EEOC must point to "clear congressional authorization" for the power it claims in the Final Rule.[17] [Doc. 47, *States* Lawsuit, p. 22]; [Doc. 53, *Bishops* Lawsuit, p. 22]. *EPA*, 597 at 723. And as the PI Ruling emphasized, "[n]ot only is the EEOC unable to point to any language in the PWFA empowering it to mandate the accommodation of elective abortions, but there can be little doubt in today's political environment that any version of the PWFA that included an abortion accommodation requirement would have failed to pass Congress." [Doc. 47, *States* Lawsuit, p. 22]; [Doc. 53, *Bishops* Lawsuit, p. 22]. That finding remains true today, and the Court concludes that the EEOC has failed to

---

[17] "[A]n agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L.Ed.2d 369 (1986). *See also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, 102 L.Ed.2d 493 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019) ("To be sure, agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions.").

25-30398.9154

point to clear congressional authorization for the inclusion of abortion protection in a statute intended only to accommodate and protect female employees during pregnancy.

Finally, as the State of Tennessee expressed in its comments to the EEOC's proposed rule, the legislative history of the PWFA provides "extra icing on a cake already frosted," [Doc. 89-2, *States* Lawsuit, pp. 246], and leaves no room for the EEOC's interpretation of the statute. As the Court stated in granting the *States* Plaintiffs a preliminary injunction:

> … [T]he legislative history unambiguously confirms that Congress specifically did not intend for the PWFA to require employers to accommodate abortion. Indeed, lawmakers from both sides of the aisle expressly stated that the PWFA does not address abortion. The Democratic sponsor of the PWFA, Senator Bob Casey, emphasized in response to concerns that abortion might be at issue: "I want to say for the record … that under the [PWFA], the [EEOC] could not – could not – issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Republican Senator Steve Daines similarly noted that "Senator Casey's statement reflects the intent of Congress in advancing the [PWFA] today. This legislation should not be misconstrued by the EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress." 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022). And Republican Senator Bill Cassidy, also a sponsor of the PWFA, likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022). Additionally, after concerns were raised about the PWFA's initial failure to include a religious exemption, Senator Cassidy confirmed on the Senate floor that the PWFA "allows employers to make employment decisions based on firmly held religious beliefs." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

[Doc. 47, *States* Lawsuit, pp. 23-24]; [Doc. 53, *Bishops* Lawsuit, pp. 23-24].

25-30398.9155

Considering the foregoing, the Court concludes that EEOC's interpretation of the PWFA to include an abortion accommodation mandate clearly and unequivocally exceeds its statutory authorization.[18]

## B.     The *Bishops* Plaintiffs

The *Bishops* Plaintiffs seek summary judgment on Counts I, III, V-VII, and IX-X of their Complaint.  Like the *States* Plaintiffs, in Count I of their Complaint, the *Bishops* Plaintiffs allege that the abortion accommodation of the Final Rule violates the canons of statutory textual interpretation and construction, and the EEOC thereby exceeds its statutory authority under the APA.  Because the Court's findings with respect to the textual analysis of the abortion accommodation mandate are equally applicable to the *Bishops* Plaintiffs, who make the same argument, and for the reasons discussed in the previous section, the *Bishops* Plaintiffs are entitled to judgment as a matter of law on Count I of their Complaint.[19]

---

[18]     Because the Court finds that the *States* Plaintiffs are entitled to summary judgment on Count I of their Complaint, and because the remedy for such violation is vacatur of the Final Rule's abortion accommodation provision, the Court need not address Counts II-IV in the *States* Plaintiffs' Complaint.  *See* [Doc. 70-1, p. 32] (noting focus on Count I).  *See also Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 246 (5th Cir. 2023) (finding that because court found Rule was issued without observance of procedure required by law, it was not necessary to reach the plaintiff's alternative issues), *cited in Texas v. Becerra*, 739 F. Supp. 3d 522, 532 (E.D. Tex. 2024), *modified on reconsideration*, 2024 WL 4490621 (E.D. Tex. Aug. 30, 2024) (where court found Final Rule exceeded statutory authority, it was not necessary to consider alternative arguments).

[19]     The *Bishops* Plaintiffs also allege the Final Rule violates the APA inasmuch as it requires accommodation for contraception and "fertility treatment" such as *in vitro* fertilization (IVF) and surrogacy.  29 C.F.R. § 1636.3(b).  *See also* 89 Fed Reg. 29,183.  This issue was not addressed by the Court in its PI Ruling, and the Court declines to address the issue now.  Rather, the Court will conduct a status conference with counsel after the filing of this Ruling to discuss and narrow the issues that remain to be decided.

25-30398.9156

Although the Court's determination that the *Bishops* Plaintiffs are entitled to summary judgment on Count I is sufficient to address the gravamen of their Complaint, the Court also addresses Count III of the *Bishops* Plaintiff's Complaint because the issue was discussed in the Court's PI Ruling. In Count III of their Complaint, the *Bishops* Plaintiffs allege that the EEOC's Final Rule has also unlawfully narrowed the PWFA and Title VII religious exemptions, taking the view that both protect only against claims for religious-based discrimination. 89 Fed. Reg. at 29,146-47 & n.239. To be clear, Title VII includes an exemption for religious employers, 42 U.S.C. § 2000e(j) (defining "religion"), and the text of the PWFA directly incorporates Title VII's religious exemption and makes the entire PWFA "subject to" the exemption. 42 U.S.C. § 2000gg-5(b).[20] While Title VII states: "This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion," 42 U.S.C. § 2000e-1(a), the Final Rule declines to adopt a blanket exemption for religious employers.[21] Instead, the Interpretive Guidance provides that the merits

---

[20]    The religious exception of the PWFA is contained in Section 107(b) and provides as follows:

> (b) Rule of construction. This chapter is subject to the applicability to religious employment set forth in section 2000e-1(a) of this title.

42 U.S.C. § 2000gg-5(b).

[21]    The Final Rule provides:

> (b) ***Rule of construction.*** The PWFA and this part are subject to the applicability to religious employment set forth in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1(a).

25-30398.9157

of an employer's defense that it took a proscribed action on the basis of religion will be determined on a "case-by-case" basis and religious employers may only raise religious defenses – including RFRA, 42 U.S.C. § 2000bb, *et seq.*, and the ministerial exception – if and when a charge is filed against them.  89 Fed. Reg. 29,146-47.[22]

Contesting this view, the *Bishops* Plaintiffs argue that Title VII exempts religious entities from the requirements of the entire "subchapter – *e.g.*, all of Title VII, not merely one category of claims – protecting religious employers from *any* Title VII claim if an employer made an employment decision based on an individual's particular religious belief, observance, or practice."  *See, e.g., EEOC v. Mississippi*

---

(1) Nothing in 42 U.S.C. 2000gg–5(b) or this part should be interpreted to limit a covered entity's rights under the U.S. Constitution.

(2) Nothing in 42 U.S.C. 2000gg–5(b) or this part should be interpreted to limit an employee's rights under other civil rights statutes.

29 C.F.R. § 1636.7(b).

[22]     The Interpretive Guidance of the Final Rule explains:

Under the Commission's interpretation of section 107(b), the PWFA does not fully exempt qualifying religious organizations from making reasonable accommodations.  This is analogous to section 702(a), which likewise does not operate as a total exemption from Title VII's requirements.

Under section 702(a), for example, qualifying religious organizations are exempt from Title VII's prohibition against discrimination on the basis of religion, but, as U.S. courts of appeals have recognized, qualifying religious organizations are still subject to the law's prohibitions against discrimination on the basis of race, color, sex, and national origin, and they may not engage in related retaliation. If a qualifying religious organization asserts as a defense to a claim under the PWFA that it took the challenged action on the basis of religion and that section 107(b) should apply, the merits of any such asserted defense will therefore be determined on a case-by-case basis consistent with the facts presented and applicable law.

Final Rule, 29096-01, 29146-47 (internal citation omitted).

25-30398.9158

*Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980) (barring a sex-discrimination investigation under Title VII where a religious employer "applied its policy of preferring Baptists over non-Baptists."); *Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 132 (3d Cir. 2006) (religious exemption bars sex-discrimination claim); *Bear Creek Bible Church v. Equal Employment Opportunity Commission*, 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021) ("The plain text of [the religious] exemption" bars sex-discrimination claims "when [a religious employer] refuses to employ an individual … based on religious observance, practice, or belief), *aff'd in part and vacated in part by Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914 (5th Cir. 2023). That is, the *Bishops* Plaintiffs argue the Final Rule violates the protections for religious employers that Congress included in the statute itself.

In its PI Ruling, the Court found that this "case-by-case" religious exemption in the Final Rule provided the *Bishops* Plaintiffs with standing to challenge the abortion accommodation mandate of the Final Rule. The lawfulness of scope of the Final Rule's religious exemption within the purview of the Court's limited grant of authority under the APA, however, is a separate issue that the Court is ill-equipped to address on the briefs before it – especially given the recent change in the administration and resulting statement of Andrea Lucas, Acting Commissioner of the EEOC. *See Position of Acting Chair Lucas Regarding the Commission's Final Regulations Implementing the Pregnant Workers Fairness Act*, U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/wysk/position-acting-chair-lucas-regarding-commissions-final-regulations-implementing-pregnant (last

Page **34** of **40**

25-30398.9159

visited May 20, 2025).  For this reason, the Court declines to enter judgment at this juncture on Count III of the *Bishops* Plaintiffs' Complaint.[23]

## IV.    Vacatur

The APA specifically "empowers and commands courts to 'set aside' unlawful agency actions," 5 U.S. § 706(2), allowing a district court's vacatur to render a challenged agency action "void."  *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 110 F.4th 762, 779 (5th Cir. 2024), *citing Texas v. Biden*, 20 F.4th 928, 957 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785, 142 S. Ct. 2528, 213 L.Ed.2d 956 (2022), *quoting* 5 U.S.C. § 706.  Binding Fifth Circuit precedent recognizes this remedy.  *Texas Med. Ass'n*, 110 F.4th at 779, *citing Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846, 856 n.2 (holding that *Texas v. Biden* "remains binding" "except for the portions of it on statutory interpretation and final agency action"); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").

When awarding relief under Section 706(2), the Court may fashion the remedy in one of two ways: remand the Rule with vacatur or remand the Rule without vacatur.  *Texas v. United States*, 50 F.4th 498, 529–30 (5th Cir. 2022). As the Fifth Circuit has explained, the default rule is to vacate and remand the unlawful agency

---

[23]    Because the Court finds that the *Bishops* Plaintiffs are entitled to summary judgment on Count I of their Complaint, and because the remedy for such violation is vacatur of the Final Rule's abortion accommodation mandate, the Court declines to address the remaining counts in the *Bishops* Plaintiffs' Complaint at this juncture.

25-30398.9160

action.  *Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022).  Remand without vacatur, on the other hand, is an "exceptional remedy" that courts may provide in exercising their discretion.  *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020); *Brown v. U.S. Dep't of Educ.*, No. 4:22-CV-0908, 640 F.Supp.3d 644, 667–68 (N.D. Tex. Nov. 10, 2022).  Remand with vacatur "re-establish[es] the status quo" before the unlawful agency action took place. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022).  Remand without vacatur, however, "leaves the rule in place during remand." *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 43 (D.D.C. 2013).  Consequently, "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015).  As such, remand without vacatur is appropriate only "when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021), *quoting Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).  Here, the Court determines that remand with vacatur is required.

Notwithstanding the foregoing, "[i]f vacatur is sufficient to address the injury, it is improper to also issue an injunction. *Texas v. United States*, 606 F. Supp. 3d 437, 501 (S.D. Tex. 2022), *rev'd*, 599 U.S. 670, 143 S. Ct. 1964, 216 L.Ed.2d 624 (2023), *citing Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66, 130 S. Ct. 2743, 2761, 177 L.Ed.2d 461 (2010) ("An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course ... If a less drastic remedy (such as

25-30398.9161

partial or complete vacatur of [the agency's] deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted."). It is equally clear that the scope of ultimate relief under Section 706 is not party-restricted, but rather directs federal courts to wholly "set aside" unlawful agency action. *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted in part sub nom. Dep't of Educ. v. Career Colleges & Sch. of Texas*, 145 S. Ct. 1039, 220 L.Ed.2d 375 (2025). *See also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021) (where court stayed OSHA's vaccine mandate without party limitation); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed.").

In the instant action, both the *States* and *Bishops* Plaintiffs seek vacatur of the abortion accommodation provision of the Final Rule "without limitation," that is, on a nationwide basis, as well as a permanent injunction. But because this case is only cognizable in this Court pursuant to the statutory authorization granted to it by the APA, and because vacatur and remand of the abortion accommodation mandate and the Interpretive Guidance of the Final Rule will remedy the parties' injuries, a permanent injunction is neither required nor permitted upon the showing made by the Plaintiffs. The Court therefore finds that only vacatur of the abortion accommodation mandate and remand to the EEOC is appropriate at this stage. Any

25-30398.9162

further relief requested by the parties will be addressed at a status conference scheduled herein.

<u>O</u>RDER AND <u>R</u>EMEDY

Considering the foregoing,

IT IS HEREBY ORDERED that the MOTION FOR SUMMARY JUDGMENT [Doc. 70] filed by the *States* Plaintiffs in the matter entitled *State of Louisiana, et al v. EEOC*, No. 2:24-cv-00629-DCJ-TPL, and the MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION [Doc. 77] filed by the *Bishops* Plaintiffs in the matter entitled *United States Conference of Catholic Bishops, et al v. EEOC, et al*, No. 2:24-cv-00691-DCJ-TPL, are hereby GRANTED IN PART, and the following provision of the Final Rule, to the extent that it includes "abortion" as a "related medical condition" of pregnancy and childbirth, is hereby VACATED:

29 C.F.R. 1636.3(b) defines "related medical conditions" as follows:

(b) ***Pregnancy, childbirth, or related medical conditions.*** "Pregnancy" and "childbirth" refer to the pregnancy or childbirth of the specific employee in question and include, but are not limited to, current pregnancy; past pregnancy; potential or intended pregnancy (which can include infertility, fertility treatment, and the use of contraception); labor; and childbirth (including vaginal and cesarean delivery). "Related medical conditions" are medical conditions relating to the pregnancy or childbirth of the specific employee in question. The following are examples of conditions that are, or may be, "related medical conditions": ***termination of pregnancy, including via miscarriage, stillbirth, or abortion***; ectopic pregnancy; preterm labor; pelvic prolapse; nerve injuries; cesarean or perineal wound infection; maternal cardiometabolic disease; gestational diabetes; preeclampsia; HELLP (hemolysis, elevated liver enzymes and low platelets) syndrome; hyperemesis gravidarum; anemia; endometriosis; sciatica; lumbar lordosis; carpal tunnel syndrome; chronic migraines; dehydration; hemorrhoids; nausea or vomiting; edema of the legs, ankles, feet, or fingers; high

> blood pressure; infection; antenatal (during pregnancy) anxiety, depression, or psychosis; postpartum depression, anxiety, or psychosis; frequent urination; incontinence; loss of balance; vision changes; varicose veins; changes in hormone levels; vaginal bleeding; menstruation; and lactation and conditions related to lactation, such as low milk supply, engorgement, plugged ducts, mastitis, or fungal infections. This list is non-exhaustive.

29 C.F.R. § 1636.3(b) (emphasis added).

IT IS FURTHER ORDERED that any Implementing Regulations or Guidance that are inconsistent with this Order, that is, to the extent that they require or suggest to employers that they are required to provide employees with accommodation for purely elective abortions that are not necessary to treat a medical condition related to pregnancy,[24] are also hereby VACATED and immediately without effect.

IT IS FURTHER ORDERED that the MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT [Doc. 68] filed by the EEOC in the matter entitled *State of Louisiana, et al v. EEOC*, No. 2:24-cv-00629-DCJ-TPL, and the MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT [Doc. 75] filed by the EEOC in the matter entitled *United States Conference of Catholic Bishops, et al v. EEOC, et al*, No. 2:24-cv-00691-DCJ-TPL, are hereby DENIED.

---

[24] To avoid any uncertainty, terminations of pregnancy or abortions stemming from the underlying treatment of a medical condition related to pregnancy are not affected by this Order. Such procedures are clearly "related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4). Covered employers are therefore required to provide accommodation to the extent set forth in the PWFA.

IT IS FURTHER ORDERED that the Preliminary Injunction, [Doc. 47, *States* Lawsuit]; [Doc. 53, *Bishops* Lawsuit], currently in place in these matters shall remain in place until final dismissal of these matters or further order of the Court.

IT IS FURTHER ORDERED that the Court will conduct an in-person status conference with the parties on June 17, 2025, at 10:00 a.m. to discuss de-consolidation of the above-captioned matters, resolution of additional discreet issues raised by the *Bishops* Plaintiffs alone, and the creation of any necessary briefing schedule to address those issues.

IT IS FURTHER ORDERED that the Court finds that there is no just reason for delaying entry of final judgment on the vacatur and remand ordered herein. This Memorandum Order therefore constitutes a FRCP 54(b) partial final and appealable judgment as to the abortion accommodation mandate VACATED herein, and the FINAL RULE is therefore REMANDED to the EEOC for action consistent with the Court's findings.

THUS, DONE AND SIGNED in Chambers on this 21st day of May 2025.

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE

25-30398.9165

# Tab 6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| **THE STATE OF LOUISIANA,**<br>**ET AL** | **CIVIL DOCKET NO. 2:24-cv-00629** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **EQUAL EMPLOYMENT**<br>**OPPORTUNITY COMMISSION** | **MAGISTRATE JUDGE THOMAS P.**<br>**LEBLANC** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **UNITED STATES CONFERENCE OF**<br>**CATHOLIC BISHOPS, ET AL** | **CIVIL DOCKET NO. 2:24-cv-00691** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **EQUAL EMPLOYMENT**<br>**OPPORTUNITY COMMISSION,**<br>**ET AL** | **MAGISTRATE JUDGE THOMAS P.**<br>**LEBLANC** |

## FRCP 54(b) PARTIAL FINAL JUDGMENT

Pursuant to FRCP 54(b), and in accordance with the Court's Memorandum Orders filed this date in the above-captioned matters, [Doc. 107, *State of Louisiana, et al v. EEOC*, No. 2:24-cv-00629-DCJ-TPL] [Doc. 113, *United States Conference of Catholic Bishops, et al v. EEOC, et al*, No. 2:24-cv-00691-DCJ-TPL],

IT IS HEREBY ORDERED that the MOTION FOR SUMMARY JUDGMENT [Doc. 70] filed by the *States* Plaintiffs in the matter entitled *State of Louisiana, et al v. EEOC*, No. 2:24-cv-00629-DCJ-TPL, and the MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION [Doc. 77] filed by the *Bishops* Plaintiffs in the matter entitled *United States Conference of Catholic Bishops, et al v. EEOC, et al*,

No. 2:24-cv-00691-DCJ-TPL, are hereby GRANTED IN PART, and the following provision of the Final Rule, to the extent that it includes "abortion" as a "related medical condition" of pregnancy and childbirth, is hereby VACATED:

> 29 C.F.R. 1636.3(b) defines "related medical conditions" as follows:
>
> (b) **Pregnancy, childbirth, or related medical conditions.** "Pregnancy" and "childbirth" refer to the pregnancy or childbirth of the specific employee in question and include, but are not limited to, current pregnancy; past pregnancy; potential or intended pregnancy (which can include infertility, fertility treatment, and the use of contraception); labor; and childbirth (including vaginal and cesarean delivery). "Related medical conditions" are medical conditions relating to the pregnancy or childbirth of the specific employee in question. The following are examples of conditions that are, or may be, "related medical conditions": **termination of pregnancy, including via miscarriage, stillbirth, or abortion**; ectopic pregnancy; preterm labor; pelvic prolapse; nerve injuries; cesarean or perineal wound infection; maternal cardiometabolic disease; gestational diabetes; preeclampsia; HELLP (hemolysis, elevated liver enzymes and low platelets) syndrome; hyperemesis gravidarum; anemia; endometriosis; sciatica; lumbar lordosis; carpal tunnel syndrome; chronic migraines; dehydration; hemorrhoids; nausea or vomiting; edema of the legs, ankles, feet, or fingers; high blood pressure; infection; antenatal (during pregnancy) anxiety, depression, or psychosis; postpartum depression, anxiety, or psychosis; frequent urination; incontinence; loss of balance; vision changes; varicose veins; changes in hormone levels; vaginal bleeding; menstruation; and lactation and conditions related to lactation, such as low milk supply, engorgement, plugged ducts, mastitis, or fungal infections. This list is non-exhaustive.

29 C.F.R. § 1636.3(b) (emphasis added).

IT IS FURTHER ORDERED that any Implementing Regulations or Guidance that are inconsistent with this Order, that is, to the extent that they require or suggest to employers that they are required to provide employees with accommodation for purely elective abortions that are not necessary to treat a medical

condition related to pregnancy,[1] are also hereby VACATED and immediately without effect.

IT IS FURTHER ORDERED that the Court finds no just reason for delaying entry of final judgment on the partial vacatur and remand ordered herein, and that this Judgment therefore constitutes a FRCP 54(b) partial final and appealable judgment. The FINAL RULE is therefore REMANDED to the EEOC for action consistent with the Court's findings. The Court retains jurisdiction over all remaining claims and issues not resolved by this Judgment.

THUS, DONE AND SIGNED in Chambers on this 21st day of May 2025.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE

---

[1] To avoid any uncertainty, terminations of pregnancy or abortions stemming from the underlying treatment of a medical condition related to pregnancy are not affected by this Order. Such procedures are clearly "related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4). Covered employers are therefore required to provide accommodation to the extent set forth in the PWFA.

# Tab 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

|  |  |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, et al., | No. 2:24-cv-691-DCJ-TPL |
| *Plaintiffs,* | Judge David C. Joseph |
| v. | Magistrate Judge Thomas P. LeBlanc |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al., | |
| *Defendants.* | |

## BISHOPS PLAINTIFFS' NOTICE OF APPEAL

Notice is hereby given that Plaintiffs the United States Conference of Catholic Bishops, the Society of the Roman Catholic Church of the Diocese of Lake Charles, the Society of the Roman Catholic Church of the Diocese of Lafayette, and The Catholic University of America hereby appeal to the United States Court of Appeals for the Fifth Circuit from the Court's Order (ECF No. 113) granting in part Plaintiffs' Motion for Partial Summary Judgment and Permanent Injunction and the Court's Rule 54(b) Partial Final Judgment (ECF No. 114), both entered in this action on May 21, 2025.

Respectfully submitted,

/s/ Daniel H. Blomberg

| | |
|---|---|
| Jonathan Berry | Daniel H. Blomberg |
| (W.D. La. Temporary Bar No. 918121) | (W.D. La. Temporary Bar No. 918117) |
| James R. Conde | *Trial Attorney* |
| (W.D. La. Temporary Bar No. 918116) | /s/ Michael J. O'Brien |
| Boyden Gray PLLC | Michael J. O'Brien |
| 800 Connecticut Ave. NW, Suite 900 | (LA Bar No. 38852) |
| Washington, DC 20006 | Laura Wolk Slavis |
| Phone: (202) 955-0620 | (W.D. La. Temporary Bar No. 918118) |
| Fax: (202) 955-0621 | Andrea R. Butler |
| jberry@boydengray.com | (W.D. La. Temporary Bar No. 918119) |
| | Jordan T. Varberg |

1

(W.D. La. Temporary Bar No. 918120)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Phone: (202) 955-0095
Fax: (202) 955-0090
dblomberg@becketfund.org

*Counsel for Bishops Plaintiffs*

Dated: July 15, 2024

2

25-30398.9188

# CERTIFICATE OF COMPLIANCE

This notice of appeal complies with the requirements of Fed. R. App. P. 3 and 5th Cir. R. 3.

/s/ Daniel H. Blomberg

Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918117)
  *Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
  (LA Bar No. 38852)

Dated: July 15, 2025

3

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, the foregoing was served on counsel for all parties via the Court's CM/ECF system.

/s/ Daniel H. Blomberg
Daniel H. Blomberg
  (W.D. La. Temporary Bar No. 918117)
*Trial Attorney*
/s/ Michael J. O'Brien
Michael J. O'Brien
  (LA Bar No. 38852)

Dated: July 15, 2025

25-30398.9190

**CERTIFICATE OF SERVICE**

I certify that on May 18, 2026, I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record who are registered CM/ECF users will be served by the court's electronic filing system.

/s/ *Daniel H. Blomberg*
Daniel H. Blomberg